```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3     United States of America,        )
                                        ) Criminal Action
 4                    Plaintiff,        ) No. 21-cr-661
                                        )
 5     vs.                              ) JURY TRIAL - Day 10
                                        )
 6     Jeffrey M. Young-Bey,            ) Washington, DC
       Martina Yolanda Jones,           ) February 6, 2024
 7                                      ) Time:  9:10 a.m.
                      Defendants.       )
 8     _____

 9                    TRANSCRIPT OF JURY TRIAL
                           HELD BEFORE
10          THE HONORABLE JUDGE COLLEEN KOLLAR-KOTELLY
                   UNITED STATES DISTRICT JUDGE
11     _____

12                     A P P E A R A N C E S

13     For Plaintiff:      Christopher R. Howland
                           Kevin L. Rosenberg
14                         U.S. ATTORNEY'S OFFICE--DISTRICT OF COLUMBIA
                           601 D Street NW, Room 5-1529
15                         Washington DC, DC 20530
                           (202) 252-7106
16                         Email:  Christopher.howland@usdoj.gov
                           Email:  Kevin.rosenberg@usdoj.gov
17     For Defendant
         Young-Bey:        Glenn Donath
18                         Catrina Crittenden
                           Joshua G. Berman
19                         CLIFFORD CHANCE
                           2001 K Street, NW, Suite 9th Floor
20                         Washington DC, DC 20006
                           (202) 912-5000
21                         Email:  Glen.donath@cliffordchance.com
                           Email:  Catrina.crittenden@cliffordchance.com
22                         Email:  Joshua.berman@cliffordchance.com

23       Jones:            Robert A. Feitel
                           LAW OFFICE OF ROBERT FEITEL
24                         1300 Pennsylvania Avenue NW, Suite 1505
                           Washington, DC 20008
25                         (202) 255-6637
                           Email:  Rf@rfeitellaw.com
```

```
1    Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
                              Official Court Reporter
2                             United States Courthouse, Room 6523
                              333 Constitution Avenue, NW
3                             Washington, DC  20001
                              202-354-3267
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1          *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *

2                    THE COURT:  Good morning, everyone.

3                    THE COURTROOM DEPUTY:  Criminal case 21-661, the

4          United States of America versus Jeffrey Young-Bey and Martina

5          Jones.

6                    Counsel, would you please identify yourself for the

7          record.

8                    MR. HOWLAND:  Good morning, Your Honor.  Christopher

9          Howland and Kevin Rosenberg for the United States.

10                   THE COURT:  Good morning.

11                   MR. DONATH:  Good morning, Your Honor.  Glenn Donath

12         for Mr. Young-Bey, who is present, with Josh Berman and Catrina

13         Crittenden.

14                   THE COURT:  Good morning, everyone.

15                   MR. FEITEL:  Good morning.  Robert Feitel for

16         Ms. Jones.  And we're ready to proceed this morning.

17                   THE COURT:  Good morning.  I didn't get any missive,

18         so we have the instructions as we have them.

19                   MR. DONATH:  Your Honor, the instructions, we did

20         have one issue we wanted to raise before the government's

21         rebuttal, which is we just received the government's PowerPoint

22         a few minutes ago and it makes reference -- there's a

23         PowerPoint with the court -- sorry, the unofficial --

24                   THE COURT:  Start again.  What's the issue?

25                   MR. DONATH:  The government's PowerPoint has
```

1    citations to the transcript, the unofficial draft transcript,

2    the dailies we received every night.  We don't think that's

3    appropriate, to put the actual excerpt before the jury, when

4    it's not the official transcript.

5           THE COURT:  Generally we do not quote from

6    transcripts.  If you want to take off -- you know, indicate

7    something that does not have the quotes on it.  And you

8    probably used a few of them in yours.  But, at any rate,

9    generally we don't.  It is an unofficial one at this point.

10          MR. ROSENBERG:  Sure, Your Honor.

11          THE COURT:  It also means that they're tending --

12   they tend to then ask, if we start using the transcript, for

13   transcripts.

14          MR. ROSENBERG:  Sure.  I think part of the issue was

15   that yesterday counsel told them, probably 15 times, that they

16   would be able to review the transcripts and acted as if they

17   could actually read them, and then made --

18          THE COURT:  Well, I corrected that, hopefully.

19          MR. ROSENBERG:  Understood.  I can take that off,

20   Your Honor.  But considering some of the misrepresentations

21   about the facts, I would like to reference what was said in the

22   transcript.

23          THE COURT:  Well, you can reference it without saying

24   something in the transcript.

25          MR. ROSENBERG:  Sure.

1          THE COURT:  Without saying it's in the transcript.  I

2     think there's -- you know, there's a problem with it.  It is

3     correct -- and, defense counsel, you made a bad mistake there.

4     I corrected it in one instance because I wasn't constantly

5     wanting to interrupt you.  But, that just simply opens it up

6     to -- and there is a way, a method, if they ask for it, of

7     doing it.  But we're better off not doing it.  But, you sort of

8     opened the door.

9          The problem is, as I said, if you continue to use it,

10    they will ask for it.  Because I said at the beginning, it

11    takes time to, you know, to prepare it.

12          MR. ROSENBERG:  Your Honor, I can take that

13    screenshot from --

14          THE COURT:  Or you could simply say that, you know --

15    let me think about it.  Maybe what I could say is -- I can say

16    that there is not an official transcript that's available to

17    the jury, so they don't think that before we start.  That there

18    are -- that there may be some unofficial transcripts that have

19    not been completed, or something to that effect.  But how

20    much -- how many quotes do you have?

21          MR. ROSENBERG:  One.  One.

22          THE COURT:  Oh, okay.

23          MR. ROSENBERG:  And, Your Honor --

24          THE COURT:  What is it?

25          MR. ROSENBERG:  Oh, it's Ms. Conn's testimony, where

1    she said if somebody wants to buy a deed, they can buy it on

2    site for $2.50, it's regulated by D.C. code.  I'm not even

3    paraphrasing or rephrasing, it's just that.

4              THE COURT:  It's obvious it's a transcript.  I would

5    not show it.  I mean, if you had it, this is what she said, you

6    know, then I don't have a real problem with it.  But, I think

7    if you actually put the transcript out, then we're -- then we

8    do get into a problem because then it truly is using the

9    unofficial.

10             MR. ROSENBERG:  That's no problem.

11             THE COURT:  I don't have a problem with people double

12   checking to make sure they're accurate with it.

13             MR. ROSENBERG:  I can take that image off of the

14   PowerPoint, that's no problem, Judge.

15             THE COURT:  All right.  Why don't we do it that way.

16             MR. ROSENBERG:  Thank you.

17             THE COURT:  I may say something to them, that there

18   is no official transcript at the end, that, you know, obviously

19   the court reporters have been working on it, but we don't have

20   something officially.

21             MR. ROSENBERG:  Of course.  Thanks, Judge.

22             THE COURT:  Anything else?

23             MR. DONATH:  Not from defense.

24             THE COURT:  Okay.  We have a few people that are

25   missing, so I think what I'm going to do, I'll get off the

1    bench and as soon as we have everybody, I'll be right back out.

2          Do you have some sense of -- I realize that asking

3    is -- I usually double it, but I must say, I should have

4    tripled it yesterday.  I'm trying to just sort of think of it

5    in the context of -- you should be aware, actually, before I

6    get off the bench.

7          Their lunches are usually 12:30, Dorothy, is that

8    correct?

9          THE COURTROOM DEPUTY:  Yes.

10          THE COURT:  So they bring a lunch up, so they eat in

11   the jury room, but are told not to, you know, deliberate during

12   that period of time.  So it's not the 1 o'clock.  So I'm going

13   to need to, you know, make sure that we have -- they can,

14   obviously, be held later than that, but we will be breaking

15   shortly after 12:30, not 1, for the -- and I will get contact

16   information.  Do we have whatever needs to be taken?  There's a

17   thumb drive or whatever that they used back there for the

18   exhibits?

19          MR. ROSENBERG:  From the government, yes, Your Honor.

20          THE COURT:  Okay.  Do you have something from your

21   end?  Or give them paper?  I mean, they can electronically put

22   the exhibits up?

23          MR. DONATH:  Yes.

24          THE COURT:  What do you have?  Paper?  You don't --

25          MR. DONATH:  They have paper from us, Your Honor,

1    yes.

2            THE COURT:  All right.  Then just make sure that

3    defense counsel -- the government has taken a look at it before

4    it goes back.

5            MR. ROSENBERG:  Of course, Your Honor.

6            Well, while we're waiting here, let me give the rest

7    of the instructions I will give at the end.  I do need to have

8    a cell phone or something.  I'm not going to call everybody.

9    One attorney, you're responsible for your clients coming.  One

10   attorney for the government.  I don't want to get a voicemail

11   at the other end, so give me something that somebody answers.

12           What we do is we keep track of the notes.  The notes

13   may say we need pens or we need something else, I'm not going

14   to bother calling you about them.  I'll keep them and read them

15   into the record at the end.  There may be some that a simple

16   answer can be done, in which case I may -- we'll call you, tell

17   you -- I'll tell you what I'm suggesting we send back, and if

18   you all agree, I'll just send it back, instead of having to get

19   everybody back in the courtroom.  If it's a more complicated

20   thing, then obviously we're going back.  But we can send notes.

21   And then I read all of their notes and whatever answers.

22           I also tell them that if they take breaks, you know,

23   for restrooms or when they're eating or whatever else, they

24   should keep track of that, so we have some sense of how long

25   they're deliberating and also to make sure that they actually

1   deliberate when everybody is there, not do it when people are

2   there and some people aren't, in terms of doing it.

3           I can't think of anything else.  I think that's it.

4           I don't require you, assuming it goes until

5   tomorrow -- which it may or may not -- I don't require you to

6   come in the morning.  You know, whatever we have to hear, we'll

7   keep track, you can call in and we'll tell you they're all here

8   and ready.

9           At the end of the day I do require you to come back

10  because sometimes we get notes just as they're leaving, or the

11  verdict.  I have an executive session at 4:30 today, so I'm

12  going to have you probably come around 4:15 and we'll, you

13  know, we'll bring them in and excuse you, excuse them.  I can

14  do it just before 4:30, since the meeting is in the building.

15          I think that's it.  We should probably just check and

16  see if everybody is here by now.

17          (Pause.)

18          THE COURTROOM DEPUTY:  Are you ready, Judge?

19          THE COURT:  Yes.

20          (Whereupon the jurors enter the courtroom.)

21          THE COURT:  Good morning, members of the jury.

22          THE JURORS:  Good morning.

23          THE COURT:  We're ready to proceed.  We'll be having

24  the rebuttal argument from the government and then we'll have

25  the jury instructions.

1          So, Counsel, please proceed.

2          MR. ROSENBERG:  Defense counsel, Your Honor.

3          THE COURT:  Everybody in the gallery understands

4     you're not supposed to be recording anything.

5          Go ahead.

6          MR. ROSENBERG:  This happened during my opening also,

7     Your Honor.

8          THE COURT:  No, not to the court reporter, but the

9     gallery, in terms of the rest.

10          MR. ROSENBERG:  Thank you, Your Honor.

11          Well, members of the jury, yesterday was interesting.

12     Check that.  And I don't want to use this word lightly; it was

13     absurd.  To sit here and listen for an hour and 45 minutes as

14     Mr. Young-Bey's trial team just invented facts out of thin air

15     and threw them at you with no evidentiary basis was absurd.  To

16     hear an officer of the court, as part of a closing argument,

17     belittle the Rules of Evidence as mere technicalities for why

18     unsubstantiated hearsay can't be thrown in front of you is

19     absurd.

20          To hear conspiracy theories, baseless, about a

21     shadowy figure named Joseph Lowery who apparently, according to

22     the defense theory, had set up a long con.  He apparently,

23     according to their theory, set up fake email accounts in 2015,

24     targeted an unemployed middle-aged man, all with the goal of --

25     get this -- not enriching himself, but getting that man

1    $500,000 and two BMWs.

2             How does any of that make sense?  And the response

3    is, you know, who doesn't show his face?  Joseph Lowery.  Do

4    you know what that's code for?  There's no evidence that he was

5    involved in anything.

6             To hear defense counsel insinuate that Amy Conn from

7    the D.C. Recorder of Deeds destroyed evidence to cover

8    something up is absurd.  To hear the Jelanis' son, who has

9    mental health issues, get smeared in court and say that he, you

10   know, without any evidence -- any evidence -- he signed over

11   these deeds, he accepted money, that's how it made it to

12   Mr. Young-Bey, without any evidence.  Again, absurd.

13            To hear from Mr. Young-Bey's childhood buddies about

14   meetings at Busboys and Poets, with no evidence.  To hear them

15   come in and testify about three-minute meetings that allegedly

16   took place four years ago and then perform an in-court

17   identification on one photo and say, Yep, that's him, that's

18   who I saw in 2019, for three minutes, briefly, that's him, I

19   know it.  Absurd.  Absurd.  The government couldn't do that in

20   an identification.  That's testimony you can't rely on.

21            To hear the way -- Mr. Young-Bey's theory about the

22   12th Street property, that he was tricked by Joseph Lowery,

23   that he then thought he was -- he actually had purchased the

24   home.  And in that deal it was him using his phone and email to

25   communicate with Jason Balin and the title company.  And then

1     hear how it just can't match up at all with the facts of the

2     Bryant Street property is, again, absurd.

3            To say that he was involved in Shepherd Park because

4     he was relying on the shadowy figure -- for which you've heard

5     no evidence.  But for Bryant Street, his email was actually

6     used by that shadowy figure.  And he had no idea about that

7     one, but he just took $130,000 and bought a BMW.  Again, ladies

8     and gentlemen, this is absurd.

9            As convincing as the argument was yesterday and as

10    sincere as it sounds and as believable as it sounds and as

11    skilled as it sounds, the one skill that Mr. Young-Bey's five

12    defense attorneys here do not have is they can't pick evidence

13    out of the air.  They can't speak it into being.  They can't

14    just speak into being that Riyad Jelani did anything.  They

15    can't speak into being that Mr. Young-Bey purchased a deed in

16    person at the D.C. Recorder of Deeds because there's no

17    evidence of any of this.

18           This is a courtroom.  Judge Kollar-Kotelly is a

19    judge, we're attorneys.  We have a book that governs what's

20    admissible in court and that's what you're presented with.  We

21    rely on evidence.  And I implore you, I implore someone in the

22    jury, when you go back and deliberate, in your discussing

23    things you say:  What about this?  What about this?  Someone be

24    the volunteer who raises their hand and say:  Was there any

25    evidence of that or did defense counsel just say it in a very

1    believable tone?

2              Someone raise their hand and say:  Was there any

3    evidence of this?  Or did they just say the word over and over

4    and over and now it feels like it's true?  Was there any

5    evidence or testimony about a corporate bank account, or is

6    this just -- no, there wasn't.  It's just Mr. Young-Bey's bank

7    account that he opened in his own name, where he paid his rent

8    in Silver Spring and his gym membership.  And you'll see later,

9    he bought tickets at Guitar Center and bought a guitar and went

10   to the dentist.  It wasn't a corporate bank account.

11             Was there any evidence that this was a corporate

12   phone number?  Or did you just hear it said so many times, in a

13   believable tone, that now you believe that it's a corporate

14   phone number?  Did anyone say that that was a corporate phone

15   number?  No.  Did anyone say that that was a corporate business

16   account?  His friend tried to say something like that and then

17   the response was:  Well, you know, I can't tell you that.  It's

18   really important for an executive to have good health, to try

19   to explain away the Planet Fitness membership.

20             We need you to -- and we implore you -- to look back

21   at the evidence and not arguments that play fast and loose with

22   the facts that are before you.  Because once you step back and

23   look at the facts in this case, it's plain as day.  It's plain

24   as day.  Once you -- once you step back and you say:  We heard

25   all this and it was in a very believable tone, but is there any

1    evidence of anything?  Please, please, just think about what

2    the exhibits are, what the testimony was.

3              If you'll indulge me just a bit as we redirect you

4    toward the evidence.  One, it's just one example, yesterday you

5    heard -- you heard someone tell you that this $2.25 charge was

6    evidence of Mr. Young-Bey purchasing a deed in hand at the D.C.

7    Recorder of Deeds office.  Blatantly false.  The testimony from

8    Amy Conn -- first off, there's no evidence that that's

9    accurate.  The testimony of Amy Conn, when she was asked if you

10   could buy a deed in person was -- she answered:  Right, at the

11   time of recording, if it is actually recorded, that customer

12   would have to request -- and by D.C. Code it's $2.50 a page and

13   $2 for certification -- and those monies would have to be paid

14   and a receipt given for that copy.  Her testimony.

15             A two-page document would be $5.  We, as the

16   government, will rely on the evidence.  We will be very

17   specific, very careful about what the evidence was.

18             There is nothing of the like on this receipt.  That

19   is playing fast and loose with the facts before a jury.  And

20   that's why you can disregard the other 95 percent of what was

21   said, because if an easy fact like that can be blatantly

22   misrepresented in front of you, then what do you think about

23   the rest of it?

24             Take a look at the evidence for that deed.  How else

25   do you know that that submission to you was just not accurate?

1    Because when Mr. Young-Bey tried to take out the loan on the

2    home and the lender asked, Hey, do you have the deed?  It's

3    still showing that it's owned by Rashid Jelani.  Show me the

4    documents.  What he say?  What did he say?  I don't have a copy

5    of it yet.  Evidence, ladies and gentlemen.  Not speculation,

6    not just imagination, but actually evidence.  That's what we

7    want you to look at here.

8            So there's a lot of discussion about this phone

9    number from 2018.  Look, we don't dispute the fact on

10   Mr. Young-Bey's arrest warrant a 443 number was listed.  And

11   the back side of it, an administrative document, had a 443

12   number listed for him in 2018.  And you heard from Agent

13   Douglas that in one court document in 2018 Mr. Young-Bey had

14   listed a 443 number.  Has there been any other testimony that

15   that's his phone number?  Has there been any other testimony

16   that anytime after 2018 he used that number or that was his

17   number?

18           Ladies and gentlemen, there's one, two, three, four,

19   five attorneys, they put on a case, they presented evidence,

20   they scoured the internet for a photo of Rashid Jelani.

21   Where's his subscriber information?  There's no evidence that

22   he used that phone.  To the contrary, on every document that

23   you see you know which one his phone is.

24           This is Government's 714.1, the subscriber

25   information for 677-8901.  Does it have -- does it have

1    anything to do with First Democracy Mortgage Investors Group?

2    Is that -- are those phrases mentioned anywhere?  No, they are

3    not, because this is his phone.  His phone.

4         Look at the emails as he was ordering rubber stamps

5    all the way back in 2019.  They address Mr. Jeffrey.  And what

6    does he say?  Yeah, call me at 677-8901 when it's ready.  Look

7    at how he interacts with Jason Balin from that phone:  Hey,

8    it's Jeff.  Hey, Jason.  This is all Mr. Bay, all from that

9    same number.  Voicemail:  Hi, Jason, this is Jeff.  Give me a

10   call.  Hey, Jason.  This is Jeff, we need to talk.  Jeff,

11   David, Brennan Title, needs to talk to you.

12        Now, it's very important for the defense to try to

13   get you to believe that couldn't have been Mr. Young-Bey

14   because he goes by Jeffrey.  But, again, how does that match up

15   with the evidence?  They told you that Mr. Young-Bey in fact

16   did engage with Hard Money Bankers to obtain the loan on 12th

17   Street.  Because their theory is, you know, he was instructed

18   by the shadowy figure.  He's going by Jeff when he's

19   negotiating that deal.  So how does that all jibe?  He doesn't

20   go by Jeff when it's Bryant Street, but he does go by Jeff when

21   it's the other deal.  It doesn't jibe because it's absurd.

22        When he's buying a BMW -- evidence, documents you'll

23   have -- he uses the 677-8901 phone number.  He uses it twice,

24   when he buys the three series and when he buys the seven

25   series.  Him, in person, signing the documents.  When he files

1    a lawsuit trying to get his money back.  Don't you think if you

2    were trying to get back three-hundred-and-some-odd thousand

3    dollars, you would leave the phone number where you wanted

4    people to call you?  Someone is going -- you're fighting to get

5    back $300,000, you think you're going to leave the wrong phone

6    number?  No.  Because that's absurd.  He leaves 677-8901.

7         And when David Edlavitch from Brennan Title scheduled

8    the signing for the 12th Street home, met with Mr. Young-Bey,

9    accepted his ID, watched him sign the documents, how did he

10   arrange the meeting, the time to be there, where to go?  He

11   called this number, 677-8901.  And who showed up?  The

12   defendant.  He showed up.  So where in any of this is Joseph

13   Lowery?  He's nowhere.  You can't -- they can't speak him into

14   being if there's no evidence.

15        Look at the Google subscriber information.  What is

16   the recovery phone number for both of those accounts?

17   677-8901.

18        Look, no idea why this was created in 2015.  And the

19   terms of service IP comes back to Pennsylvania.  You heard

20   Ms. Hite explain that for her mother, she had to set up her

21   mother's email account because her mother didn't know how to

22   use email that well.  But we're not talking about 2015, we're

23   talking about 2019, November, we're talking about February of

24   2020.  2015 is way in the past.

25        The question is, who was using that email in 2019, in

1  2020?  Well, here's a pretty good indication:  The person is

2  addressed by Jeffrey and they respond with their phone number.

3       Look at the -- look at the trail of the fake lease.

4  It's created by one of Mr. Young-Bey's e-mail accounts,

5  2017JMB21.  It's then sent to himself, he then sends it to the

6  First Democracy Investors account.  He then uses that account

7  to send it to Jason Balin at Hard Money Bankers.  Where in any

8  of this chain is Joseph Lowery?  He's nowhere.  It can't be

9  spoken into being.

10       Look at these emails.  Jason Balin writes to Jeff and

11  Martina.  Now, Mr. Young-Bey's defense is, well, that was

12  actually Joseph Lowery pretending to be me.  But, Martina,

13  there's no evidence that she knows anyone named Joseph Lowery.

14  So how does any of this exist?  The only evidence you heard is

15  that Ms. Hite saw the defendant in her home, recognized him as

16  someone who's going to help her save her home.  No one has

17  offered any testimony that anyone named Joseph Lowery ever knew

18  Ms. Jones, ever dealt with Ms. Jones, was involved at all in

19  any of these email communications.

20       Again, someone in the jury room please take a pause

21  and ask the rest:  Is there any evidence that Ms. Jones had

22  anything to do with Mr. Lowery?  And if she didn't have

23  anything to do with Mr. Lowery, how are emails like this being

24  passed along?

25       You heard a lot about this corporate car or corporate

19

1    account or corporate phone number.  Ladies and gentlemen, this

2    was not -- this simply wasn't a business, this wasn't a

3    corporate anything.  This is a fraud.  It's a fraud.  They

4    submitted -- Mr. Young-Bey, Mr. Young-Bey submitted a fake

5    rental lease for Regus dated 2019.

6              Mr. Young-Bey submitted to the D.C. DMV a fake lease

7    alleging that he was renting out part of the eighth floor of

8    this building that's actually occupied by another global law

9    firm, Gibson Dunn.  He attached a certificate of occupancy

10   document for that -- for part of the offices occupied, multiple

11   floors occupied by Gibson Dunn.  An urban real estate business?

12   How is there an urban real estate business?

13             Where is the other real estate?  If this is just an

14   accident by Mr. Young-Bey, where are all the other legitimate

15   transactions?  Where are the other homes that he bought on the

16   up and up?  There aren't any because it's a fraud.

17             The company is advertised with his face on the front.

18   He alleged in a court document that he pays employees.  There's

19   no employees.  He alleged that he pays contractors.  There's no

20   contractors.  He alleged that he pays people on the 1st and

21   15th of every month.  These are demonstrably false statements

22   made to a court by Mr. Young-Bey.

23             His affidavit says he is the owner of First Democracy

24   Mortgage, that he is the sole signatory of this account.  So

25   when he's trying to get money back, he'll admit that this is

1    his company, this is his account.  But when we're in a court of

2    law and he's charged with a crime, it's no, no, talk about the

3    shadowy figure, who is nowhere in this courtroom.

4            Ladies and gentlemen, it's absurd.  Look at the bank

5    of America videos and still frames.  It's only him using this

6    account.  On videotape, look, it's a big smile.  He's taking a

7    lot of money out.  January 2020, February 2020, April 2020,

8    March 2020.  There's nobody else on the video.  Explain that

9    away.

10           This isn't a corporate account.  This is his account

11   where he pays his gym membership.  It's his account where he

12   pays the lease -- or, the rent for his home in Silver Spring,

13   where the FBI took the BMW, on Flack Street.  It's his checking

14   account where he goes to the dentist and buys guitars.  This

15   has nothing to do with the real estate business.  It has

16   everything to do with the business of fraud.  And what else is

17   in the accounts?  Receipts for fraudulent notary stamps, bought

18   in other folks' names.

19           Ladies and gentlemen, this isn't a convoluted

20   Ocean's-Eleven-long-con conspiracy theory.  It's a guy who got

21   a notary stamp and forged a bunch of signatures and bought two

22   BMWs.  It's as simple as that.  They want to talk about

23   signatures, look at the signatures from Rubber Stamp.  There's

24   no handwriting here; there just isn't.  Look at Mr. Young-Bey's

25   signatures, look at the signature from the receipt from Rubber

1    Stamp.  The bottom left, bottom right, Government's 709s.

2    That's Mr. Young-Bey emailing an order in his name, paying with

3    the debit card in his name, signing the receipts in his name.

4    That's what you need to look at, evidence.

5         I'm sorry I focused all this attention on

6    Mr. Young-Bey, but Ms. Jones is also sitting here.  And, look,

7    we do not dispute anything that her family said.  The

8    government can only imagine the pain of her brother -- a police

9    officer -- coming into court and testifying on behalf of his

10   sister.  Horrible.  What a difficult position to be put in.

11        To have her daughter come in and testify about this.

12   Not about the facts, but about my mom is a good person, she

13   raised us right.  We have no -- no one is disputing any of

14   that.  But, you know, let's not forget something:  She still

15   made $130,000 off of this.  And it's not like she got a phone

16   call and said:  Oh, this is a big mistake.  Can I give the

17   money back?  That's not what happened here.  You know, $130,000

18   is quite a big bag of change to just get for doing nothing.

19        This deal for the Bryant Street home would not have

20   gone through without her LLC.  It would not have gone through

21   without her paying the appraisal fees from her Venmo account.

22   It would not have gone through unless she hopped on the phone

23   call with Jason Balin.  It would not have gone through without

24   her traveling to the closing signing in LA.  It wouldn't have

25   gone through without her completing all those tasks on the

1    Marvel Title website, where they send you all those, you know,

2    reminders.  Hey, you need to fill out this paperwork.  Hey, you

3    need to do this.  And Tonita Williams said:  Yep, either she

4    would have to fill them out online or call me with the

5    information.  But if we don't get the information, it's not

6    going forward.  None of this would have happened without

7    Ms. Jones.

8         Ms. Jones was copied on these emails where

9    Mr. Young-Bey told the lenders she inherited the home and she

10   wants to take out this money.  Right?  Now, the only defense to

11   that is, well, she doesn't read emails.  Okay.  Well, I

12   asked -- I asked her daughter, very respectfully:  Well, if you

13   don't know what's in the email, how would you know who to

14   forward it to?  Okay.  The answer to that is there's no way.

15   Tell me this:  If you began getting emails over and over and

16   over -- let's just imagine the first email:  Hey, fill out this

17   paperwork for a refi on your home.  No, not even your home,

18   some other home you've never been to, what's the first

19   response?  Maybe you ignore it the first time.  Then you get

20   another one and another one, and then at that point a

21   reasonable person in your shoes would call the company and say:

22   Hey, I think you've got the wrong guy.  I don't know anything

23   about that home.  I live in another city.

24        Now, what if you got 20 of those, or 30 or those, and

25   just went along with it and started sending those emails to

1    other folks, like Mr. Young-Bey?  How does any of that jibe

2    with Ms. Jones not knowing what she was doing and not knowing

3    what she was getting into?  You know how she -- this is how you

4    will be convinced that she reads her emails:  Because when

5    Mr. Young-Bey sent her an email saying job's done, let's split

6    the loot, here's the routing number, do you know what she did?

7    She read the email and she sent the money to that routing

8    number.

9         If she didn't read her emails, ladies and gentlemen,

10   the money would still all be in her account.  If she didn't

11   read her emails, she wouldn't have known how to get to the

12   signing in Los Angeles because, as you'll see from the

13   exhibits, from the evidence, that's where they were sending her

14   the directions.

15        You can't suspend your common sense and life

16   experiences and engage in these mental gymnastics.  You have to

17   use your common sense, please, and look at the evidence in this

18   case.

19        Ms. Jones may have made a mistake.  You heard that --

20   from her daughter, that she was in financial troubles.  You

21   heard that the home was being foreclosed on.  You heard that

22   she kept her finances private from her family.  But, please,

23   remember that's -- that money is gone.  And you will receive an

24   instruction about something called deliberate ignorance.  It's

25   kind of a not-so-nice instruction.  Some people call it willful

1    blindness.  And, you know, I'm not going to read it to you, the

2    Judge will read it.  But the essence of it is you can't -- you

3    can't use as a defense:  I closed my eyes and I didn't know

4    what was going on.  I purposely closed my eyes.

5            It's essentially, you know, by way of an example, you

6    know, someone crossing the border -- walking over the border

7    from Mexico to the U.S. and a stranger says:  Hey, take this

8    bag.  Don't look inside.  I'll give you 10 grand.  Just hand it

9    to somebody once you get to the other side.  And then you get

10   stopped at immigration and you say I didn't know what was in

11   the bag, I didn't look, that's a defense.  No, it's not.  It's

12   not.  That is purposely closing your eyes and avoiding

13   knowledge.

14           Now, imagine someone said:  Hey, here's $130,000, all

15   you have to do is sign some paperwork.  And then the person

16   claiming, Well, I didn't know what it was for.  Stacks and

17   stacks of paperwork.  When you go to the jury room, you will be

18   firmly convinced that she knew exactly what it was for.  Why?

19   Because she didn't do it again.

20           Think about it.  A woman in financial stress, losing

21   her home.  Would you believe that she thought she was engaging

22   in a legitimate real estate transaction and all she had to do

23   was sign her name two or three times and she would get 130,000

24   dollars for doing that?  What would be the follow-up on January

25   3, once the money is transferred?  There would be a follow-up

1   email saying:  Hey, Mr. Young-Bey, I'm really good at signing

2   papers, can I do it again for 130 more thousand dollars?  No.

3   That sounds like a great job.  If it's true, that's a great way

4   to make a living, signing papers for $130,000 a pop.

5        You'll be firmly convinced that she knew what she was

6   doing because when the police got involved and Mr. Young-Bey

7   called her in April 2020, what's the phrase, Take the money and

8   run?  That's what she did.  She went to MECU, and literally ran

9   there every day in May, making giant cash withdrawals.  And

10  then when the FBI -- and then Mr. Balin reached out to say that

11  the 164 Bryant loan is coming due, are you going to pay that?

12  No response.  And when the FBI called and said:  Hey, can we

13  talk to you about Mr. Young-Bey?  I don't know him, not

14  familiar with the name.

15       You know that's wrong because you can look at the

16  phone call summaries.  Between August of 2019 and May of 2020

17  there are literally hundreds and hundreds and hundreds of phone

18  calls and text messages between the two.  If you do the math,

19  it's something like, through text or phone call, they

20  communicated on average five times a day for ten months

21  straight.  And she denied knowing him.  Denied knowing him.

22  Who does that?  Someone who knows that the gig is up.  Someone

23  who has already taken the $97,000.

24       Look, the charges in the case, they're not that

25  complicated.  But bank fraud means:  Was there a financial

1    institution?  Hard Money Bankers, you'll see, fits the

2    definition of a financial institution because they take a

3    secured interest in a home and they give a loan on that.

4           Mail fraud, you'll see the instruction -- and it's

5    much different than what you heard yesterday about what mail

6    fraud is.  Mail fraud is a part of a fraud scheme, you cause

7    the mails to be sent.  Doesn't mean that you're committing a

8    fraud on, you know, Joe postal worker or that you're passing,

9    you know, fake stamps over your neighborhood P.O. box.  It just

10   means that as part of the scheme you knew mails would be sent.

11          And what's the evidence of that Amy Conn explained to

12   you, the D.C. recorder of deeds lady?  Well, if they don't put

13   an address on the return label, then we wouldn't accept the

14   deed.  We can't accept the deed without this to return it.

15   When finished, mail to.  We can't accept, we couldn't record

16   it, it can't be done.  That's a mailing.

17          Mr. Young-Bey and Ms. Jones putting addresses on

18   there is them showing they knew and had a reasonable belief

19   that a mailing would happen because they put the addresses on

20   there.  D.C. Recorder of Deeds doesn't track every single

21   envelope that they send.  I think the testimony was, on

22   average, 150,000 a year.  Could you imagine that?  Sending all

23   those by certified mail?

24          Do you remember the example in the opening, weeks

25   ago?  You might not be able to remember every day you took out

1    your kitchen trash in April of 2020, but you know you took it

2    out because if you didn't, it would still be sitting there in

3    the kitchen.  It's just something you do.  Trash can gets full,

4    you take it out to the alley, dump it in the dumpster.  You

5    don't take notes on it and you're sure you emptied your trash

6    because the trash isn't there anymore.

7           That's what Ms. Conn, Ms. Proctor, and Ms. McKenzie

8    explained.  Look, we record the deeds, we put them in

9    envelopes, we put them in a bundle and four days later we drop

10   them in the mail.  How do you know this one didn't slip through

11   the cracks?  Well, if it did, it would still be there.  That's

12   how you know it happened.  Circumstantial evidence is just as

13   strong as direct evidence.

14          Money laundering.  Now, you know in Mr. Young-Bey's

15   close there was an explanation of government's calling this

16   money laundering and shady dealing.  We all know there's two

17   types of money laundering.  And we're not talking about

18   concealment money laundering.  We're talking about a different

19   type, it's called expenditures money laundering.  It just means

20   you can't engage in financial transactions in money that came

21   from fraud.  That's it.  That's it.

22          Three financial transactions:  Mr. Young-Bey asking

23   Ms. Jones to send 130 grand, Mr. Young-Bey buying a BMW,

24   Mr. Young-Bey buying a second BMW.  And aggravated identity

25   theft, you just can't sign your name -- sign other people's

1    names in furtherance of committing a felony offense or

2    committing another crime, which is the bank fraud and the mail

3    fraud.

4              I don't have a timer and I am hopeful that this has

5    been close, relatively close to 30 minutes.  I know it's been

6    under an hour and 45 minutes.  We implore you to look at the

7    evidence.  We implore you to avoid rampant speculation based on

8    convincing theories that are based on nothing more than

9    invented facts.  When you do this, you will see that this is

10   just as plain as day.  It's a fake notary stamp, paid for by

11   Mr. Young-Bey's bank account, with his signature, opened under

12   his name, arranged with his phone number that was turned into

13   two fraudulent deeds which led to $800,000 in loans and two

14   BMWs parked in front of Mr. Young-Bey's house on Flack Street.

15   Thank you.

16             THE COURT:  All right.  Members of the jury, next

17   we're going to do the instructions.  The instructions take

18   about an hour.  So did anybody want a break at this point for a

19   few minutes?  If you do, don't by shy.  I would rather you are

20   paying attention.  But it's going to take about an hour.  It

21   takes some time to go through them.  Everybody okay?  Or do you

22   need a break?

23             THE JURORS:  (No response.)

24             THE COURT:  Okay.  No hands up.  All right.

25             So let me tell you up front, you're going to get a

1    copy of these instructions.  So you don't need to sit there

2    taking notes, trying to remember what it is that I actually

3    said about all of the offenses and the other instructions that

4    are in here.  Actually, I'm going to give you two copies, so

5    that there's enough for more than one person to be able to look

6    through it.  It has a table of contents and it has the

7    instructions themselves, as well as verdict forms.

8            So I want you to listen so you know what's in here,

9    you hear it, so you absorb the information both orally and then

10   you can read it as well.  So let me begin with some general

11   principles.

12           First, I'm sure you understand by now that the jury

13   and the Court, that that's you and I, have quite different

14   responsibilities in a trial.  Now, my function is to conduct

15   the trial in an orderly, fair and efficient manner, to rule on

16   questions of law, and to instruct you on the law that applies

17   in this case.  It's your duty to accept the law as I instruct

18   you.

19           You should consider all the instructions as a whole.

20   You may not ignore or refuse to follow any of them.  If counsel

21   or a witness has stated the law differently than the Court, my

22   instructions of the law control.

23           Now, your function as the jury is to determine what

24   the facts are in this case.  You're the sole judges of the

25   facts.  While it's my responsibility to decide what is admitted

1   as evidence during the trial, you alone decide what weight, if

2   any, to give to that evidence.  You alone decide the

3   credibility or the believability of the witnesses.

4          As human beings, we all have personal likes and

5   dislikes, opinions, and prejudices and biases.  Generally we're

6   aware of these things.  But, you also should consider the

7   possibility that you have implicit biases, that is, biases of

8   which you may not be consciously aware.  Personal prejudices,

9   preferences, or biases have no place in a courtroom, where our

10  goal is to arrive at a just and impartial verdict.

11         All people deserve fair treatment in our system of

12  justice, regardless of any personal characteristic, such as

13  race, national ethnic origin, age, sex, gender expression,

14  education, or income level.  You should determine the facts

15  solely from a fair consideration of the evidence.

16         You should decide the case without prejudice, fear,

17  sympathy, favoritism, or consideration of public opinion.  You

18  may decide this case solely based on the law and the facts

19  before you.

20         Moreover, you're not to be concerned with the wisdom

21  of any law or rule of law as I state them.  It would be a

22  violation of your sworn duty to base a verdict upon any other

23  view of the law than that given in the instructions of the

24  Court.  Just as it would be a violation of your sworn duty as

25  judges of the facts to base a verdict on anything but the

1    evidence in the case.  You may not take anything I've said to

2    attorneys or witnesses, or done, as indicating how I think you

3    should decide this case.  Any comments or rulings I've made

4    were not indicative of how you should evaluate the credibility

5    of witnesses or determine the verdict.

6             I try not to develop any views.  If you believe that

7    I've expressed or indicated any such opinion, it was

8    unintentional and you should ignore it.  The verdict in this

9    case is your sole and exclusive responsibility.

10            Now, during the trial I've permitted those jurors who

11   wanted to to take notes.  You can take your notebooks with you

12   to the jury room and you can use them during your

13   deliberations, if you wish.  As I told you at the beginning of

14   the trial, your notes are only to be an aid to your memory,

15   they're not evidence in the case and they should not replace

16   your own memory of the evidence.  And those jurors who have not

17   taken notes should rely on their own memory of the evidence.

18   The notes are intended to be for the note taker's own personal

19   use and not for the use of other jurors.

20            If any reference by me or the attorneys to the

21   evidence is different from your own memory of the evidence,

22   it's your memory that should control during your deliberations.

23            Now, the lawyers in this case sometimes objected when

24   the other side asked a question, made an argument or offered

25   evidence that the objecting lawyer believed was not proper.

1    You must not hold such objections against the lawyer who made

2    them or the party they represent.  It's the lawyer's

3    responsibility to object to evidence that they believe is not

4    admissible.

5            If during the course of the trial I sustained an

6    objection to a lawyer's question, you should ignore the

7    question and you mustn't speculate as to what the answer would

8    have been.  If the after the witness answered a question I

9    ruled that the answer should be stricken, you should ignore

10   both the question and the answer and they should play no part

11   in your deliberations.  Again, questions are not evidence and

12   simply because an attorney may have proposed a fact to a

13   witness in a question doesn't mean that purported fact is true,

14   or even if true, a fact that you may consider.  You may only

15   consider the testimony and exhibits admitted into evidence in

16   this case.

17           During your deliberations you may consider only the

18   evidence properly admitted in this case.  The evidence in this

19   case consists of the sworn testimony of witnesses and exhibits

20   that were admitted into evidence.

21           When you consider the evidence, you're permitted to

22   draw from the facts that you find -- permitted to draw from the

23   facts that you find have been proven such reasonable inferences

24   as you find are justified in the light of your own experiences.

25   You should give any evidence such weight as in your judgment

1    it's fairly entitled to receive.

2            Let me just see something.

3            (Pause.)

4            I may have taken these out of order.  Okay.  We move

5    them around.  The Red Book has them in a particular order and I

6    put them in a slightly different order.

7            All right.  As to statements of counsel, statements

8    and arguments of the lawyers are important because they're

9    intended to help you understand the evidence and the

10   contentions of each of the parties.  However, the statements

11   and arguments of the lawyers are not evidence.  They're only

12   intended to assist you in understanding the evidence.

13           Similarly, the questions of the lawyers, as I've said

14   before, are not evidence; the contents isn't evidence.

15   Moreover, occasionally during argument a lawyer for one side or

16   the other may appear to state his belief or opinion concerning

17   the facts in the case or the credibility of testimony.  The

18   lawyer is not permitted to state his belief or opinion during

19   argument, nor may a lawyer state his belief or opinion during

20   an objection.  He's permitted only to argue to you based on

21   what the evidence in this case shows.  So if you think a lawyer

22   has expressed his personal belief or opinion during argument,

23   you must disregard any such expression and judge the case, as

24   always, only on the evidence.

25           Now, you've heard testimony about witnesses meeting

1    with attorneys and/or investigators before they testify.

2    You're instructed that it's perfectly proper for a lawyer or

3    investigator to interview a witness in preparation for trial.

4            In his closing argument defense counsel for

5    Mr. Young-Bey has claimed that certain evidence was not

6    produced by the government and then indicated that you should

7    draw a negative inference to conclude that the government did

8    not present this evidence because it would not have supported

9    their charges against Mr. Young-Bey.  You should know that it

10   is appropriate for an attorney to claim a lack of evidence.

11           However, where the evidence was equally available to

12   both parties, as was the case here, it's not appropriate to

13   claim that a lack of evidence should be used to draw a negative

14   inference, that such evidence would have been favorable to the

15   defendant and not favorable to the government.  Accordingly,

16   you should not draw the inference that defense counsel for

17   Mr. Young-Bey has suggested.

18           Now, the burden of proof.  Every defendant in a

19   criminal case is presumed to be innocent.  This presumption of

20   innocence remains with the defendant throughout the trial,

21   unless and until the government has proven the defendant is

22   guilty beyond a reasonable doubt.  This burden never shifts

23   throughout the trial.  The law does not require any defendant

24   to prove their innocence or produce any evidence or testify.

25           If you find that the government has proven beyond a

1    reasonable doubt every element of a particular offense with

2    which a defendant is charged, it's your duty to find that

3    defendant guilty of that offense.  On the other hand, if you

4    find the government has failed to prove any element of a

5    particular offense beyond a reasonable doubt, it's your duty to

6    find the defendant not guilty of that offense.

7          Moreover, if a witness suggested that the burden has

8    shifted to the defendant to offer proof, that should be

9    disregarded as an inaccurate statement of the law.

10         Now, reasonable doubt.  The government has the burden

11   of proving the defendant guilty beyond a reasonable doubt as to

12   the count or charge against them.  Some of you may have

13   observed, as jurors in civil cases, where you were told that it

14   is only necessary to prove that a fact is more likely true than

15   not true, which we will call the preponderance of the evidence.

16   In criminal cases, the government's proof must be more powerful

17   than that.  It must be beyond a reasonable doubt.

18         Now, proof beyond a reasonable doubt is proof that

19   leaves you firmly convinced of the defendant's guilt.  There

20   are very few things in this world that we know with absolute

21   certainty.  And in criminal cases the law does not require

22   proof that overcomes every possible doubt.  If, based on your

23   consideration of all of the evidence, you are firmly convinced

24   that the defendants are guilty of the crime charged, you must

25   find them guilty.  If, on the other hand, you think there's a

1    real possibility that the defendant is not guilty, you must

2    give defendants the benefit of the doubt and find them not

3    guilty.

4           Now, the two types of evidence from which you may

5    determine what the facts are in this case, there's direct

6    evidence and circumstantial evidence.  When a witness, such as

7    an eyewitness, asserts actual knowledge of a fact, that

8    witness's testimony is direct evidence.  On the other hand,

9    evidence of fact and circumstances from which reasonable

10   inferences may be drawn is circumstantial evidence.

11          So let me give you an example.  Assume a person

12   looked out a window and saw that snow was falling.  If he later

13   testified in court about what he had seen, his testimony would

14   be direct evidence that snow was falling at the time he saw it

15   happen.  Assume, however, that he looked out a window and saw

16   no snow on the ground, then went to sleep and saw snow on the

17   ground after he woke up.  His testimony about what he had seen

18   would be circumstantial evidence that it had snowed while he

19   was asleep.

20          The law says that both direct and circumstantial

21   evidence are acceptable as a means of proving a fact.  The law

22   does not favor one form of evidence over another.  It's for you

23   to decide how much weight to give to any particular evidence,

24   whether it's direct or circumstantial.  You're permitted to

25   give equal weight to both.  Circumstantial evidence does not

1    require a greater degree of certainty than direct evidence.  In

2    reaching a verdict in this case, you should consider all of the

3    evidence presented, both direct and circumstantial.

4          During your deliberations you may consider only the

5    evidence properly admitted in this case.  The evidence in this

6    case consists, as I said, of the sworn testimony of witnesses,

7    the exhibits that were admitted into evidence, the facts of

8    which I took judicial notice, and the facts and testimony

9    stipulated to by the parties.

10          Now, I may take what is called judicial notice of

11   public acts, places, facts, and events that I consider to be

12   matters of common knowledge or matters that can be determined

13   easily through undisputed sources.  In this case I took

14   judicial notice of a petition of a mechanic's lien filed by

15   defendant Young-Bey regarding Ms. Jones's property.  When I

16   take judicial notice of a particular fact, you may regard that

17   fact as proven evidence.

18          During the trial you were also told that the parties

19   had stipulated -- that is, agreed -- to certain facts.  Those

20   stipulations were read to you during the trial.  You should

21   consider any stipulation of fact to be undisputed evidence.

22          When you consider the evidence, you are permitted to

23   draw, from the facts that you find have been proven, such

24   reasonable inferences as you feel are justified in the light of

25   your experience.  You should give any evidence such weight as

1       in your judgment it's fairly entitled to receive.

2                Now, I had read this instruction during the course of

3       the trial and I'm repeating it here:  You've heard evidence by

4       a stipulation of fact that defendant Young-Bey was convicted of

5       bank fraud in 1995.  You may use this evidence only for the

6       limited purpose of deciding whether the government has proved

7       beyond a reasonable doubt that in this case defendant Young-Bey

8       had the requisite intent and that he acted knowingly and on

9       purpose, not by mistake or accident.

10               You may not use this evidence -- and I'm talking

11      about the conviction -- for any other purpose.  Defendant

12      Young-Bey is only on trial for the crimes charged.  Defendant

13      Young-Bey is not charged in this case with any offense related

14      to his prior bank fraud conviction.  And you may not use this

15      evidence to conclude that he has a bad character and/or that

16      defendant Young-Bey has a criminal personality.  The law does

17      not allow you to convict defendant Young-Bey simply because you

18      believe he may have done bad things not specifically charged as

19      crimes in this case.

20               Now, we also received character evidence.  Defendant

21      Jones has introduced testimony that she has a good repetition

22      in the community for honesty and trustworthiness and that, in

23      the witness's opinion, Ms. Jones is an honest and trustworthy

24      person.  Such evidence may indicate to you that it's unlikely

25      that an honest and trustworthy person would commit the crime

1    charged or it may not.  You may consider this evidence along

2    with other evidence in the case and give it as much weight as

3    you think it deserves.

4          Notwithstanding the evidence of character, if, after

5    weighing all the evidence, you're convinced beyond a reasonable

6    doubt that Ms. Jones is guilty of the crime charged, it's your

7    duty to find her guilty.  On the other hand, evidence of good

8    character alone may create a reasonable doubt as to a

9    defendant's guilt, although without it the other evidence would

10   be convincing.

11         Now, the credibility of witnesses.  In determining

12   whether the government has proved the charges against the

13   defendants beyond a reasonable doubt, you must consider the

14   testimony of all the witnesses who have testified.  You are the

15   sole judges of the credibility of the witnesses.  You alone

16   determine whether to believe any witness and the extent to

17   which a witness should be believed.  Judging a witness's

18   credibility means evaluating whether the witness has testified

19   truthfully and also whether the witness accurately observed,

20   recalled, and described the matters about which the witness

21   testified.  You may consider anything that in your judgment

22   affects the credibility of any witness.

23         For example, you may consider the demeanor and the

24   behavior of the witness on the witness stand; the witness's

25   manner of testifying; whether the witness impresses you as a

1    truthful person; whether the witness impresses you as having an

2    accurate memory; whether the witness has any reason for not

3    telling the truth; whether the witness had a full opportunity

4    to observe the matters about which he or she has testified;

5    whether the witness has any interest in the outcome of this

6    case, stands to gain anything by testifying or has a friendship

7    or hostility toward other people concerned with this case.

8            In evaluating the accuracy of a witness's memory you

9    may consider the circumstances surrounding the event, including

10   the time that elapsed between the event and any later

11   recollections of the event and the circumstances under which

12   the witness was asked to recall details of the event.  You may

13   consider whether there are any inconsistencies in a witness's

14   testimony.  You may also consider any inconsistencies between

15   the witness's testimony and any other evidence that you credit.

16   You may consider whether any inconsistencies are a result of

17   lapses in memory, mistake, misunderstandings, intentional

18   falsehood, or differences in perception.

19           You may consider the reasonableness or

20   unreasonableness, the probability or improbability of the

21   testimony of a witness in determining whether to accept it as

22   true and accurate.  You may consider whether the witness has

23   been contradicted or supported by other evidence that you

24   credit.  If you believe that any witness has shown him or

25   herself to be biased or prejudiced for or against either side

1    in this trial or motivated by self-interest, you may consider

2    and determine whether such bias or prejudice has colored the

3    testimony of the witness so as to affect the desire and

4    capability of that witness to tell the truth.

5          You should give the testimony of each witness such

6    weight as in your judgment it's fairly entitled to receive.

7          Now, law enforcement testimony.  A law enforcement

8    officer's testimony should be evaluated by you just as any

9    other evidence in the case.  In evaluating the officer's

10   credibility you should use the same guidelines that you apply

11   to the testimony of any witness.  In no event should you give

12   either greater or lesser weight to the testimony of any witness

13   merely because they are a law enforcement officer.

14         Now, the right of a defendant not to testify.  As

15   I've told you repeatedly, every defendant in a criminal case

16   has an absolute right not to testify.  Jeffrey Young-Bey and

17   Martina Jones have chosen to exercise this right.  You must not

18   hold this decision against them and it would be improper for

19   you to speculate as to the reason or reasons for their

20   decision.  You must not assume the defendants are guilty

21   because they chose not to testify.

22         During the course of the trial, a number of the

23   exhibits were admitted into evidence.  Sometimes only portions

24   of an exhibit were admitted, such as portions of a document

25   with some words blacked out.  There are a variety of reasons

1    why only a portion of an exhibit is admitted, including that

2    the other portions are inadmissible or implicate an

3    individual's privacy.  As you examine exhibits and you see

4    portions where there appear to be omissions, you should

5    consider only the portions that were admitted.  You should not

6    guess as to what has been taken out or why.  And you should not

7    hold it against either party.  You're to decide the facts only

8    from the evidence that is before you.

9         Now, the indictment is merely the formal way of

10   accusing a person of a crime.  And you must not consider the

11   indictment as evidence of any kind.  You may not consider it as

12   any evidence of Mr. Young-Bey and/or Ms. Jon's guilt or draw

13   any inference of guilt from it.

14        Now, also, one of the questions you were asked when

15   we were selecting this jury was whether the nature of a charge

16   itself would affect your ability to reach a fair and impartial

17   verdict.  We asked you that question because you mustn't allow

18   the nature of a charge to affect your verdict, including the

19   government's decision as to which charge to bring.  You must

20   consider only the evidence that has been presented in this case

21   in reaching a fair and impartial verdict.

22        Now, also, the weight of the evidence is not

23   necessarily determined by the number of witnesses testifying

24   from each side.  Rather, you should consider all the facts and

25   circumstances in evidence to determine which of the witnesses

1    you believe.  You might find that the testimony of a smaller

2    number of witnesses on one side is more believable than the

3    testimony of a greater number of witnesses on the other side,

4    or you may find the opposite.

5              All right.  I'm now go to move to part two.  We just

6    talked about part one, which is all of the instructions that

7    you apply in looking at the evidence.

8              Now, part two gives you the actual charges and the

9    instructions that relate to them.  So let me talk about the

10   offenses charged in this case.  It sets out the first thing --

11   and they're divided by one, two, and three.  The first one

12   indicates what the charges actually are and then inside you'll

13   find the instructions that relate to those offenses.

14             So, defendants Jeffrey Young-Bey and Martina Jones

15   are jointly charged with Count 1, conspiracy to commit mail

16   fraud and bank fraud, in violation of a federal statute.

17             Count 2, mail fraud, in violation of a federal

18   statute.

19             Count 3, bank fraud, in violation of a federal

20   statute.

21             And Count 6, conspiracy to commit expenditure money

22   laundering, in violation of a federal statute.

23             Now, defendant Young-Bey is alone charged with Count

24   4, mailed fraud, in violation of a federal statute.

25             Count 5, bank fraud.  In violation of a federal

1    statute.

2              Counts 7 and 8, expenditure money laundering, in

3    violation of a federal statute.

4              And Counts 9 through 13, aggravated a identity theft,

5    in violation of a federal statute.

6              And the federal statute is set out there.

7              Now, Count 1 and Count 3 of the indictment charged

8    offenses that took place from -- and it says in or around --

9    November 2019 and continuing through on or about February 20th,

10   2020.

11             Count 2 charges an offense that took place from in or

12   around November 2019 and continuing through in or around

13   February 2020.

14             Counts 4 and 5 charge an offense that took place from

15   in or around February 2020 and continuing through in or around

16   April 2020.

17             Count 6 charges an offense that took place in or

18   around January 1st, 2020 and continuing to at least January

19   8th, 2020.

20             Count 7 charges an offense occurring on or about

21   January 27th, 2020.

22             Count 8 charges an offense occurring on or about

23   March 19th, 2020.

24             Counts 9 and 10 charge offenses occurring on or about

25   November 7th, 2019.

1          Counts 11, 12, and 13 charge offenses occurring on or

2     about February 14th, 2020.

3          The proof need not establish with certainty the exact

4     date of the alleged offenses.  It's sufficient if the evidence

5     in the case establishes beyond a reasonable doubt that the

6     offense was committed on a date reasonably near the date

7     alleged.

8          Now, this following jury instruction applies to both

9     defendant Young-Bey and defendant Jones and it is for Count 1.

10    So Count 1 is conspiracy to commit mail fraud and bank fraud.

11    Count 1 of the indictment accuses the defendants of a

12    conspiracy to commit the crime of mail fraud and bank fraud, in

13    violation of federal law, in connection with the property

14    located at 164 Bryant Street, Northwest, Washington, D.C.

15         It's a crime for two or more persons to conspire, or

16    agree, to commit a criminal act, even if they never actually

17    achieve their goal.  A conspiracy is a kind of criminal

18    partnership.  For you to find any one of the defendants guilty

19    of the conspiracy charge, the government must prove each and

20    every one of the following elements beyond a reasonable doubt:

21         First, that two or more persons conspired or agreed

22    to commit the crimes of mail fraud and bank fraud.

23         Second, that the defendant knowingly and voluntarily

24    joined the conspiracy.

25         And you must be convinced that the government has

1    proved all of these elements beyond a reasonable doubt in order

2    to find any one of these defendants guilty of the conspiracy

3    charge.

4           Now I'm going to address the elements of the crime of

5    mail fraud and bank fraud in a few moments.

6           With regard to the first element, a criminal

7    agreement, the government must prove that two or more persons

8    conspired or agreed to cooperate with each other to commit the

9    crimes of mail fraud and bank fraud.  This does not require

10   proof of any formal agreement, written or spoken.  Nor does

11   this require proof that everyone involved agreed on all the

12   details.  But proof that people simply met together from time

13   to time and talked about common interests or engaged in similar

14   conduct is not enough to establish a criminal agreement.  These

15   are things that you may consider in deciding whether the

16   government has proved an agreement, but without more they are

17   not enough.

18          What the government must prove is that there was a

19   mutual understanding, either spoken or unspoken, between two or

20   more people to cooperate with each other to commit the crimes

21   of mail fraud and bank fraud.  This is essential.

22          An agreement can be proved indirectly, by facts and

23   circumstances which lead to a conclusion that an agreement

24   existed, but it's up to you -- excuse me, but it's up to the

25   government to convince you that such facts and circumstances

1    existed in this particular case.

2           One more point about the agreement:  The indictment

3    accuses the defendants of conspiring to commit two federal

4    crimes, mail fraud and bank fraud.  The government does not

5    have to prove that the defendants agreed to commit both of

6    these crimes, but the government must prove an agreement to

7    commit at least one of them for you to return a guilty verdict

8    on the conspiracy charge.  And your verdict must be unanimous

9    as to the federal crime that the conspirators agreed to commit.

10          With regard to the second element, if you're

11   convinced that there was a criminal agreement, then you must

12   decide whether the government has proved that each defendant

13   knowingly and voluntarily joined that agreement.  You must

14   consider each defendant separately in this regard.  To convict

15   any defendant, the government must prove that the defendant

16   knew the conspiracy's main purpose, and that the defendant

17   voluntarily joined it intending to help advance or achieve its

18   goals.

19          This does not require proof that a defendant knew

20   everything about the conspiracy or everyone else involved, or

21   that the defendant was a member of it from the very beginning.

22   Nor does it require proof that a defendant played a major role

23   in the conspiracy, or that the defendant's connection to it was

24   substantial.  A slight role on connection may be enough.

25          But proof that a defendant simply knew about a

48

 1    conspiracy, or was present at times, or associated with members

 2    of the group, is not enough, even if the defendant approved of

 3    what was happening or did not object to it.  Similarly, just

 4    because a defendant may have done something that happened to

 5    help a conspiracy does not necessarily make the defendant a

 6    conspirator.  These are all things that you may consider in

 7    deciding whether the government has proved that the defendant

 8    joined a conspiracy.  But without more they are not enough.

 9          A defendant's knowledge can be proved indirectly by

10    facts and circumstances which lead to a conclusion that he or

11    she knew the conspiracy's main purpose.  But it's up to the

12    government to convince you that such facts and circumstances

13    existed in this particular case.

14          Now, this jury instruction applies to both defendant

15    Young-Bey and defendant Jones for Count 2.  This also, jury

16    instruction, applies to defendant Young-Bey for Count 4.  In

17    this, Count 2 and 4 relates to mail fraud.  And, remember, I

18    indicated in the conspiracy that it was for bank fraud, mail

19    fraud.  So you can look at the instruction about what mail

20    fraud is and what bank fraud is.

21          The elements of mail fraud, each of which the

22    government must prove beyond a reasonable doubt, are this:

23    One, the defendant knowingly and willingly devised a scheme to

24    defraud or to obtain money or property by means of materially

25    false or fraudulent pretenses, representations, or promises.

1        Two, the defendant did so with the intent to defraud.

2        Three, in furthering or carrying out this scheme to

3    defraud, the defendant knowingly and deliberately placed or

4    caused to be placed mail matter to be delivered by the

5    United States Postal Service or a private or commercial

6    interstate carrier.

7        A scheme it defraud is any plan, pattern, or course

8    of action intended to deceive or cheat someone out of money or

9    property by using materially false or fraudulent pretenses,

10   representations, or promises, reasonably calculated to deceive.

11       False or fraudulent pretenses, representations, or

12   promises are any actual or direct false statements known to be

13   false or made with reckless indifference to the truth,

14   deceitful statements, half-truths, concealment of facts that

15   are material or important to the matter, all of which were

16   knowingly made or concealed with the intent to defraud.

17       A pretense, representation, or promise is material if

18   it would be important to a reasonable person in making a

19   decision about a particular matter.  However, whether a

20   pretense, representation, or promise is material does not

21   depend on whether a person was actually deceived or relied on

22   it or should have known it was false or fraudulent.  Nor is it

23   require that the government show that the defendant's purpose

24   was to cause a loss to the victim.

25       Moreover, it's irrelevant whether the person acting

1    on the pretense, representation, or promise did so negligently,

2    carelessly, irresponsibly, or could have done something more to

3    prevent the offense.

4              With respect to the second element, intent to defraud

5    means to act knowingly and with the specific intent to deceive.

6    Knowingly means to act voluntarily and deliberately, rather

7    than mistakenly or inadvertently.

8              Direct proof of knowledge and fraudulent intent is

9    almost never available.  It would be a rare case where it could

10   be shown that a person wrote or stated that as of a given time

11   in the past she or he committed an act with fraudulent intent.

12   Such direct proof is not required.

13             Someone's intent ordinarily cannot be proved directly

14   because there's no way of knowing what a person is actually

15   thinking.  But you may infer the person's intent from the

16   surrounding circumstances.  You may consider any statement made

17   or acts done or omitted by the defendant, and all other facts

18   and circumstances received in evidence which indicate the

19   defendant's intent.  You may infer, but are not required to

20   infer, that a person intends the natural and probable

21   consequences of acts the defendant intentionally did or did not

22   do.  It's entirely up to you, however, to decide what facts to

23   find from the evidence received during this trial.  You should

24   consider all the circumstances in evidence that you think are

25   relevant in determining whether the government has proved

1    beyond a reasonable doubt that the defendant acted with the

2    necessary state of mind.

3            Circumstantial evidence, if believed, is of no less

4    value than direct evidence.  In either case, the essential

5    elements of the crime must be established beyond a reasonable

6    doubt.

7            The third element of the mail fraud offense concerns

8    the use of the mails.

9            The government need not prove that the scheme planned

10   for the use of the mails, but the mailing must be for the

11   purpose of executing the scheme.  It's not necessary that the

12   government prove all of the details alleged in the indictment

13   concerning the precise nature and purpose of the scheme, or

14   that the mailed matter was itself false or fraudulent, or that

15   the alleged scheme actually succeeded in defrauding anyone, or

16   that the use of the mail or common carrier was intended as the

17   specific or exclusive means of accomplishing the alleged fraud.

18   What must be proved beyond a reasonable doubt is that the

19   defendant knowingly devised or intended to device a scheme to

20   defraud.  That was substantially the same as the one alleged in

21   the indictment.  And that the use of the mails or a common

22   carrier was closely related to the scheme, in that the

23   defendant either mailed something or caused it to be mailed or

24   delivered by common carrier in an attempt to execute or carry

25   out the scheme.

1          Although a defendant must cause a mailing in

2    furtherance of a fraud, that mailing may be incidental to the

3    fraud and the defendant need not personally send the mailing or

4    even intend that it be sent.  A defendant, quote, causes,

5    unquote, the mails to be used where the defendant, quote, does

6    an act with knowledge that the use of the mails will follow in

7    the ordinary course of business or where such use can

8    reasonably be foreseen, even though not actually intended,

9    unquote.

10         To cause the mails or common carrier to be used is to

11   do an act with knowledge that the use will follow in the

12   ordinary course of business or where such use can reasonably be

13   foreseen even though the defendant did not intend or request

14   the mails or common carrier to be used.

15         It's not necessary for the defendant to be directly

16   or personally involved in the delivery by mail or common

17   carrier, as long as such delivery was reasonably foreseeable in

18   the execution of the alleged scheme in which the defendant is

19   accused of participating.  This does not mean that the

20   defendant must have specifically authorized others to make the

21   delivery.  When one does an act with knowledge that the use of

22   the mail or common carrier will follow in the ordinary course

23   of business or where such use can reasonably be foreseen, even

24   though not actually intended, then the defendant causes the

25   mails or common carrier to be used.

1          Finally, each use of the mails to further or to carry

2    out the scheme to defraud may be a separate violation of the

3    mail fraud statute.

4          Now, Counts 2 and 4.  And these are mail fraud.  And

5    Count 2 charges Mr. Young-Bey and Ms. Jones with mail fraud in

6    connection with the property located at 164 Bryant Street,

7    Northwest, in Washington, D.C.  This is a separate charge from

8    conspiracy to commit mail fraud as charged in Count 1.

9          Count 4 charges only Mr. Young-Bey with mail fraud in

10   connection with the property at 7712 12th Street, Northwest,

11   Washington, D.C.

12         So, mail fraud has been previously defined for you in

13   instruction 23 on pages 31 to 35.

14         Now, the following jury instruction applies to both

15   defendant Young-Bey and defendant Jones for Count 3.  This jury

16   instruction also applies to defendant Young-Bey for Count 5.

17   And this is the charge of bank fraud.

18         For you to find the defendant guilty of bank fraud

19   you must find that the government has proved each and every one

20   of the following elements beyond a reasonable doubt:

21         First, that the defendant knowingly executed a scheme

22   or artifice to obtain any of the monies, funds, credits,

23   assets, securities, or other property owned by or under the

24   control or custody of a financial institution by means of false

25   or fraudulent pretenses, representations, or promises.

1          Second, that the scheme related to a material fact or

2     included a material misrepresentation or concealment of a

3     material fact.

4          Third, that the defendant had the intent to deceive

5     or cheat someone for the purpose of either causing a financial

6     loss to another or bringing about a financial gain to himself

7     or herself or to another person.

8          And, fourth, that Hard Money Bankers is a financial

9     institution as defined by statute.

10         Now, under the relevant statute, definition of

11    financial institution, in quotes, includes a mortgage lending

12    business.  Quote, mortgage lending business, quote, is defined

13    as an organizations which finances or refinances any debt

14    secured by an interest in real estate, including private

15    mortgage companies and any subsidiaries of such organizations,

16    and whose activities affect interstate or foreign commerce.

17         It's not necessary that the government prove that the

18    bank or financial institution suffered a financial loss, that

19    defendant intended to defraud a bank or financial institution

20    or that the defendant's scheme created a risk of financial loss

21    to the bank or financial institution.

22         The following definitions are the same as that which

23    I gave you in connection with the mail fraud in instruction 23

24    on pages 31 to 35, but I'm going to repeat them here for

25    convenience.

1          So, a scheme or artifice is any plan, pattern, or

2    course of action intended to deceive or cheat someone out of

3    money or property by using materially false or fraudulent

4    pretenses, representations, or promises, reasonably calculated

5    to deceive.

6          False or fraudulent pretenses, representations, or

7    promises are any actual or direct false statements known to be

8    false or made with reckless indifference to the truth,

9    deceitful statements, half truths, concealment of facts that

10   are material or important to the matter, all of which were

11   knowingly made or concealed with the intent to defraud.

12          A pretense, representation, or promise is material if

13   it would be important to a reasonable person in making a

14   decision about a particular matter.  However, whether a

15   pretense, representation, or promise is material does not

16   depend on whether a person was actually deceived or relied on

17   it or should have known it was false or fraudulent.  Nor is it

18   required that the government show that the defendant's purpose

19   was to cause a loss to the victim.

20          Moreover, it's irrelevant whether the person acting

21   on the pretense, representation, or promise did so negligently,

22   carelessly, irresponsibly, or could have done something more to

23   prevent the offense.

24          With respect to the first element, knowingly, it

25   means to act voluntarily and deliberately, rather than

1    mistakenly or inadvertently.

2              Regarding intent to deceive or cheat, direct proof of

3    knowledge and fraudulent intent is almost never available.  It

4    would be a rare case where it could be shown that a person

5    wrote or stated that as of a given time in the past they

6    committed an act with fraudulent intent.  Such direct proof is

7    not required.

8              Someone's intent ordinarily cannot be proved directly

9    because there's no way of knowing what a person is actually

10   thinking, but you may infer the person's intent from the

11   surrounding circumstances.  You may consider any statement made

12   or acts done or omitted by the defendant, and all other facts

13   and circumstances received in evidence which indicate his or

14   her intent.  You may infer, but are not required to infer, that

15   a person intends the natural and probable consequences of acts

16   he or she intentionally did or did not do.  It's entirely up to

17   you, however, to decide what facts to find from the evidence

18   received during this trial.  You should consider all the

19   circumstances in evidence that you think are relevant in

20   determining whether the government as proved beyond a

21   reasonable doubt that the defendant acted with the necessary

22   state of mind.

23             Now, Counts 3 and 5, bank fraud.  Count 3 charges

24   Mr. Young-Bey and Ms. Jones with bank fraud in connection with

25   the property located at 164 Bryant Street, Northwest,

1    Washington, D.C.  This is a separate charge from the conspiracy

2    to commit bank fraud as charged in Count 1.

3         Count 5 charges only Mr. Young-Bey with bank fraud in

4    connection with the property located at 7712 12th Street,

5    Northwest, Washington, D.C.  Bank fraud has been previously

6    defined to you in instruction 25 on pages 37 to 40.  So in some

7    instances, rather than repeating it, I've sent you back and

8    told you where it is and what pages.  In other instances I've

9    included it because it's short enough.

10        So you should look at each of these offenses in their

11   entirety, whether it's referring back, or if I'm not referring

12   back, in which case that's the total instruction on the

13   offense.

14        Now, the following jury instruction applies to the

15   defendant Young-Bey and defendant Jones for Count 6.  Count 6

16   is conspiracy to commit expenditures money laundering.  It's a

17   particular type of money laundering.

18        Count 6 of the indictment accuses defendant Young-Bey

19   and defendant Jones of a conspiracy to commit the crime of

20   expenditures money laundering, in violation of a federal law,

21   in connection with the property located at 164 Bryant Street,

22   Northwest, Washington, D.C.

23        It's a crime for two or more persons to conspire or

24   agree to commit a criminal act, even if they never actually

25   achieve their goal.

 1          A conspiracy is a kind of criminal partnership.  For

 2     you to find any one of the defendants guilty of the conspiracy

 3     charge the government must prove each and every one of the

 4     following elements beyond a reasonable doubt:

 5          First, that two or more persons conspired or agreed

 6     to commit the crime of expenditures money laundering.

 7          Second, that the defendant knowingly and voluntarily

 8     joined the conspiracy.

 9          And you must be convinced that the government has

10     proved all of these elements beyond a reasonable doubt in order

11     to find any one of these defendants guilty of the conspiracy

12     charge.

13          Now, I'll address the elements of the crime of

14     expenditures money laundering in a few moments.

15          Now, with regard to the first element -- and this is

16     a conspiracy, a criminal agreement -- the government must prove

17     that two or more persons conspired or agreed to cooperate with

18     each other to commit the crime of expenditures money

19     laundering.  This does not require proof of any formal

20     agreement, written or spoken, nor does this require proof that

21     everyone involved agreed on all the details.  But proof that

22     people simply met together from time to time and talked about

23     common interests or engaged in similar conduct is also not

24     enough to establish a criminal agreement.  These are things

25     that you may consider in deciding whether of the government has

59

1    proved an agreement.  But without more they are not enough.

2          What the government must prove is that there was a

3    mutual understanding, either spoken or unspoken, between two or

4    more people, to cooperate with each other to commit the crime

5    of expenditures money laundering.  This is essential.

6          An agreement can be proved indirectly by facts and

7    circumstances which lead to a conclusion that an agreement

8    existed, but it's up to the government to convince you that

9    such facts and circumstances existed in this particular case.

10          With regard to the second element, if you're

11    convinced that there was a criminal agreement, then you must

12    decide whether the government has proved that each defendant

13    knowingly and voluntarily joined that agreement.  You must

14    consider each defendant separately in this regard to convict

15    any defendant.

16          The government must prove that the defendant knew the

17    conspiracy's main purpose and that he or she voluntarily joined

18    to advance or help achieve its goals.  This does not require

19    proof that the defendant knew everything about the conspiracy

20    or everyone else involved or that the defendant was a member of

21    it from the very beginning.  Nor does it require proof that the

22    defendant played a major role in the conspiracy or that the

23    defendant's connection to it was substantial.  A slight role or

24    connection may be enough.

25          But proof the defendant simply knew about a

1    conspiracy or was present at times or associated with members

2    of the group is not enough, even if the defendant approved of

3    what was happening or did not object to it.  Similarly, just

4    because a defendant may have done something that happened to

5    help a conspiracy doesn't necessarily make the defendant a

6    conspirator.  These are all things that you may consider in

7    deciding whether the government joined a conspiracy.  But

8    without more they are not enough.

9           A defendant's knowledge can be proved indirectly by

10   facts and circumstances which lead to a conclusion that the

11   defendant knew the conspiracy's main purpose.  But it's up to

12   the government to convince you that such facts and

13   circumstances existed in this particular case.

14          Now, this jury instruction applies to defendant

15   Young-Bey for Counts 7 and 8.  And this is expenditures money

16   laundering.

17          Count 7 charges only defendant Young-Bey with

18   expenditures money laundering in connection with the property

19   located at 164 Bryant Street, Northwest, Washington, D.C.

20          Count 8 charges only defendant Young-Bey with

21   expenditures money laundering in connection with the property

22   located at 7712 12th Street, Northwest, Washington, D.C.  Title

23   18 United States Code Section 1957 makes it a crime to engage

24   in money laundering.  For you to find the defendant guilty, the

25   government must prove each of the following beyond a reasonable

1    doubt:

2              First, that the defendant engaged in a monetary

3    transaction which had some effect on interstate or foreign

4    commerce.

5              Second, that the monetary transaction involved

6    criminally derived property with a value greater than $10,000,

7    and obtained through specified unlawful activity.

8              And, third, that the defendant did so knowingly.

9              Knowing that the property involved in a financial

10   transaction represents the proceeds of some form of unlawful

11   activity means that the person knew that the property involved

12   in the transaction represented proceed from some form, although

13   not necessarily which form, of activity that constitutes a

14   felony under state, federal, or foreign law, regardless of

15   whether or not such activity is specified in the definition of

16   specified unlawful activity.

17             Interstate commerce includes commerce between one

18   state, territory, possession, or the District of Columbia and

19   another state, territory, possession, or the District of

20   Columbia.

21             Monetary transaction means the deposit, withdrawal,

22   transfer or exchange, in or affecting interstate or foreign

23   commerce, of funds or a monetary instrument by, through, or to

24   a financial institution, including any transaction that would

25   be a financial transaction which in any way or degree affects

1    interstate or foreign commerce involving the movement of funds

2    by wire or other means or involving one or more monetary

3    instruments, or involving the transfer of title to any real

4    property, or a transaction involving the use of a financial

5    institution which is engaged in, or the activities affect,

6    interstate or foreign commerce in any way or degree.

7         Criminally derived property means any property

8    constituting, or derived from, proceeds obtained from a

9    criminal offense.

10        The government need not prove that all of the money

11   involved in the transaction constituted the proceeds of the

12   criminal activity.  It is sufficient if the government proves

13   that at least part of the money represented such proceeds.  Nor

14   does the government have to trace the origin of the funds from

15   the sale of assets that were purchased with commingled

16   illegally-acquired and legally-acquired funds.

17        Now, this jury instruction applies to defendant

18   Young-Bey for Counts 9 and 10.  And this is aggravated identity

19   theft.

20        Defendant Young-Bey is alone charged in Counts 9 and

21   10 with aggravated identity theft in connection with the

22   property located at 164 Bryant Street, Northwest, Washington,

23   D.C.

24        For you to find the defendant guilty of this crime

25   you must find that the government has proved each and every one

1    of the following elements beyond a reasonable doubt:

2              First, that the defendant committed the felony

3    violation charged in Count 2 and/or Count 3.  So that's the

4    mail fraud or bank fraud.  And I indicate see instruction 23,

5    and the pages for them, as well as instruction 25, and the

6    pages for them.  So you'll know where they are for those

7    definitions.

8              The violations charged in Count 2 and 3 are felony

9    violations listed in the statute.

10             Second, that the defendant knowingly transferred,

11   possessed, or used a means of identification of another person

12   without lawful authority.

13             Third, that the defendant knew the means of

14   identification belonged to another person.

15             And, fourth, that the transfer, possession, or use

16   was during and in relation to the crime charged in Count 2 and/or

17   3.

18             Now I'll give you more detailed instruction on some

19   of these terms.

20             The term, quote, means of identification, unquote, is

21   defined as any name, signature, or number that may be used to

22   identify a specific individual.

23             Count 9 alleges that the name and signature of

24   Roosevelt Twiggs was used as a means of identification.

25             Count 10 alleges that the name and signature of

1    Patricia Davis was used as a means of identification.

2         The term use of, quote/unquote, means active

3    employment of the means of identification during and in

4    relation to the crime charged in Count 2 and 3.  Quote, active

5    employment, unquote, includes activity such as displaying or

6    bartering.  Quote, use, unquote, also includes a person's

7    reference to a means of identification in his possession for

8    the purpose of helping to commit his crimes charged in Count 2

9    and 3.

10        An act is done knowingly if done voluntarily and

11   intentionally, and not because of mistake or accident or other

12   innocent reason.  The government is not required to prove that

13   the defendant knew that his actions violated any particular

14   provision of law, or even knew that his actions violate the law

15   at all.  Ignorance of the law is not a defense to this crime.

16        The phrase, quote, without lawful authority, unquote,

17   does not require that the defendant stole the means of

18   identification information from another person, but includes

19   the defendant obtaining that information from another person

20   without that person's permission or consent.  And the term,

21   quote, during and in relationship to requires that the means of

22   identification have some purpose or effect with respect to the

23   crimes charged in Counts 2 and 3.  In other words, the means of

24   identification must facilitate or further or have the potential

25   of facilitating or furthering the crime charged in Counts 2 and

65

1   3, and its presence or involvement cannot be the result of

2   accident or coincidence.

3           Now, this jury instruction again applies to defendant

4   Young-Bey for Counts 11, 12, and 13.  And it's, again, an

5   aggravated identity theft.

6           Defendant Young-Bey is alone charged in Counts 11,

7   12, and 13 with aggravated identity theft in connection with

8   the property located at 7712 12th Street, Northwest,

9   Washington, D.C.

10          For you to find the defendant guilty of this crime,

11  you must find that the government has proved each and every one

12  of the following elements beyond a reasonable doubt:

13          First, that the defendant committed the felony

14  violation charged in either Count 4 or 5, mail fraud and/or

15  bank fraud.  And then I have the pages where the instructions

16  are; number 23, at pages 31 to 35, and instruction 25, at pages

17  37 to 40 for those definitions.  The violations charged in

18  Count 4 and 5 are felony violations listed in the statute.

19          Second, that the defendant knowingly transferred,

20  possessed, or used a means of identification of another person

21  without lawful authority.

22          Third, that the defendant knew the means of

23  identification belonged to another person.

24          And, fourth, that the transfer, possession, or use

25  was during and in relation to the crime charged in Count 4

1    and/or 5.

2            Now, Count 11 alleges that the name and signature of

3    Rashid Jelani was used as a means of identification.

4            Count 12 alleges that the name and signature of Ann

5    Jelani was used as a means of identification.

6            Count 13 alleges that the name and signature of

7    Patricia Davis was used as a means of identification.

8            Now, quote, means of identification, unquote,

9    knowingly and without lawful authority -- all within quotes --

10   have previously been defined.

11           The term "use" means active employment of the means

12   of identification during and in relation to the crime charged

13   in either Count 4 or 5.  "Active employment" includes

14   activities such as displaying or bartering.  "Use" also

15   includes a person's reference to a means of identification in

16   his possession for the purpose of helping to commit the crime

17   charge in either Counts 4 or 5.

18           For the charges in Count 11, 12, and 13, the term,

19   quote, during and in relationship to, unquote, requires that

20   the means of identification have some purpose or effect with

21   respect to the crime charged in either Counts 4 and 5.  In

22   other words, the means of identification must facilitate or

23   further or have the potential of facilitating or furthering the

24   crime charged in either Counts 4 and 5, and its presence or

25   involvement cannot be the result of accident or coincidence.

1          Now, definition of willfully causing an act to be

2     done.

3          You may find either Jeffrey Young-Bey or Martina

4     Jones, or both, guilty of the crimes charged in the indictment

5     without finding that he or she personally committed each of the

6     acts constituting the offense or was personally present at the

7     commission of the offense.  A defendant is responsible for an

8     act which he or she willfully causes to be done if the act

9     would be criminal if performed by him or her directly or by

10    another.  To cause an act to be done means to bring it about.

11    You may convict either Jeffrey Young-Bey or Martina Jones, or

12    both, of the offense charged if you find that the government

13    has proved beyond a reasonable doubt each element of the

14    offense and either Jeffrey Young-Bey or Martha Jones, or both,

15    willfully caused such an act to be done with the intent to

16    commit the crime.

17         Now proof of state of mind.

18         Someone's intent and knowledge ordinarily can't be

19    proved directly.  There's no way of knowing what a person is

20    thinking, but you may infer someone's intent and knowledge from

21    the surrounding circumstances.  You may consider any statement

22    made or acted on or omitted by either Jeffrey Young-Bey or

23    Martina Jones, or both, and all other facts and circumstances

24    received in evidence that indicate his or her intent and

25    knowledge.

1          You may infer, but you're not required to infer, that

2    a person intends the natural and probable consequences of acts

3    the defendant intentionally did or did not do.  It's entirely

4    up to you, however, to decide what facts to find from the

5    evidence received during this trial.  You should consider all

6    the circumstances in evidence that you think are relevant in

7    determining whether the government has proved beyond a

8    reasonable doubt that either Jeffrey Young-Bey or Martina

9    Jones, or both, acted with the necessary state of mind.

10          Now, motive is not an element of the offense -- of

11    the offenses charged, and the government is not required to

12    prove motive in this case.  You may, however, consider evidence

13    of motive or lack of evidence of motive in deciding whether or

14    not the government has proved the charges beyond a reasonable

15    doubt.

16          Deliberate ignorance.

17          Next I want to explain something about proving a

18    defendant's knowledge.  This instruction applies to Counts 1

19    through 13 of the indictment.

20          No one can avoid responsibility for a crime by

21    deliberately ignoring the obvious.  If you're convinced that

22    the defendant deliberately ignored a high probability that a

23    scheme to fraudulently transfer property deeds and fraudulently

24    obtain loans on these properties existed, then you may find

25    that they knew of the scheme to fraudulently transfer property

1    deeds and fraudulently obtain loans on those properties.

2         But to find this, you must be convinced beyond a

3    reasonable doubt that the defendant was aware of a high

4    probability of a scheme to fraudulently transfer deeds and

5    fraudulently obtained loans on those properties existed and

6    that the defendant deliberately closed his or her eyes to what

7    was obvious.  Carelessness, or negligence, or foolishness on

8    the defendant's part is not the same as knowledge and is not

9    enough to convict.  This, of course, is all for you to decide.

10        In conspiracy cases deliberate ignorance can be used

11   to prove, one, the defendant's knowledge of the aims or purpose

12   of the conspiracy, but not, two, the defendant's intent to join

13   the conspiracy.  So you need to make sure you apply it to the

14   correct one.

15        Now, this instruction, the following one on aiding

16   and abetting, applies to defendant Young-Bey for Counts 2, 3,

17   4, 5, 7, 8, 9, 10, 11, 12, and 13.  It applies to defendant

18   Jones for Counts 2 and 3.

19        You may find defendant Jeffery Young-Bey guilty of

20   the crimes charged in Counts 2, 3, 4, 5, 7, 8, 9, 10, 11, 12,

21   and 13 without finding that he personally committed each of the

22   acts that make up the crime, or that he was present while the

23   crime was being committed.

24        You may find Martina Jones guilty of the crimes

25   charged in Counts 2 and 3 without finding that she personally

1    committed each of the acts that make up the crime, or that he

2    or she was present while the crime was being committed.

3          Any person who in some way intentionally participates

4    in the commission of a crime can be found guilty either as an

5    aider and abettor or as a principal offender.  It makes no

6    difference which label you attach.  The person is as guilty of

7    the crime as they would be if they had personally committed

8    each of the acts that make up the crime.

9          To find that a defendant aided and abetted in

10   committing the crime, you must find the defendant knowingly

11   associated himself or herself with the commission of the crime,

12   that he or she participated in the crime as something they

13   wished to bring about, and he or she intended by their actions

14   to make it succeed.

15         Some affirmative conduct by the defendant in planning

16   or carrying out the crime is necessary.  Mere physical presence

17   by the defendant at the place and time the crime is committed

18   is not by itself sufficient to establish their guilt.

19         The government is not required to prove that anyone

20   discussed or agreed upon a specific time or method of

21   committing the crime.  The government is not required to prove

22   that the crime was committed in the particular way planned or

23   agreed upon.  Nor need the government prove that the principal

24   offender and the person alleged to be the aider and abetter

25   directly communicated with each other.

1           I've already instructed you on the elements of each

2     of the offenses with which Jeffrey Young-Bey and Martina Jones

3     are charged:  Mail fraud, instruction 23, pages 31 to 35; bank

4     fraud, instruction 25, pages 37 to 40; expenditures money

5     laundering, instruction 28, pages 46 through 48; and,

6     aggravated identity theft, at instruction 29 and 30, pages 49

7     to 51 and 52 to 54.

8           With respect to the charges of mail fraud, regardless

9     of whether either Jeffrey Young-Bey or Martina Jones, or both,

10    was an aider and abetter or a principal offender, the

11    government must prove beyond a reasonable doubt that either

12    Jeffrey Young-Bey or Martina Jones, or both, personally acted

13    knowingly.

14          With respect to the charges of bank fraud, regardless

15    of whether either Jeffrey Young-Bey or Martina Jones, or both,

16    was an aider, abettor, a personal offender, the government must

17    prove beyond a reasonable doubt that either Jeffrey Young-Bey

18    or Martina Jones, or both, personally acted knowingly.

19          With regard to the charges of expenditures money

20    laundering, regardless of whether either Jeffrey Young-Bey or

21    Martina Jones, or both, were an aider and abettor or a

22    principal offender, the government must prove beyond a

23    reasonable doubt that either Jeffrey Young-Bey or Martina

24    Jones, or both, personally acted knowingly.

25          With respect to the charges of aggravated identity

1    theft, regardless of whether Jeffrey Young-Bey was an aider or

2    abettor or a principal offender, the government must prove

3    beyond a reasonable doubt that Jeffrey Young-Bey personally

4    acted knowingly.

5           It's not necessary that all the people who committed

6    the crime be caught or identified.  It's sufficient to find

7    beyond a reasonable doubt that the crime was committed by

8    someone and that the defendant knowingly and intentionally

9    aided and abetted in committing the crime.

10          Now co-conspirator liability.

11          Jeffrey Young-Bey is alone charged with mail fraud,

12   Count 4; bank fraud, Count 5; expenditures money laundering,

13   Counts 7 and 8; and, aggravated identity theft, Counts 9

14   through 13.

15          Jeffrey Young-Bey may be found guilty of these

16   crimes, if it was committed by a co-conspirator of Jeffrey

17   Young-Bey, even though he did not participate directly in the

18   acts constituting the offense.  That is because a conspiracy is

19   a kind of partnership in crime and its members may be

20   responsible for each other's actions.  A defendant is

21   responsible for an offense committed by another member of the

22   conspiracy if the defendant was a member of the conspiracy when

23   the offense was committed and if the offense was committed in

24   furtherance of and as a natural consequences of the conspiracy.

25          In considering the following, the Court instructs the

1    jury to refer back to earlier instructions that explain what

2    constitutes an conspiracy, and that is instruction 23,

3    conspiracy to commit mail fraud and bank fraud on pages 27 to

4    30; instruction 27, conspiracy to commit expenditures money

5    laundering on page 42 through 45.  And the same standard should

6    apply to conspiracy regarding aggravated identity theft.

7            In order to find Jeffrey Young-Bey guilty of mail

8    fraud, Count 4, or bank fraud, Count 5, under this theory you

9    must find beyond a reasonable doubt that:

10            It was a conspiracy to obtain money and property

11    through forged property deeds and fraudulently obtained loans.

12            The offense of mail fraud or bank fraud was committed

13    by a co-conspirator of Jeffrey Young-Bey.

14            Jeffrey Young-Bey were members of the conspiracy to

15    obtain money and property through forged property deeds and

16    fraudulently obtained loans at the time the offense of mail

17    fraud or bank fraud was committed.

18            The offense of mail fraud or bank fraud was committed

19    during the existence of the conspiracy.

20            The offense of mail fraud or bank fraud was committed

21    in furtherance of the conspiracy.

22            And the offense of mail fraud or bank fraud was a

23    reasonable foreseeable consequence of the conspiracy.  It's not

24    necessary to find that the crime was intended as part of the

25    initial plan, only that it was a foreseeable consequence of the

1      original plan.

2                So Jeffrey Young-Bey is also charged with

3      expenditures money laundering, Counts 7 and 8.

4                Before you may find Jeffrey Young-Bey guilty of

5      expenditures money laundering under this theory -- this is the

6      theory of co-conspirator liability -- you must find beyond a

7      reasonable doubt that:

8                One, there was a conspiracy to obtain money and

9      property through forged property deeds and fraudulently

10     obtained loans.

11               Two, the offense of expenditures money laundering was

12     committed by a co-conspirator of Jeffrey Young-Bey.

13               Three, Jeffrey Young-Bey was a member of a conspiracy

14     to obtain money and property through forged property deeds and

15     fraudulently obtained loans at the time that the offense of

16     expenditures money laundering was committed.

17               Four, the offense of expenditures money laundering

18     charged in Counts 7 or 8 was committed during the existence of

19     a conspiracy.

20               The offense of expenditures money laundering was

21     committed in furtherance of the conspiracy.

22               And the offense of expenditure money laundering was a

23     reasonably foreseeable consequence of the conspiracy.  It's not

24     necessary to find that the crime was intended as part of the

25     original plan, only that it was a foreseeable consequence of

1    the original plan.

2              Now, Jeffrey Young-Bey is also charged with

3    aggravated identity theft, Counts 9 through 13.  So before you

4    may find Jeffrey Young-Bey guilty of aggravated identity theft

5    under this theory -- and this is the co-conspirator theory --

6    you must find beyond a reasonable doubt that:

7              One, there was a conspiracy to obtain money and

8    property through forged property deeds and fraudulently

9    obtained loans.

10             The offense of aggravated identity theft was

11   committed by a co-conspirator of Jeffrey Young-Bey.

12             Jeffrey Young-Bey was a member of the conspiracy to

13   obtain money and property through forged property deeds and

14   fraudulently obtained loans at the time the offense of

15   aggravated identity theft was committed.

16             The offense of aggravated identity theft was

17   committed during the existence of the conspiracy.

18             The offence of aggravated identity theft was

19   committed in furtherance of the conspiracy.

20             And the offense of aggravated identity theft was a

21   reasonably foreseeable consequence of the conspiracy.  It's not

22   necessary to find that the crime was intended as part of the

23   original plan, only that it was a foreseeable consequence of

24   the original plan.

25             So part two has the different -- the elements of the

1     offenses.  There are certain instructions that relate to

2     definitions of terms and certain requirements, knowingly and

3     willfully, in furtherances.  There are two theories of

4     liability, one is an aiding and abettor, and the other is the

5     co-conspirator theory.

6              I know it sounds repetitious, but when you look at

7     this, we tried to put them so you don't have to keep shifting

8     back and forth.  It would have made it very long to put these

9     elements back in here.  That's why we've given you where you

10    need to go back and look.

11             Now, Count 3 is discussion of your deliberations.

12             MR. HOWLAND:  Your Honor, may I ask for a brief

13    conference before we get to part 3 of the instructions?

14             (Bench discussion:)

15             MR. HOWLAND:  I just want to --

16             THE COURT:  Is there something wrong?

17             MR. HOWLAND:  It occurred to me that the Court did

18    not rule on the mistrial motion.  And one of the potential

19    remedies, to the extent that the Court feels that there was any

20    error, is a curative instruction.  So I just -- I want to flag

21    it for the Court because now is pretty much the only time, if

22    there is going to be some sort of curative instruction, that

23    the Court could make that -- could read it to the jury.  And

24    mostly I just want to hear what the defense's position is.

25             THE COURT:  Go ahead for comment.  I didn't hear

1    anything from the defense.

2          MR. HOWLAND:  I think their phone is not working,

3    Your Honor.

4          THE COURT:  Oh.  Dorothy, does the phone work?  I

5    don't know why they have problems with it.

6          MR. DONATH:  Apologies, Your Honor.  There's only one

7    phone at this table that works.

8          THE COURT:  Okay, I'm sorry.  We will get the --

9    let's see.  We'll get the IT people up.

10          MR. DONATH:  It's no problem, Your Honor, if they're

11    not.  Obviously we stand by our motion in terms of the --

12          THE COURT:  I was waiting for the curative

13    instructions.  It seemed to me there were two things:  One was

14    the issue, I believe, of -- why don't you tell me precisely.

15    The one about looking at the exhibit is I plan on indicating --

16    I've indicated throughout here that they can only consider the

17    evidence that's actually been in the exhibits that have been

18    admitted.  And there should be, somewhere in here, one that

19    indicates that if they've been shown an exhibit, that it hasn't

20    been admitted, such as to refresh recollection, that it's only

21    the exhibits that are admitted, which seemed to be the best way

22    to deal with that one.

23          The other was the shifting burden, I think.  And the

24    shifting burden, I indicated specifically that if a witness had

25    indicated that the burden shifted, that that was not correct.

1      It's in here, I already read it.

2              Was there something else?

3              MR. DONATH:  Mr. Young-Bey is not asking for anything

4      else beyond the evidence in the motion.

5              THE COURT:  Were those the two key things?

6              MR. DONATH:  Those are the two key things, Your

7      Honor.

8              THE COURT:  Without having had the full opportunity

9      to look through them all, it seemed to me those were the

10     closest I could come up with as curative instructions.  I would

11     note that, unfortunately, defense counsel in his closing

12     referred to the arrest, which is the document that we were

13     hoping they would not consider because that's the one that was

14     up there for refreshing recollection when it talked about the

15     phone number.

16             But at any rate, there is in here, when we talk about

17     getting the instructions -- I'll take a look and make sure I've

18     it.  But I'm pretty sure that there is one related to that.  I

19     know we had talked about it, were debating about where to put

20     it.  Let me put the phone down so I can move the pages and find

21     it.  Hold on.

22             (Pause.)

23             THE COURT:  Yeah, the instruction on page 76, I added

24     the addition:  Any exhibits that were used to refresh a

25     witness's recollection which was not admitted to evidence, as

1    well as those exhibits' contents, should not be considered as

2    evidence in the case.  So those were the closest I could come

3    up with as curative instructions.

4              MR. DONATH:  Very well, Your Honor.

5              THE COURT:  The additional research, off the top of

6    my head, I think that's probably not enough for a mistrial.

7    But I will not, until I have a chance to really read through

8    the two things and look at the case law -- I went through

9    something more formal, I will write something up.

10             The one thing I will indicate to you is we need to

11   change the verdict form because they should have, on the

12   conspiracy bank fraud, mail fraud, we should make sure they're

13   unanimous on each of those.  So they need to indicate their

14   finding on that.

15             Also, there's a couple of them that appears they need

16   to have found him guilty on bank fraud or mail fraud, or

17   something, with it.  I have to go back and look.  Part of it is

18   if there's a felony.  So we need to make sure they don't

19   consider it, if they haven't found him guilty already on these.

20   But we can talk about it, we have time to do the verdict form.

21             MR. DONATH:  Okay.

22             THE COURT:  Anything else?  If not -- once I finish

23   the instructions, I was going to ask you if there's anything

24   other than the objections you've already raised.  No matter how

25   many times I get in, there's always little things, there's

1    things I've read, we will fix before it goes back to them.

2    MR. HOWLAND:  Again, apologize.  I want to get on the

3    record, the defense did not want anything additionally, except

4    for the instructions Your Honor just mentioned.

5    THE COURT:  Anything else?  This is the time to do it.

6    MR. DONATH:  Nothing for Mr. Young-Bey, Your Honor.

7    THE COURT:  Mr. Feitel?

8    MR. HOWLAND:  Mr. Feitel says, "Nothing."

9    THE COURT:  All right.

10    (Open court:)

11    THE COURT:  Now, part 3 relates to your

12    deliberations.  So when you return to the jury room, you should

13    select a foreperson to preside over your deliberations and to

14    be your spokesperson here in court.

15    Now, there are no specific rules regarding how you

16    select a foreperson.  That's totally up to you.  However, as

17    you go about the task be mindful of your mission:  To reach a

18    fair and just verdict based on the evidence.  So consider

19    selecting a foreperson who will be able to facilitate your

20    discussions, who can help you organize the evidence, who will

21    encourage civility and mutual respect among all of you, who

22    will invite each juror to speak up regarding his or her views

23    about the evidence, and who will promote a full and fair

24    consideration of that evidence.

25    Now, if it becomes necessary during your

1     deliberations to communicate with me, you can send a note by

2     the clerk.  -- there will be a court security person outside

3     the jury room while you're deliberating -- and signed by your

4     foreperson or one or more members of the jury.  No member of

5     the jury should try to communicate with me on anything

6     involving the merits, except by such a signed note.  And I will

7     never communicate with any member of the jury on any matter

8     concerning the merits of this case, accept in writing or orally

9     here in open court.

10              Now, bear in mind also that you're never, under any

11    circumstances, to reveal to any person -- not the clerk, any of

12    the security people, me -- how jurors are voting until after

13    you've reached a unanimous verdict.  That means that you should

14    never tell me in writing or open court or otherwise how the

15    jury is divided on any matter -- 6 to 6, 7 to 5, 11 to 1 -- or

16    any other fashion, whether the vote is for conviction or

17    acquittal, or any other issue.  So never include where you are

18    with your deliberations, or certainly any kind of split in any

19    kind of note that you would send.

20              Now, the verdict should represent the considered

21    judgment of each juror.  And in order to return a verdict, each

22    juror must agree on the verdict.  In other words, your verdict

23    on the count must be unanimous.

24              Each count in the indictment charges a separate

25    offense.  Moreover, each defendant is entitled to have the

1    issue of their guilt as to each of the crimes for which they

2    are not on trial determined from their own conduct and from the

3    evidence that applies to them as if they were being tried

4    alone.  You should, therefore, consider separately each offense

5    and the evidence which applies to it and you should return

6    separate verdicts as to each count of the indictment, as well

7    as to each defendant.

8          The fact that you may find any one defendant guilty

9    or not guilty on any one count of the indictment shouldn't

10   influence your verdict with respect to any other count of the

11   indictment for that defendant, unless I've instructed you

12   otherwise -- in a couple of instances, you'll see -- nor should

13   it influence your verdict with respect to any other defendant

14   as to that count or any other count in the indictment.

15         So you may find any one or more of the defendants

16   guilty or not guilty on any one or more counts of the

17   indictment and you may return different verdicts as to

18   different defendants and as to different counts.

19         Now, the question of possible punishment of a

20   defendant in the event of a conviction is not a concern of

21   yours and should not enter into or influence your deliberations

22   in any way.  The duty of imposing sentence in the event of a

23   conviction rests with me.  It's not your decision, shouldn't

24   influence you.  Your verdict should be based solely on the

25   evidence in the case and you should not consider the matter of

1    punishment at all.

2           Now, the attitude or conduct of jurors at the

3    beginning of deliberations are matters of considerable

4    importance.  It may not be useful for a juror, upon entering

5    the jury room, to voice a strong expression of an opinion on

6    the case or announce a determination to stand for a certain

7    verdict.  When one does that at the outset, a sense of pride

8    may cause that juror to hesitate to back away from an announced

9    position after a discussion of the case.

10          Furthermore, many jurors find it useful to avoid an

11   initial vote when you retire to the jury room.  Calmly

12   reviewing and discussing the case at the beginning of

13   deliberations is often a more useful way to proceed.  Remember

14   that you're not partisans or advocates in this matter, but you

15   are judges of the facts.

16          Now, I'll be sending into the jury room with you the

17   exhibits that have been admitted into evidence.  They -- some

18   will be paper, some will be electronic.  The ones you've seen

19   electronically you will be getting.  You may examine any or all

20   of them as you consider your verdict.  Please keep in mind that

21   exhibits that were only marked for identification but were not

22   admitted into evidence will not be given to you to examine or

23   consider in reaching your verdict.  So it's only exhibits that

24   were admitted.

25          So, additionally, for instance, exhibits that were

1    used to refresh a witness's recollection which were not

2    admitted into evidence, as well as those exhibits -- the

3    contents of those exhibits should not be considered as evidence

4    in the case.  So it's only the exhibits that actually got

5    admitted.

6           Now, as I told you, I'm providing you a copy of the

7    instructions.  I'll actually give you two copies, since there's

8    quite of bit a material in here.

9           During your deliberations you may, if you want, refer

10   to these instructions.  While you may refer to any particular

11   portion of the instructions, you're to consider the

12   instructions as a whole and you may not follow some and ignore

13   others.  If you have any questions about the instructions, feel

14   free to send a note.  And then please return the instructions

15   at the end.

16          You are going to get a verdict form and your

17   foreperson will fill it out.  You're going to get -- you're

18   going to get two copies; they're separate for Mr. Young-Bey and

19   separate for Ms. Jones.  And there's two copies of each.

20   They're exactly the same, the two copies for Mr. Young-Bey and

21   two copies for Ms. Jones.  What I would ask the foreperson is

22   to fill out both.

23          When you've reached a unanimous verdict, you should

24   send a note that you've reached a unanimous verdict and send

25   the note back with one -- with a copy for each of the

1   defendants, we've reached this unanimous verdict.  And keep the

2   other copies.  You'll be brought into the courtroom.  I'll ask

3   the foreperson -- we'll indicate you by seat number -- if

4   you've reach a unanimous verdict.  If the answer is yes, then

5   we'll go through the verdict form.  And I will have the form

6   and you will have the form.

7           I get the one that has the same thing.  I look at it

8   just to make sure there isn't a problem -- you have not

9   followed instructions or done something with it -- just to make

10  sure that -- there may be parts of the instructions that

11  indicate you have to make this finding before you reach to

12  that, something of that nature.  So read carefully the

13  instructions.  It's not a substitute for the instructions, but

14  in rendering your verdict it will match what I've given you as

15  instructions.

16          So you will get these verdict forms and, as I said,

17  it's not evidence in the case and shouldn't be any way of

18  suggesting or conveying an opinion as to how you're supposed to

19  do the verdicts.

20          It doesn't replace the instructions that I've already

21  given you and it doesn't replace or modify the instructions

22  about the elements which the government has to prove beyond a

23  reasonable doubt.  It's only meant to assist you in recording

24  your verdict in each of the counts as to each of the

25  defendants, to make sure there are no mistakes.

1               Now, I would like to remind you that in some cases --

2      although not necessarily this one -- there may be reports on

3      newspaper, radio, internet, TV, something where there's some

4      indication of the case going on.  I don't believe there's been

5      any so far.  But if there should be such media coverage, you

6      may be tempted to read, listen, or watch it.  Please don't

7      read, listen, or watch the reports.  You have to decide the

8      case on the evidence presented in the courtroom.

9               If there's any publicity about the trial that

10     inadvertently comes to your attention, don't discuss it with

11     the other jurors or anyone else.  Let me know or the clerk know

12     that that has happened and we'll briefly have a discussion.

13     You should just keep in mind that you've been here watching

14     everything, so you don't need to have somebody else's view

15     about what the case is about.  You know what the case is about.

16              Now, as you retire to the jury room -- again, I also

17     wish to remind you about my instructions at the beginning --

18     you may not communicate with anyone not on the jury about the

19     case.  This is electronic communications, email, text, social

20     media, posts, blogging, whatever, and you may not conduct any

21     independent investigation.  So you don't go look at where the

22     property is or look it up or look up definitions.  If I haven't

23     given you a definition, you need to send me a note and you'll

24     get something back.  Don't do anything independently because if

25     you do that, then you're getting information outside of it and

1    it also may not be accurate, in terms of information.

2              So let me -- one last conversation with the --

3              (Bench discussion:)

4              THE COURT:  So this is going to be excusing the

5    alternates, but I wanted to make sure there wasn't anything

6    else.  You preserved your objections, but if there's anything

7    else that needs to be done, this is the easiest time to correct

8    it.

9              Government?

10             MR. HOWLAND:  Nothing from the government, Your

11   Honor.

12             THE COURT:  Okay.  Mr. Young-Bey?

13             MR. DONATH:  Nothing from Mr. Young-Bey, Your Honor.

14             THE COURT:  Anything from Mr. Feitel?

15             MR. DONATH:  Nothing from Mr. Feitel, Your Honor.

16             THE COURT:  All right.  Thank you.

17             (Open court:)

18             THE COURT:  The last thing I must do is excuse the

19   alternate jurors.  As I told you before, the selection of the

20   alternates is an entirely random process.  Nothing personal.

21   Numbers were chosen at the beginning and the parties selected

22   three seats to be alternates before any of you entered the

23   courtroom, just to make sure there wasn't a problem in terms of

24   proceeding with the case.

25             Since the rest of you have remained healthy and

1      attentive, I can now excuse those three jurors.  So they are

2      jurors in seat numbers 2, 7, and 8.  Don't leave quite yet.

3      Okay.  Wait, wait.  Don't be so anxious.  I have a little bit

4      more.  You haven't totally finished with your job here.

5              Before the three of you leave, tear out the pages

6      from your notebook.  Write down your name and daytime phone

7      number and please give it to the clerk so we have a way of

8      contacting you.  I do this because it's possible, although very

9      unlikely, that we'll need to summon you back to rejoin the jury

10     in case something happens to a regular juror.  We started this

11     process when COVID came along, where we had a few problems.

12             So what I ask is since that -- slim as it is, that

13     possibility exists, I'm going to instruct you not to discuss

14     the case with anyone.  As soon as there's a verdict, we'll call

15     you and you'll know there's no possibility of your being pulled

16     back into the case.  So my earlier instruction on the internet

17     applies:  Don't research it, don't communicate, don't talk.

18     Act like you're still part of the jury panel.  And in all

19     likelihood, we'll be calling you to tell you there's been a

20     verdict and you're now free to discuss the case or do whatever

21     you wish to do.  But just on this very slim chance that you

22     could be called back.  And we will hold onto your -- pull out

23     the notes, but we'll hang onto them until, you know, there

24     actually is a verdict, then we'll destroy it, along with the

25     rest.

1          But I do want to thank you for your service, in terms

2     of your taking the time to participate, took some time to

3     select you for the trial, and I know this takes you away from

4     other responsibilities.  So we definitely appreciate the

5     service to the community.

6          So, let me excuse you.  And I think -- do they need

7     to go to the jury office?  Or do they just go leave the jury

8     badges?

9          THE COURTROOM DEPUTY:  They're finished.  I'll take

10    the badges.

11         THE COURT:  Jury badges you can give to

12    Ms. Patterson.  You don't need to go to the jury office.

13    You're free to do whatever you wish.  Take care and be well.

14         The rest of you, if you wait, I have one other thing

15    to say.

16         (Whereupon the alternates leave the courtroom.)

17         THE COURT:  All right.  So you'll be back -- just

18    some practical things:  You'll be back in the jury room, there

19    will be a security officer, such as that gentleman, who will be

20    there.  So you can give him notes and things so he can bring

21    them into the -- into the courtroom for us to look at.

22         The lunch, they will bring you lunch, and it's at

23    12:30, simply because of the kitchens downstairs.  So it won't

24    be a 1 o'clock one, it will be at 12:30.

25         While you're eating lunch you can't go out of the

1        courthouse, do not deliberate.  You can talk about whatever you

2        want to do, but don't engage in deliberations.  Make sure that

3        if somebody is in the restroom, you're not having any

4        deliberations.  You need to make sure everybody can hear the

5        discussion.  You can take breaks every hour, if you wish.  You

6        know, people can use the restrooms or whatever.  I would try

7        and make those regular, so that you have periods of time when

8        you're actually deliberating.

9              If the jurors could sort of keep track of when you're

10       not deliberating; not when you are, but when you're not.  So,

11       we don't really figure out how long you have to deliberate, but

12       it does help us to have some sense of how much time you've

13       actually spent on the deliberation.  So, as I indicated, you'll

14       send a note.  If you've reached a unanimous verdict, you'll

15       send back the filled-in jury verdict forms.  We'll bring you

16       back into the courtroom, call on the foreperson who -- and I

17       will go over them, the verdict, the two verdict forms.

18             I don't want you to be surprised if one or both of

19       the parties ask for the jury to be polled.  And they're

20       entitled to make sure that this is a unanimous verdict.  So

21       what it would be, juror seat number one, you agree with the

22       verdict as stated by your foreperson?  You say yes or no.  And

23       we go down by seat number, just to make sure the jury is

24       unanimous.  They may or may not ask it.  I don't want you to be

25       surprised if they do.

1           As I said, you'll get the two copies and the changes

2    and the verdict form and you can start.  Okay?  Let me excuse

3    you at this point.  We'll bring you back -- let me explain one

4    other thing.  I have an executive session today at 4:30, so

5    we're going to excuse you -- unless we hear from you before

6    that -- but we will excuse you at about 4:20.  We'll bring you

7    back into the courtroom and excuse you.

8           In the morning, if you're still deliberating tomorrow

9    morning, we will adjust -- we will do the usual time and

10   we'll -- you'll start your deliberations.  We don't need to

11   bring you into the courtroom, but I do do it at the end of the

12   day.

13          Okay.  All right.  So they're ready.

14          (Whereupon the jurors leave the courtroom.)

15          THE COURT:  Okay.  I think -- as I understand it,

16   you've gone over the exhibits and stuff.  You have to sign the

17   form, the thing.  But let me go through the verdict form for a

18   second.  And I think -- I'm going to redo it and I'll bring it

19   back out again.  But I think what we need to do is to, on the

20   conspiracy, is to indicate sort of a subsection that has mail

21   fraud, bank fraud, so they have to indicate whether they have

22   found a conspiracy to commit mail fraud, bank fraud, or both,

23   and so that we actually make sure it's unanimous.  So I'll make

24   a change there.

25          MR. FEITEL:  Your Honor?

1              THE COURT:  Yes?

2              MR. FEITEL:  It's morning still.  With respect to the

3      subset for Count 1, the conspiracy, I would ask that the jury

4      verdict say that your decision must be unanimous as to --

5              THE COURT:  I know, that's the reason we're putting

6      it in.

7              MS. FEITEL:  Thank you.

8              THE COURT:  I'll redo that.  Then, I'm trying to

9      think.  There's a couple of other -- bank fraud -- there's some

10     others where you --

11             Let me get my law clerk in, since she's the one who

12     is going to put this together.  We'll do it for -- the mail

13     fraud, bank fraud have unanimous as to which of the crimes.

14     There's some other -- which other crimes should we -- where

15     there is a -- you have to make a finding of -- you know, that

16     they have found either, you know, bank fraud or mail fraud or

17     something.  Do you want to indicate something that says that --

18     let's assume they -- do we want to put some language that says:

19     If you have found blank, blank, then you can move on to this

20     other offense.  If they have acquitted, they should not move

21     on.  Am I correct about that, or not?  That's what it looked

22     like from the instruction.  Because I think -- I'm trying to

23     remember which of the ones that it is.  Remember, it's

24     expenditures or the identity theft.

25             MR. ROSENBERG:  Yes, Your Honor.  It would really be

1   part of the -- that seems complicated.  We could just list a

2   unanimity sub-line for each aggravated identity theft count

3   which says which offense is the aggravated identity --

4            THE COURT:  I --

5            MR. ROSENBERG:  We should do both, actually.

6            THE COURT:  Doesn't some of these require that they

7   actually find bank fraud or mail fraud, that there actually be

8   a finding as to a felony?  That's what I was thinking at first.

9            MR. ROSENBERG:  Yeah.

10            THE COURT:  So would we say something like:  If you

11   have found -- let's say Mr. Young-Bey -- guilty of bank fraud,

12   or whatever, on count so and so, go on to these.  If you have

13   found him not guilty, do not go on to certain counts.  Is that

14   correct?  That's what it sounds like.

15            MR. HOWLAND:  Yeah, that's fine.

16            MR. ROSENBERG:  Yes, Your Honor.

17            THE COURT:  Which -- you need to figure out which

18   ones -- which one it goes to.

19            MR. ROSENBERG:  2, 3, 4, 5, right?

20            MR. HOWLAND:  Yeah.

21            THE COURT:  Which of the counts?

22            MR. ROSENBERG:  I believe -- well, Counts 2 and 3 and

23   4 and 5.

24            THE COURT:  We're discussing the verdict form.  We

25   need to make some changes.

```
 1              MR. ROSENBERG:  They refer to 9 and 13.

 2              THE COURT:  That's what I was asking.  A couple of

 3    them, they have to committed a felony and the felony is either

 4    bank or mail fraud, as I recall.

 5              MR. ROSENBERG:  Yes.

 6              THE COURT:  So you would have -- you would have an

 7    introduction that indicated, for some of these counts, when you

 8    got to it, an introduction that said if you have found the

 9    defendant, say, Mr. Young-Bey guilty of bank fraud, go on and

10    consider this; if you have not, don't, skip it.  I mean, how --

11              MR. ROSENBERG:  Yes, that would work as well, Your

12    Honor.

13              THE COURT:  Okay.  So which ones require the finding

14    that they've convicted him of the felony?

15              MR. ROSENBERG:  That would be Counts 9 through 13.

16              MR. DONATH:  13.

17              MR. ROSENBERG:  Yep, 9 through 13.

18              THE COURT:  Okay.

19              MR. ROSENBERG:  Yes.

20              MR. HOWLAND:  Your Honor, what I would propose,

21    maybe, is that the Court send around language for the parties.

22              THE COURT:  I'm trying to get a sense from you before

23    I go back there, so I know which ones we're talking about.

24              MR. ROSENBERG:  So it's 9 through 13.  If

25    Mr. Young-Bey or Miss Jones -- or, if Mr. Young-Bey is found
```

1    not guilty on Counts 2, 3, 4, and 5, then 9 through 15 really

2    don't -- they wouldn't apply.

3                THE COURT:  Okay.  So not guilty on one wins.

4                MR. ROSENBERG:  So if he were found not guilty on

5    Counts 2 and 3, then --

6                THE COURT:  You wouldn't go to 9 through 13.

7                MR. ROSENBERG:  You wouldn't go to 9 through --

8                THE COURT:  He would or would not?

9                MR. ROSENBERG:  Would not go to 9, 10, and 11.

10               THE LAW CLERK:  Just 9 and 10.

11               MR. ROSENBERG:  Okay.  Just 9 and 10.  Okay.  I'm

12   going off memory.  Then if he were found not guilty on 4 and 5,

13   the jury would not further deliberate on 11, 12, and 13.

14               THE COURT:  Okay.  And then for --

15               MR. ROSENBERG:  But either -- sorry, if he was

16   found --

17               THE COURT:  I'll organize it and come out and bring

18   it.  I'm not going to send anything back until I -- I just want

19   to get a sense from you, then I'll write something up, I'll

20   bring it out and you can take a look at it.

21               MR. ROSENBERG:  I wanted to point out, if he was

22   guilty on Count 2 and but not guilty on Count 3, they can

23   still --

24               THE COURT:  Yes, one or the other.

25               MR. ROSENBERG:  Thank you, Judge.

1          THE COURT:  Okay.

2          MR. DONATH:  Your Honor, while we're on the topic, I

3   think we're clear on aggravated identity theft, which has the

4   predicate, I think -- I was talking to the government, it's not

5   clear to me whether money laundering should also include that

6   predicate requirement there, a specified unlawful activity,

7   but --

8          THE COURT:  The instruction -- does the instruction

9   require -- I mean, if it doesn't -- if it doesn't require -- I

10  would have to go back, in terms of looking at it.  That's why I

11  wanted to see whether you needed to find the bank and mail

12  fraud as predicates, or not.  I thought there was some

13  instructions that have that.  Does it include that, or not, on

14  the identity theft?

15         MR. HOWLAND:  I'm pulling it up right now.

16  Aggravated identity theft --

17         THE COURT:  You need to take your mask off.  We can't

18  hear you.

19         MR. HOWLAND:  Certainly.

20         Your Honor, for aggravated identity theft, I think

21  we're going back on the money laundering counts right now.

22         THE COURT:  All right.  Do you also want them to

23  specify, you know, each of these people, or not?

24         MR. ROSENBERG:  Each of the victims?

25         THE COURT:  The identity theft indicates different

 1   people.

 2              MR. ROSENBERG:  Yes, Your Honor.

 3              THE COURT:  Do you want that on the jury verdict

 4   form, or not?

 5              MR. ROSENBERG:  I think it would probably give -- if

 6   there's an appeal, it certainly would give a better record of

 7   what the jury decided.

 8              THE COURT:  I'm happy to do it.

 9              MR. DONATH:  Thank you.

10              THE COURT:  Okay.  Let me know the aggravated

11   identity thing, and then if you'll wait here while I go do

12   this --

13              Do you have an answer on the -- the money laundering

14   requires the bank and mail fraud, right?  Is it money fraud or

15   the identity theft you're looking at?  One of them does, I

16   wasn't sure about the other one.

17              MR. ROSENBERG:  So, Your Honor, as I look at the

18   expenditures money laundering instruction, I actually don't see

19   specified unlawful activity defined.  It's just defined as

20   criminally derived property.

21              THE COURT:  Some of the instructions had that you

22   needed to find a felony.

23              MR. ROSENBERG:  Yes.

24              THE COURT:  And that's the aggravated identity theft.

25              MR. ROSENBERG:  Yes.

```
1              THE COURT:  So the expenditure one is the one -- I
2      mean, it has to be in there, or not.  If it's not there, then I
3      would not -- I'm not going to put it in and create problems.
4              MR. ROSENBERG:  Which is, as I'm reading it right
5      now, it's not in there.  It's not a you-must-find Count 1 or --
6              THE COURT:  I'll go back and take a look at it again.
7      That will make it simpler.  Wait here, we'll be back.
8              (Recess.)
9              THE COURT:  So it's on the email, take a look at it.
10     I would start with Ms. Jones because it's the quickest and
11     easiest one, then look at his.
12             (Pause.)
13             THE COURT:  We just added the names to the counts.
14             (Pause.)
15             THE COURT:  Let me know when everybody is finished,
16     and then I can hear what you have to say.
17             Government, do you have an issue?
18             MR. ROSENBERG:  Um --
19             THE COURT:  What?
20             MR. ROSENBERG:  Yes.
21             THE COURT:  Okay, which one.
22             MR. ROSENBERG:  So if we looked at page 3 for
23     Mr. Young-Bey, where it says --
24             THE COURT:  Hang on one second.  3, right?
25             MR. ROSENBERG:  The first clause:  If you unanimously
```

1    find defendant Young-Bey guilty of either 2 and 3, proceed to 9

2    and 10.  The second clause, I believe, shouldn't have an

3    "either/or."  I think it should just say "both."  So if you

4    have unanimously found defendant Young-Bey not guilty of both 2

5    and 3.

6              THE COURT:  Okay.  All right.  That's right.  It

7    should be "both."

8              MR. ROSENBERG:  And I believe that's the same for

9    page 4, Your Honor, which refers to Counts 4 and 5.  That's

10   all, Judge.

11             THE COURT:  Okay.  That's correct.

12             So do we have another issue?

13             MR. FEITEL:  Yes, Your Honor.  Your Honor, let me ask

14   the government what they think, maybe we'll be in agreement.

15             THE COURT:  Sure, go ahead.

16             (Pause.)

17             MR. FEITEL:  See what happens when you ask?  I think

18   we're in agreement with respect to the language for Count 1 on

19   the verdict form.

20             THE COURT:  Okay.

21             MR. FEITEL:  Under special finding, we would ask that

22   it say:  If you unanimously found defendant Jones or Young-Bey

23   guilty, on which of the following grounds, either or both, have

24   you unanimously found the defendant guilty of --

25             THE COURT:  Say that again.  It sounds like it's

1    repetition.  Trying to keep it short.  If you have

2    unanimously -- you what?

3              MR. FEITEL:  I actually think it would be better if

4    the word "unanimously" -- if it said:  If you have found

5    defendant Jones or Mr. Young-Bey guilty on Count 1, on which of

6    the following grounds, either or both, have you unanimously

7    found the defendant guilty of?  That is, that the unanimity

8    should apply to the mail fraud or the bank fraud.

9              THE COURT:  Okay.

10             MR. FEITEL:  I think that's how it's --

11             THE COURT:  If you have found defendant Young-Bey

12   guilty on Count 1, on which of the following grounds, either or

13   both, have you unanimously --

14             MR. FEITEL:  -- found the defendant guilty of.

15             THE COURT:  Okay.  All right.

16             MR. FEITEL:  Thank you, Your Honor.

17             THE COURT:  Is there anything else?

18             MR. FEITEL:  Not from me, no.

19             THE COURT:  Anybody else?

20             MR. DONATH:  Not from us.

21             THE COURT:  We'll make that change, which would be a

22   change we do for both.

23             Now, do you want to change the second one?  We'll

24   make this -- next one says:  If you unanimously found not

25   guilty.  We don't -- that one works.  Okay?

```
 1                    MR. FEITEL:  Yeah.

 2                    MR. ROSENBERG:  Less asked the better.

 3                    MR. HOWLAND:  If I may?

 4                    THE COURT:  Go ahead.  I want -- let's get this all

 5       done.

 6                    MR. HOWLAND:  I was just discussing --

 7                    THE COURT:  I can't hear you.

 8                    MR. HOWLAND:  I was just discussing with

 9       Mr. Rosenberg, instead of saying, "The following grounds,"

10       could we change "grounds" to "predicates"?

11                    THE COURT:  We can.

12                    MR. HOWLAND:  Just a semantic distinction.  It seems

13       like it's a more appropriate and exact word.

14                    THE COURT:  Does anybody have a problem?  We're

15       making a change anyway, we can make it to "predicate."

16                    MR. BERMAN:  That's fine.

17                    MR. DONATH:  No.

18                    THE COURT:  With that, anything else?

19                    MR. HOWLAND:  With that, I think the government is

20       fine with the language.

21                    THE COURT:  And, Mr. Feitel, is that it?

22                    MR. FEITEL:  Without further objection, Your Honor.

23                    THE COURT:  Okay.

24                    MR. DONATH:  No objections from defense.

25                    THE COURT:  They've got the instructions already with
```

1    the small changes of the "he/she," et cetera.  And I assume

2    that they have the evidence.

3              Can you tell me when you want to respond to the

4    mistrial?

5              MR. HOWLAND:  I was just going to explain, Your

6    Honor, I'm looking at it right now.  We're looking at it right

7    now, and I think by the end of the day we should be able to

8    have something for the Court.

9              THE COURT:  Okay.  Terrific.

10             MR. HOWLAND:  It's going to be pretty similar to what

11   we've already filed, but --

12             THE COURT:  Did you give Ms. Patterson your contact

13   information, cell phones, et cetera?

14             MR. BERMAN:  Yes.

15             MR. HOWLAND:  We did, Your Honor.

16             THE COURT:  They hopefully -- go eat.  They should

17   have brought food, I think, by 12:30, 1:30.

18             MR. BERMAN:  Thank you.

19             THE COURT:  We will send you -- I will email you the

20   new version and I'll just take the new version -- we'll take

21   the new version in.  Okay.

22             MR. BERMAN:  Thanks, Your Honor.

23             THE COURT:  So you're excused.  Then come back at

24   about 4:15 so we can excuse them.  Or if I get a note.

25             (Recess from 12:56 p.m. to 4:18 p.m.)

1           THE COURT:  All right.  They're all lined up.  We've

2     had no note, so we'll just collect the evidence and everything

3     else and they're excused for this evening and they'll come back

4     tomorrow at 9:15.  I don't bring them out in the morning, so

5     you don't need to be here.

6           (Whereupon the jurors enter the courtroom.)

7           THE COURT:  All right.  Good afternoon, members of

8     the jury.  We're going to excuse you for this evening.  I

9     mentioned I have this other meeting to go to and it will run

10    over.  I don't want to have you wait any later than 5.  So I'll

11    release you.

12          Come back to start your deliberations at 9:15.  When

13    you're all there, we'll bring the evidence and everything for

14    you to start with.

15          So have a very good evening, take care of yourselves

16    and be well.  And see you tomorrow.

17          (Whereupon the jurors leave the courtroom.)

18          THE COURT:  All right.  She'll collect everything and

19    bring it back out tomorrow morning when they start to

20    deliberate, so we can keep track of -- so they don't start

21    before everybody is there.  We'll take it back this evening and

22    put it out when everybody is there.

23          MR. FEITEL:  Good afternoon, Your Honor.  I just

24    wanted to ask:  Tomorrow, I'll be downtown, but how close or

25    how long do I need to be -- like, how far away am I allowed to

1    wander away?  Like if I'm ten minutes away, is that good, or --

2          THE COURT:  Ten minutes is okay.  Not any longer than

3    that.  Ten minutes.

4          MR. FEITEL:  That's why I'm asking.  Okay.  Thank you

5    very much, Your Honor.

6          THE COURT:  So what I would do, I have a matter at 9

7    in the morning, criminal matter in another case.  You might

8    want to check in, like, at 9:30 or so, and just make sure

9    everything is going the way it's supposed to.  And then we will

10   be doing the lunches at 12:30 to 1:30, so you can go off and do

11   what you want.  But I sort of pay attention before lunch and

12   right after lunch because that's when we tend to get notes.

13         Did they keep track of when they took breaks or

14   anything?

15         THE COURTROOM DEPUTY:  I asked them to.  I haven't

16   looked.

17         THE COURT:  Then I'll read that in.  If they wrote

18   something down when they took breaks, I'll read that into the

19   record tomorrow.  But we didn't get any other notes.

20         All right.  So everybody take care, be well, and see

21   you tomorrow.  If we don't hear anything in between, we come at

22   the end of the day.

23         And hang on one second.  Let me just look at one

24   thing.

25         (Pause.)

```
1              THE COURT:  Yeah.  So, tomorrow, we will go --
2     probably have them deliberate, if they're still deliberating
3     all day, close to 5 o'clock, because I don't have anything at
4     the end of the day.  All right.  Parties are excused.
5                            *    *    *
```

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, JANICE DICKMAN, do hereby certify that the above and

4     foregoing constitutes a true and accurate transcript of my

5     stenographic notes and is a full, true and complete transcript

6     of the proceedings to the best of my ability.

7                         Dated this 3rd day of March, 2024

8

9

10                         _____

11                         Janice E. Dickman, CRR, CMR, CCR
                           Official Court Reporter
12                         Room 6523
                           333 Constitution Avenue, N.W.
13                         Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25