# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

JEFFREY M. YOUNG-BEY,
    Defendant.

Criminal Action No. 21-661 (CKK)

## MEMORANDUM OPINION
(February 28, 2025)

A jury convicted Defendant Jeffrey Young-Bey on twelve counts related to a mortgage-fraud scheme he perpetrated in the District of Columbia. Verdict Form, ECF No. 206. Now before the Court are Young-Bey's motions for a judgment of acquittal and for a new trial. For the reasons that follow, the Court will **DENY** those motions and affirm the jury's well-supported verdict.[1]

## I. BACKGROUND

A grand jury indicted Young-Bey and his co-defendant Martina Jones in connection with two mortgage frauds perpetrated in the District of Columbia. Counts One, Two, and Three charged Young-Bey and Jones with Conspiracy to Commit Mail Fraud and Bank Fraud, in violation of 18 U.S.C. § 1349; Mail Fraud, in violation of 18 U.S.C. § 1341; and Bank Fraud, in violation of 18 U.S.C. § 1344. Counts Four and Five charged Young-Bey alone with additional Mail Fraud and Bank Fraud counts. Count Six charged both defendants with Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h). Counts Seven and Eight charged Young-Bey with Expenditure Money Laundering, in violation of 18 U.S.C. § 1957. And Counts Nine through

---

[1] The Court's consideration focused primarily on: Young-Bey's Motion for New Trial, ECF No. 228 ("Rule 33 Mot."); Young-Bey's Supplement to the Rule 33 Mot., ECF No. 233 ("Rule 33 Supp."); Young-Bey's Motion for Judgment of Acquittal, ECF No. 229 ("Rule 29 Mot."); Young-Bey's Supplement to the Rule 29 Mot., ECF No. 234 ("Rule 29 Supp."); the Government's Consolidated Opposition, ECF No. 237 ("Opp'n"); and Young-Bey's Consolidated Reply, EF No. 239 ("Reply").

Thirteen each charged Young-Bey with Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A.  Following extensive motions practice, Young-Bey and Jones both proceeded to trial.

At trial, the Government proved that Young-Bey orchestrated a scheme to steal the title to two properties in Washington, D.C. and convince a bank to loan money against those properties. The first property, 164 Bryant Street NW (the "Bryant Street property"), had been owned by Roosevelt Twiggs for fifty years.  But Young-Bey created a fake deed purporting to transfer the Bryant Street property to an entity owned and controlled by Jones.  He then bought a notary stamp, forged the relevant signatures and seals, and brought the fraudulent deed to the D.C. Recorder of Deeds (the "Recorder").  In doing so, he tricked the Recorder into memorializing Jones's ownership of the Bryant Street property and caused the Recorder to mail the deed to Jones.

Then, using the fraudulent deed, Young-Bey and Jones worked together to strike a deal with Hard Money Bankers ("Hard Money"), a real-estate financier.  Young-Bey and Jones lied to Hard Money, telling them that Jones had inherited the Bryant Street property and that Jones was renting it to a non-existent tenant.  With the fake deed and a fake lease in hand, Young-Bey and Jones convinced Hard Money to lend Jones $350,000 against the Bryant Street Property.  When Jones received the money, she wired half of it to Young-Bey at his direction.  And Young-Bey used these proceeds to buy a BMW with a cashier's check.

Later, Young-Bey repeated the scheme on his own.  This time, he prepared a deed purporting to transfer title to 7712 12th Street NW (the "12th Street property") from Ann and Rashid Jelani to a company he controlled.  He then took the deed to the Recorder with the Jelanis' forged signatures and the same fake notary stamp he had used before.  Once again, Young-Bey tricked the Recorder into memorializing his ownership of the 12th Street property and caused the Recorder to mail the deed to an address he provided for his company.  Then, Young-Bey exploited

the recorded deed to secure a $225,604 wire transfer and used the proceeds to purchase yet another BMW with a cashier's check.

To explain away the copious documentary evidence showing his participation in this scheme, Young-Bey argued to the jury that he was a scapegoat. In Young-Bey's telling, Joseph Lowery—"JLo"—had masterminded the frauds, taken advantage of him, and pretended to be him by repeatedly using his email address, cell phone, and credit card. Young-Bey further contended that, to the extent he participated in the frauds (rather than being impersonated by JLo), he did so without knowledge of the scheme and in good-faith reliance on others' representations.

The jury did not credit this theory. It returned guilty verdicts against Young-Bey on twelve counts and hung on Count Six (Conspiracy to Launder Monetary Instruments). Verdict Form as to Jeffrey Young-Bey, ECF No. 206. The jury hung on all counts against Jones. Verdict Form as to Martina Jones, ECF No. 208. On the Government's motion, the Court dismissed the deadlocked counts. Order, ECF No. 221. And Young-Bey then moved for a new trial and for a judgment of acquittal. *See* Rule 33 Mot.; Rule 29 Mot. Those motions are ripe for review.

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 29 permits a defendant to move for a post-verdict judgment of acquittal if the evidence presented at trial cannot sustain a conviction. But the Court must affirm the jury's verdict if, considering the evidence in the light most favorable to the Government, it finds that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002). The Court may grant a Rule 29 motion "only when there is *no* evidence upon which a reasonable juror might fairly conclude guilt beyond a reasonable doubt." *United States v. Weisz*, 718 F.2d 413, 438 (D.C. Cir. 1983). And the Court "must presume that the jury has properly carried out its

functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences." *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983).

Federal Rule of Criminal Procedure 33 allows the Court, on a defendant's motion, to "vacate [a] judgment and grant a new trial if the interest of justice so requires."  The breadth of that standard is reflected in the Court's "broad discretion" when ruling on Rule 33 motions.  *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982).  But however broad, that discretion "should be exercised sparingly."  *United States v. Borda*, 786 F. Supp. 2d 25, 31 (D.D.C. 2011) (GK) (cleaned up).  And relief under Rule 33 "is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred."  *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014).

### III. MOTION FOR ACQUITTAL

#### A. Insufficient Evidence

Young-Bey argues that the Government presented insufficient evidence to secure his convictions for Conspiracy to Commit Mail and Bank Fraud; Mail Fraud; and Bank Fraud.  For the reasons that follow, the Court disagrees.

#### 1. Count One: Conspiracy to Commit Mail and Bank Fraud

To convict Young-Bey of conspiracy, the Government bore the burden of proving that he "enter[ed] into an agreement with at least one person to commit a specific offense" and "knowingly participate[d] in the conspiracy with the intent to commit the offense."  *United States v. Smith*, 950 F.3d 893, 895 (D.C. Cir. 2020).  As the Court will explain, the evidence at trial was sufficient for a rational jury to conclude that Young-Bey knowingly agreed and conspired with Jones to engage in a scheme to defraud with the requisite intent to defraud.

*Agreement Between Young-Bey and Jones*.  Young-Bey first argues that the evidence the Government presented to prove an agreement between himself and Jones "was wholly insufficient as a matter of law."  Rule 29 Mot. at 2.  To prove the existence of an agreement, the Government "need only show that the conspirators agreed on the essential nature of the plan, not that they agreed on the details of their criminal scheme."  *United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996) (cleaned up).  And because the existence of a conspiracy can be "inferred from the facts and circumstances," the Government need not "prove the agreement by direct evidence" and can rely on circumstantial evidence.  *Smith*, 950 F.3d at 895 (citations omitted).

The Government adduced ample evidence allowing the jury to infer an agreement between Young-Bey and Jones, some of which the Court summarizes here.  Witness testimony and documentary evidence showed that Young-Bey recorded a forged deed purporting to transfer ownership of the Bryant Street property to an entity controlled by Jones.  Trial Tr. Vol. III, ECF No. 211 at 100:10–107:8, 143:24–145:18; Gov't's Ex. 100.  The Government introduced an email showing that Young-Bey sent Jones a "Property Transfer Confirmation" listing Jones as the owner of the Bryant Street Property.  Trial Tr. Vol. VI, ECF No. 214 at 229:2–232:5; Gov't's Ex. 935.  And the Government introduced a series of other emails showing Young-Bey and Jones working together to secure a loan against the Bryant Street property from Hard Money.  Trial Tr. Vol. VI 232:6–238:22; Trial Tr. Vol. VII, ECF No. 215 at 62:4–91:5.  All of the documents related to that transaction were in Jones's name; Jones was included on emails from Young-Bey to Hard Money; Young-Bey forged lease agreements that Jones reviewed and forwarded to Hard Money; Jones attended the closing in person with help from Young-Bey; and after the closing, Young-Bey directed Jones to wire him $161,612.47.  *See* Gov't's Exs. 900, 901, 954, 976, 977.

Young-Bey argues that this evidence is legally insufficient because it "speak[s] only to actions taken once the alleged conspiracy had ended."  Rule 29 Mot. at 3.  In *United States v. Turner*, 584 F.3d 1094 (D.C. Cir. 2008), the U.S. Court of Appeals for the D.C. Circuit concluded that actions to conceal a conspiracy years after its completion could not alone support a finding that the conspiracy once existed.  And under Young-Bey's theory, the conspiracy ended the moment Jones obtained title to the Bryant Steet property.  So, he argues, the litany of communications between Jones and Young-Bey coordinating the Hard Money loan and the distribution of the profits therefrom cannot support a finding of agreement here.

But, as the Government notes, "obtaining the loan from Hard Money . . . was the main goal of the conspiracy" charged in this case.  Gov't Opp'n at 10.  And all the evidence the Court described above preceded or followed immediately from the completion of that goal.  That is a far cry from the years-later actions to conceal a conspiracy at issue in *Turner*.  And *Turner* does nothing to suggest that communications about how to divvy up the proceeds of a fraud cannot be used to show the existence of an agreement among the fraudsters.

The Government adduced more than enough evidence for a rational jury to infer an agreement between Young-Bey and Jones.  The jury did so here.  And Young-Bey offers no compelling reason to disturb that reasonable inference.

***Knowing Intent to Defraud.***  Next, Young-Bey argues that the Government's evidence was insufficient to prove that he acted with the requisite *mens rea*.[2]  To convict Young-Bey of conspiracy to commit mail and bank fraud, the Government was required to show that Young-Bey "knowingly participate[d] in the conspiracy with the intent to commit" the underlying offenses— that is, with the intent to defraud.  *Smith*, 950 F.3d at 895.  Because the defendant must act

---

[2] Young-Bey presses this argument as a basis for a judgment of acquittal on the conspiracy, mail fraud, and bank fraud charges.  Because his argument is the same regardless of context, the Court treats it here only.

6

knowingly and with the specific intent to defraud, "[g]ood faith is a complete defense." *United States v. Howard*, 245 F. Supp. 2d 24, 38 (D.D.C. 2003) (RBW).  A defendant's mistake of law or subjective belief that he was not acting fraudulently precludes conviction.  *See United States v. Hunter*, 554 F. App'x 5, 9 (D.C. Cir. 2014).  But because it is often "near impossible to establish the requisite *mens rea* through direct evidence, . . . proof must be inferred from circumstantial evidence instead." *United States v. Vega*, 826 F.3d 514, 523 (D.C. Cir. 2016) (per curiam).

Young-Bey argues the Government failed to carry this burden.  Accepting, *arguendo*, that the Government showed he in fact recorded a forged deed, made false statements to Hard Money, coordinated a fraudulent transaction, accepted the proceeds therefrom, and used them to buy a car, Young-Bey argues that the Government did not adduce evidence to prove that he *knew* he was doing so.  Young-Bey contends that he believed at all times that he was engaged in legitimate real-estate business and that he was a patsy operating in good-faith reliance on the shadowy JLo figure who used him as a pawn.  The jury heard this argument at trial and rejected it for good reason.

Young-Bey emailed himself an unsigned and unstamped copy of the forged Bryant Street deed.  Gov't Ex. 919.  Soon after, Young-Bey's bank account was used to purchase a notary stamp.  Trial Tr. Vol. V, ECF No. 213 at 184:16–196:19; Gov't Exs. 709, 922.  The next day, Young-Bey appeared at the Recorder's office with a signed and notarized deed to the Bryant Street property.  *See* Trial Tr. Vol. III at 143:3–150:17.  But one of the grantors who purportedly signed the deed had been deceased for years.  *Id.* at 99:3–9.  The other testified that the signature was not his.  *Id.*  And the notary who supposedly stamped and signed the deed testified that the seal and signature were not hers. Trial Tr. Vol. VI at 157:3–158:23.  Then, when Jones received the proceeds of the Bryant Street fraud, Young-Bey emailed her to coordinate a deposit of "half of what [Jones] received."  Gov't Exs. 900, 901.

A rational jury could infer from all this that Young-Bey knew the Bryant Street deed was forged, knew it was fraudulently recorded, and thus knew that the proceeds he accepted were fraudulently obtained.  Moreover, if half of the profits went to Jones and half went to Young-Bey, then there would be nothing left for the supposed-mastermind JLo.

Young-Bey argues that a rational jury would have to infer that he was acting in good faith from the fact that "Young-Bey did not conceal himself" at the Recorder's officer or "claim to be someone else when depositing money" into his company's account.  Rule 29 Mot. at 7.  Those, he argues, are the behaviors of someone with "every right to be doing each activity"—not those of someone "in the process of committing a crime."  *Id.*

But Young-Bey has not been found guilty of robbing a bank or some other crime requiring a masked perpetrator.  The jury found him guilty of conspiring to commit, and committing, frauds and confidence schemes.  The entire purpose of the conspiracy and the frauds was to make forged documents and lies appear as legitimate as possible.  A rational jury could have concluded that, with fraudulent documents in hand, Young-Bey felt no need to lie or obscure his identity.  Indeed, a rational jury could have concluded Young-Bey calculated that lying about his identity would have jeopardized the scheme.  And of course, it would have been entirely futile for Young-Bey to claim to be someone else when depositing the fruits of his frauds into a bank account he controlled.

Viewing the evidence in the light most favorable to the Government, a rational jury could have concluded that Young-Bey acted knowingly and with the intent to defraud.

### 2.  Counts Two and Four: Mail Fraud

To prove mail fraud, the Government must show, among other things, "the mailing of a letter, etc., for the purpose of executing the scheme."  *Coughlin*, 610 F.3d at 97.  Young-Bey mounts two sufficiency-of-the-evidence challenges to this requirement.  First, he argues the

Government presented insufficient evidence to prove a mailing occurred.  Rule 29 Mot. at 12–15. Second, he argues the Government did not prove any mailing was for the purpose of the scheme. *Id.* at 10–12.  Neither argument persuades.

***Whether a Mailing Occurred.***  The Government's theory for the existence of a mailing was that when Young-Bey recorded the fraudulent deeds in person at the Recorder's office, he set in motion an administrative process that necessarily resulted in a mailing of the recorded deeds to listed return addresses.  In support of this theory, the Government called as a witness Amy Conn, the Deputy Director of the D.C. Recorder of Deeds.

Conn testified that to record a deed in person, the filer must include on the deed a return mailing address.  Trial Tr. Vol. III at 133:20–23.  Once the deed is received, an Examination Unit reviews the paper document to ensure proper execution, then the deed passes to a Production Unit that affixes barcode labels and scans the deed into a digital system.  *Id.* at 133:9–19.  After the deed is digitized, the original paper copy is taken to a "mail station" where it is sorted, marked for postage to the listed return address, collected by the Logistics Office, and delivered to the post office.  *Id.* at 137:19–23, 140:13–17.  If a deed filed in person did not have a return address, the Recorder "wouldn't accept it."  *Id.* at 140:9–15.  And Conn could not answer what would happen if a deed filed in person was not mailed because "that would not occur."  *Id.* at 140:16–21.  Indeed, Conn testified that her office records and mails roughly 150,000 documents per year but receives only "two or three calls per year" about unmailed documents.  *Id.* at 141:19–142:16.

Here, there is no dispute that Young-Bey went to the Recorder's office in person with physical copies of the fraudulent deeds and that these deeds listed return addresses.  And Conn's testimony provided ample circumstantial evidence for a rational jury to conclude that the deeds were mailed to those addresses in the ordinary course of business.

Young-Bey argues that this indirect evidence of mailing is insufficient under the Ninth Circuit's holding in *United States v. Lo*, 231 F.3d 471 (9th Cir. 2000). But *Lo* does not bind this Court. And its reasoning does not extend to this case.

In *Lo*, the Ninth Circuit vacated a mail fraud conviction where no direct evidence of mailing was introduced at trial and the only circumstantial evidence that the mailing occurred was testimony about a bank's procedures in the normal course. *Id.* at 475–76. *Lo* did not, however, announce a general rule that circumstantial evidence cannot support the existence of a mailing. Rather, the opinion recognizes that where "adequate circumstantial evidence supports the inference" that a mailing occurred, "direct proof of mailing is not required." *Id.* at 476 (cleaned up) (quoting *United States v. Brackenridge*, 590 F.2d 810, 811 (9th Cir. 1979)).

The outcome in *Lo* turned on the specific facts of that case. The Ninth Circuit stressed that the Lo's jury "had to infer the very existence of the document" because it was never introduced and that it further had to infer that the document "was introduced into the system" that ordinarily led to mailing. *Lo*, 231 F.3d at 476. Neither inference was required here. The Government produced copies of the recorded deeds. Gov't Exs. 100, 101. And there is no dispute that the deeds were introduced into the Recorder's system: Young-Bey admits he filed them in person.

Moreover, *Lo* recognized that where, as here, "the question is whether a document that did exist and did reach its destination was in fact mailed rather than arriving in some manner," circumstantial evidence about an organization's mailing practices "is likely to be a necessary link" in the chain of proof. 231 F.3d at 477. That is so because "[c]lerical personnel often will not be able to testify directly to precisely what documents were in fact placed in the United States Postal Service Box" and because documentary evidence of their actions is unlikely to exist. *Id.*

Conn testified to precisely these conditions. The Recorder does not use certified mail when returning deeds recorded in person. Trial Tr. Vol. III at 138:23–139:5. And the Recorder's office keeps no record of its mailings internally other than an informal checklist indicating that the day's mailing has been completed. *Id.* at 139:8–10. Under these circumstances, "there is no plausible negative inference to be drawn from the absence of more direct evidence." *Lo*, 231 F.3d at 477. When viewed in the light most favorable to the Government, the evidence presented supported an inference that Recorder mailed the deeds.

***Mailing in Furtherance.*** The fact of a mailing alone is insufficient to support a mail fraud conviction. Instead, the mailing must also be "in furtherance" of the underlying fraud. *Coughlin*, 610 F.3d at 97. Young-Bey argues that, assuming mailings occurred, the Government has not satisfied this element because it presented insufficient evidence to show that (1) the mailed deeds "ensured the success of the scheme to defraud" or that (2) the "mailings were made prior to the date on which either [fraud] came to fruition." Rule 29 Mot. at 10.

Young-Bey's first contention rests on a misapprehension of the relevant law. "To be part of the execution of the fraud, . . . the use of the mails need not be an essential element of the scheme." *Schmuck v. United States*, 489 U.S. 705, 710 (1989). Rather, the mailing need only be "incident to an essential part of the scheme" or "a step in the plot." *Id.* at 711 (quoting *Badders v. United States*, 240 U.S. 391, 394 (1916)). Recording the fraudulent deeds was an essential part of Young-Bey's scheme. And, as the Court just surveyed, the evidence supported a finding that the deeds were mailed incident to that step of Young-Bey's plot. That is all the law requires.

Young-Bey's second contention, that he must be acquitted because the mailings occurred after his fraud scheme had ended, simply restates an argument he made in his pretrial Motion to Dismiss. The Court rejected that argument then and does the same now. Mem. Op., ECF No. 70

at 6–8.  Young-Bey relies on the premise that the frauds ended when the deeds were recorded, just before the mailings occurred.  But, as the Court has repeatedly explained, "this misstates the schemes."  *Id.* at 7.  Young-Bey's mail frauds did not conclude until he secured loans against the fraudulently obtained titles.  According to Conn's testimony, deeds recorded in person are mailed within approximately five business days.  Trial Tr. Vol. III at 137:12–14.  As a result, the jury could have concluded that the mailings occurred long before the frauds came to fruition.

### 3.  Counts Three and Five: Bank Fraud

As relevant here, to secure a conviction for bank fraud, the Government was required to show, among other things: that Young-Bey executed a scheme to defraud an entity; that the scheme involved a materially false or fraudulent pretense, representation, or promise; and that, at the time of the offense, the entity was a financial institution as defined by 18 U.S.C. § 20.  *See* 18 U.S.C. § 1344; *see also United States v. Freed*, 921 F.3d 716, 722 (7th Cir. 2019).

Young-Bey mounts three sufficiency-of-the-evidence challenges to the Government's case.  First, he argues the Government did not show his misrepresentations were material to the scheme.  Rule 29 Mot. at 16–18.  Second, he argues the Government did not show Hard Money was a financial institution within the meaning of the statute.  Rule 29 Supp. at 1. And third, he argues the Government failed to prove that he signed any relevant documents.  *Id.* at 5–7.  None of these arguments entitles him to a judgment of acquittal.

***Material Misrepresentation.***  In the bank-fraud context, a misrepresentation is material if it is "reasonably likely to influence the bank in making a determination required to be made." *United States v. Calderon*, 944 F.3d 72, 85 (2d Cir. 2019) (citation omitted); *cf. Neder v. United States*, 572 U.S. 1, 16 (1999) (holding a false statement is material to tax fraud if it has "a natural tendency to influence . . .  the decision of the decisionmaking body to which it was addressed").

The Government's theory of materiality was that, but for Young-Bey's misrepresentations about the Bryant Street and 12th Street properties, Hard Money would not have extended lines of credit against those properties. In support of this theory, the Government called as a witness Jason Balin, an underwriter at Hard Money. Trial Tr. Vol. IV at 246:25.

Some of Balin's testimony focused on the fake lease agreement for the Bryant Street property that Young-Bey had produced to Balin. Balin testified that Young-Bey's delay in producing the lease held up the closing on the loan against the Bryant Street property. *See* Trial Tr. Vol. IV at 280:22–282:21. This was because Balin "wanted to make sure that it was a rental property and a tenant was living there" before he extended a loan that Jones's rental income was meant to repay. *Id.* at 279:14–19. Balin further testified that it was only after he received the fake lease agreement that the loan was disbursed. Trial Tr. Vol. V at 6:2–12. But Balin was somewhat equivocal about how important the lease was to the loan. On direct, he testified that he would "[p]robably not" have extended the loan if he knew the lease was fake. *Id.* at 29:22–24. And on cross, he equivocated again: "Maybe; maybe not." *Id.* at 70:1–3.

Seizing on this ambiguity, Young-Bey argues that the Government failed to show his misrepresentations about the lease agreement were material to the Hard Money loan. Rule 29 Mot. at 17. But a rational jury could still have concluded that it was "reasonably likely" the fake lease agreement influenced Balin's decisionmaking. *Calderon*, 944 F.3d at 85. After all, Balin's testimony showed that the absence of the lease was holding up the transaction. Documentary evidence showed him repeatedly requesting that Young-Bey send him the lease. And Hard Money extended the loan only after it received the lease.

But in any event, Young-Bey's argument ignores the most fundamental misrepresentations he made to Hard Money: that Jones and he were the true owners of the Bryant Street and 12th

Steet properties.   Trial Tr. Vol. IV at 257:11–258:23; Trial Tr. Vol. V at 9:5–12: 23.   The Government showed that those representations were false.   And Balin testified unequivocally that had he known Jones and Young-Bey were not the true owners of the properties, Hard Money would never have extended the loans.   Trial Tr. Vol. V at 29:8–21.   In sum, the Government's evidence showed that Young-Bey misrepresented facts material to the transactions.   To the extent Young-Bey repeats his argument that he did not know these were misrepresentations, the Court has addressed that argument in Part III.A.1 *supra*.

*Financial Institution.*   Briefly, Young-Bey argues that Hard Money is not a "financial institution" within the meaning of 18 U.S.C. § 20.   Rule 29 Supp. at 1.   Young-Bey pressed this exact argument before trial.   *See* Proposed Jury Instructions, ECF No. 168.   And the Court heard and resolved his contentions.   *See* Mem. Op. & Order, ECF No. 178.   The Court incorporates its earlier reasoning and will not repeat it again here.

*Signatures.*   Finally, Young-Bey contends that the Government failed to prove that he "was, in fact, the individual that signed either of the loans taken out from Hard Money."   Rule 29 Supp. at 6.   But the Court is unaware of any requirement that the Government prove Young-Bey signed the loan documents.   And Young-Bey offers no authority for such a requirement.

To the extent Young-Bey argues the Government adduced insufficient evidence to show that he was the person making misrepresentations to Hard Money, he is mistaken.   Balin's testimony, described above, showed that virtually all of Hard Money's communications regarding the Bryant Street property were with Young-Bey.   Tonita Williams, of Marvel Title and Escrow, testified that Young-Bey told her over the phone that he was "play[ing] middleman" for Jones because she "was not very savvy with real estate matters."   Trial Tr. Vol. V at 100:9–102:9.   And when Balin was asked whether "all of the documents for [the 12th Street property] that came to

[him] were signed by Mr. Young-Bey," he responded "Yes."  *Id.* at 83:24–84:3.  This evidence was more than sufficient for a rational jury to conclude that Young-Bey was the person communicating misrepresentations to Hard Money.

### B. Inconsistent Verdicts

Next, Young-Bey presses two arguments that he is entitled to a judgment of acquittal on Count One—Conspiracy to Commit Mail and Bank Fraud—because the jury did not convict Jones on that count.  First, he argues that, as a matter of law, "there can be no conspiracy because the jury failed to conclude that Ms. Jones engaged in any conspiracy."  Reply at 5.  Second, he argues that the Court gave an instruction in response to a juror note that "implicitly gave the jury permission to reach a lawless verdict."  *Id.* at 8.

Neither argument is properly before the Court because Young-Bey raises them for the first time in his Reply.  *See In re Asemani*, 455 F.3d 296, 300 (D.C. Cir. 2006) (finding argument "waived because it was made for the first time in his reply brief"); *Rollins Envtl. Servs. v. EPA*, 937 F.2d 649, 653 n.2 (D.C. Cir. 1991) ("Issues may not be raised for the first time in a reply brief.").  But in any event, both arguments are meritless.  The Court takes them in turn.

***The Verdict.***  First, Young-Bey argues he is entitled to acquittal on the conspiracy charge as a matter of law.  To prove a conspiracy, the Government must show that a defendant "enter[ed] into an agreement with at least one other person to commit a specific offense."  *United States v. Smith*, 950 F.3d 893, 896 (D.C. Cir. 2020).  Here, the Government alleged that Young-Bey and Jones "agree[d] with each other" to commit mail and bank fraud.  Superseding Indictment, ECF No. 141 at 2.  No other co-conspirators were charged or alleged to have existed.  The jury found Young-Bey guilty of conspiracy—but not Jones.  So Young-Bey contends that the jury must necessarily have concluded that Jones did not conspire with him, "therefore destroying the key aspect of the charged conspiracy": an agreement between the two.  Reply at 5.

That argument has some facial appeal. Indeed, it sounds in a common-law doctrine known as the "rule of consistency." *United States v. Dakins*, 872 F.2d 1061, 1065 (D.C. Cir. 1989). That rule has its origins in English common law. *See* Chad W. Coulter, Comment, *The Unnecessary Rule of Consistency in Conspiracy Trials*, 135 U. Pa. L. Rev. 223, 226–29 (1986). But it was not adopted universally in American courts. *See Dakins*, 872 F.2d at 1065. In the courts that recognized it, the rule of consistency "mandate[d] acquittal of *all* co-defendants tried together in a conspiracy case where the jury acquits all but one." *Id*.

But the D.C. Circuit "has not adopted the rule of consistency" and has "decline[d] to do so" when presented the opportunity. *Dakins*, 872 F.2d at 1065. Instead, the D.C. Circuit has interpreted *United States v. Powell*, 469 U.S. 57 (1984), "if not to prelude such a rule, at least to cast doubt upon it." *Dakins*, 872 F.2d at 1065.

Powell was acquitted of conspiracy to possess and possession of cocaine but convicted of using a telephone to facilitate those offenses. 469 U.S. at 59–60. Although the Supreme Court recognized the inconsistency in these verdicts, it held that "there is no reason to vacate [a defendant's] conviction merely because the verdicts cannot be rationally reconciled." *Id.* at 69. "The most that can be said" of inconsistent verdicts, the Court reasoned, is "that either in the acquittal or the conviction the jury did not speak their real conclusions." *Id.* at 64 (citation omitted). But inconsistency alone "does not show that [the jurors] were not convinced of the defendant's guilt." *Id.* at 64–65 (citation omitted). Instead, it "is equally possible that the jury, convinced of guilt, properly reached its conclusion on [one offense], and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on" another. *Id.* at 65. Because allowing defendants to pierce the veil of the juror's reasoning would be "imprudent and

unworkable," the Court limited defendants' "protection against juror irrationality" to "independent review of the sufficiency of the evidence." *Id.* at 67.

Notably, *Powell* concerned the inconsistency between verdicts on *different* charges against the *same* defendant rather than the inconsistency Young-Bey identifies between verdicts on the *same* charge against *different* defendants. But with a lone exception, every Court of Appeals to address the question has extended *Powell*'s reasoning to hold that a conviction for conspiracy can stand even when all other alleged co-conspirators are acquitted.[3] In short, the Courts of Appeals are in broad agreement that *Powell* extinguished the rule of consistency.

Moreover, even if this Court or the D.C. Circuit bucked that broad consensus and applied a rule of consistency despite *Powell*'s reasoning, Young-Bey's conviction would not require reversal for a simple reason: There is no verdict in this case causing any inconsistency. The jury did not acquit Jones of conspiracy—or of any charge. Instead, it hung as to each count of the Superseding Indictment. *See* Verdict Form as to Martina Jones, ECF No. 208. Confronted with

---

[3] *United States v. Bucuvalas*, 909 F.2d 593, 597 (1st Cir. 1990) (rejecting defendant's argument that "the acquittal of his sole alleged co-conspirator necessarily means that the government has not proved an essential element of its case [agreement]"); *United States v. Ferby*, 108 F. App'x 676, 681 (2d Cir. 2004) (affirming conviction of defendant who argued "that the acquittal of his alleged coconspirators requires his acquittal for the conspiracies" because "[i]nconsistent verdicts are generally not reviewable" and because "jury lenity . . . does not have to be provided uniformly to all codefendants"); *United States v. Tyson*, 653 F.3d 192, 207–08 (3d Cir. 2011) (affirming conviction because the "jury's verdict, even if it is not consistent, may reflect the decision to exercise lenity" and the "discretion" to make that decision "is the jury's prerogative, which we will not disturb"); *United States v. Darby*, 455 F. App'x 329, 333 (4th Cir. 2011) ("It is well established that an acquittal of the appellant's alleged co-conspirator does not necessitate that the appellant's conviction be vacated."); *United States v. Zuniga-Salinas*, 952 F.2d 876, 878 (5th Cir. 1992) ("An inconsistent verdict should no longer be a bar to conviction where all other co-conspirators are acquitted."); *United States v. Crayton*, 357 F.3d 560, 565 (6th Cir. 2004) (holding that, because "*Powell* rendered the rule of consistency no longer good law," "the acquittal of all but one co-conspirator during the same trial does not necessarily indicate that the jury found no agreement to act"); *United States v. Mancari*, 875 F.2d 103, 104 (7th Cir. 1989) (holding *Powell*'s "reasoning applies with undiminished force to a case in which the jury has treated codefendants inconsistently"); *United States v. Morton*, 412 F.3d 901, 904 (8th Cir. 2005) (declining to apply "the so-called rule of consistency" because "this rule did not survive" *Powell*); *United States v. Valles-Valencia*, 823 F.2d 381, 382 (9th Cir. 1987) ("[T]he acquittal of all coconspirators but one does not necessarily indicate that the jury found no agreement to act."); *United States v. Andrews*, 850 F.2d 1557, 1561 (11th Cir. 1988) (en banc) ("Consistent verdicts are unrequired in joint trials for conspiracy: where all but one of the charged conspirators are acquitted, the verdict against the one can stand."), *cert. denied* 488 U.S. 1032 (1989). Only the Tenth Circuit has suggested, in dicta, that the rule of consistency has enduring force in conspiracy prosecutions. *See United States v. Abbott Washroom Sys., Inc.*, 49 F.3d 619, 623(10th Cir. 1995).

this precise situation in *United States v. Dakins*, 872 F.2d 1061, (D.C. Cir. 1989), the D.C. Circuit

held that, because a "hung jury is failure of the jury to reach a verdict as to the coconspirator, we

are not faced with inconsistent verdicts." *Id.* at 1065 (quoting *United States v. Sangmeister*, 685

F.2d 1124, 1227 (9th Cir. 1982). Here, as in *Dakins*, the co-conspirator's hung jury does not

mandate acquittal. Accordingly, the Court will deny Young-Bey's motion on that basis.

    ***The Instruction.*** Second, and relatedly, Young-Bey argues that the Court erred in

responding to a jury note regarding how to treat the conspiracy charge against both defendants.

During deliberations, the jury sent a note informing the Court that it had reached "an impass [sic]

on a number of charges" and asking: "We assume we cannot rule on conspiracy for one w/o ruling

[on] the other?" Jury Note, ECF No. 204. The Court responded:

> The answer is, you should consider the evidence related to the conspiracy charges
> separately as to each Defendant. Refer to Instruction 22 on Pages 27 to 30 on
> Count 1 for the elements the Government must prove beyond a reasonable doubt
> for conspiracy to commit mail and bank fraud. Refer to Instruction 27, Pages 42 to
> 45, on Count 6 for the elements the Government must prove beyond a reasonable
> doubt for conspiracy to commit expenditure money laundering. Refer to Instruction
> 40, Page 73, as to multiple Defendants and multiple counts. Refer to Instruction
> 36, Pages 64 to 68, regarding co-conspirator liability.

Trial Tr. Vol. X, ECF No. 218 at 6:13–7:1. The Court then read the standard "Thomas" anti-

deadlock instruction, named for the D.C. Circuit case that endorsed it: *United States v. Thomas*,

449 F.2d 1177 (D.C. Cir. 1971). Trial Tr. Vol. X 7:3–22.

    Young-Bey contends this was error. He argues that the Court should have understood the

juror note as a "direct question on whether it could come to a legally impressible conclusion" and

that the Court's response "implicitly gave the jury permission to reach a lawless verdict" or engage

in nullification. Reply at 8. This argument lacks merit.

    Although he spends pages discussing the issue, Young-Bey purports to identify only one

error in the Court's instruction. He asserts that the phrase "you should consider evidence related

to the conspiracy charges separately as to each Defendant" called the jury's attention to its power of nullification.  Reply at 8.  But this instruction mirrors, almost perfectly, the Redbook's model instructions for cases with multiple defendants and multiple counts, *see* 1 Crim. Jury Instructions for the Dist. of Columbia § 2.404, and for conspiracy charges, *see id.* § 7.102—minor variations of which the jury had already received, *see* Final Jury Instructions, ECF No. 224 at 30–33, 76. And the Court directly called the jury's attention to the requirement that they find an agreement to convict Young-Bey of conspiracy by referring them to Instruction 22.

At least at one point, Young-Bey recognized that the Court's response to the juror note was proper.  After all, it was "the instruction which [the parties] all agreed to" when the Court discussed the note with them.  Trial Tr. Vol. X 4:23–24.  And all parties reiterated their agreement to the instruction just before the Court called the jury into the courtroom.  *Id.* 5:4–10.

Young-Bey offers no compelling reason now for the Court to disturb its—and Young-Bey's—earlier conclusion that the response to the jury note was appropriate.  The Court will deny his motion for acquittal on that basis.

## C. Improper Venue

Young-Bey next argues that he is entitled to a judgment of acquittal because it was improper for the Government to lay venue in the District of Columbia for Counts One, Two, Four, Six, Seven, and Eight of the Superseding Indictment.  Rule 29 Mot. at 18–23; Rule 29 Supp. at 2, 5.  This argument, too, is unsuccessful.

"Proper venue in criminal proceedings was a matter of concern to the Nation's founders." *United States v. Cabrales*, 524 U.S. 1, 6 (1998).  Accordingly, the Constitution guarantees a defendant the right to be tried where his crimes "have been committed."  U.S. Const. art. III, § 2, cl. 3; *see also* U.S. Const. amend. VI (guaranteeing a trial "by an impartial jury of the State and

district wherein the crime shall have been committed"). "The Government bears the burden of establishing by a preponderance of the evidence that venue is proper with respect to each count charged against the defendant." *United States v. Morgan*, 393 F.3d 192, 195 (D.C. Cir. 2004). When evaluating challenges to venue, courts "view the evidence in the light most favorable to the Government." *Id.*

Applying these standards, the Court concludes that the Government's evidence supports its decision to lay venue in the District of Columbia for each count on which the jury returned a verdict. The Court therefore declines to order a new trial based on Young-Bey's venue objections.

### 1. Count One: Conspiracy to Commit Mail and Bank Fraud

Young-Bey's argument against laying venue in the District of Columbia for Count One, Conspiracy to Commit Mail Fraud and Bank Fraud, is unsuccessful. *See* Rule 29 Supp. at 1–2. In a conspiracy case, venue is proper in any District in which an "overt act in furtherance of the conspiracy was committed." *Whitfield v. United States*, 543 U.S. 209, 218 (2005). The Government's evidence showed that Young-Bey committed such acts in this District when he recorded two fraudulent deeds in the Recorder's office, which is in the District of Columbia. *See, e.g.*, Trial Tr. Vol. III, ECF No. 211 at 100:10–108:5, 113:7–121:7; 143:24–145:18; Gov't Exs. 100, 102, 104. Venue was therefore properly laid in this District as to Count One.

### 2. Counts Two and Four: Mail Fraud

Young-Bey's objection to venue in this District for Counts Two and Four, both of which charge Mail Fraud in violation of 18 U.S.C. § 1341, also fails. *See* Rule 29 Supp. at 5. The Government's evidence showed that the mailings that gave rise to Counts Two and Four were sent from the Recorder's office in this District. *See* Trial Tr. Vol. III at 133:9–23, 137:19–23, 140:9–21, 141:19–142:16. As the Court has explained, these mailings were part of Young-Bey's

fraudulent scheme. *See* Part III.A.2 *supra*. Because the Government may lay venue in a mail fraud prosecution in any district in which the defendant "causes [mail] to be deposited," the Government properly laid venue in this District for Counts Two and Four. *See United States v. Singhal*, 876 F. Supp. 2d 82, 101 (D.D.C. 2012) (RCL); 18 U.S.C. § 1341.

### 3. Count Six: Conspiracy to Launder Monetary Instruments

Young-Bey also argues that it was improper to lay venue in this District for Count Six, Conspiracy to Commit Money Laundering. Rule 29 Mot. at 18–23. But the jury hung on Count Six. *See* Verdict Form as to Jeffrey Young-Bey, ECF No. 206 at 2. And the Court dismissed Count Six on the Government's motion. *See* Order, ECF No. 221. The Court therefore need not decide whether venue was proper as to Count Six.

### 4. Counts Seven and Eight: Expenditure Money Laundering

Finally, Young-Bey argues that venue was improper for Counts Seven and Eight, which charge Expenditure Money Laundering in violation of 18 U.S.C. § 1957, because "the Superseding Indictment fails to establish in any way that the financial institutions used to conduct the alleged transactions are connected in any way to the District of Columbia." Rule 29 Mot. at 21; *see also id.* at 18–23. This argument, too, is unsuccessful.

Venue is proper for a § 1957 money-laundering charge in either a "district in which the financial or monetary transaction is conducted" or, as relevant here:

> any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted.

18 U.S.C. § 1956(i)(1).

In this case the "underlying specified unlawful activity" was mail and bank fraud. *See* Superseding Indictment, ECF No. 141 at 10–11. As explained above, the mail fraud charges were

properly brought in the District of Columbia because Young-Bey's fraudulent scheme involved causing mail to be sent from the Recorder's office, which is located in this District. *See Singhal*, 876 F. Supp. 2d at 101; Trial Tr. Vol. III at 133:9–23, 137:19–23, 140:9–21, 141:19–142:16.

Further, the Government's evidence showed that Young-Bey "participated in the transfer of the proceeds" of that fraudulent activity to Maryland. In Maryland, Young-Bey took out loans against the fraudulent deeds, which were issued in the District of Columbia, and used those loans to purchase luxury cars. *See* U.S.C. § 1956(i)(1); Trial Tr. Vol. IV, ECF No. 212 at 248:7–23; 255:13–19, Trial Tr. Vol. V, ECF No. 213 at 6:2–20, 8:15–9:12, 9:19–20, 138:21–139:3, 150:8–20, 150:24–151:7. Because Young-Bey caused the Recorder to send a fraudulent deed from the District of Columbia to Maryland, he "participated in the transfer of proceeds" to the district where the wrongful transactions occurred. *See* 18 U.S.C. § 1956(c)(9) (defining "proceeds" to include "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity"). As a result, venue was proper in this District.

### D. Predicates for Aggravated Identity Theft

Finally, as a corollary to the arguments addressed above, Young-Bey argues that he is entitled to acquittal on Counts Nine through Thirteen, which all charged Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A. *See* Rule 29 Supp. at 3. To secure a conviction on these counts, the Government was required to show that Young-Bey committed certain acts "during and in relation to" enumerated predicate felonies. 18 U.S.C. § 1028A(a)(1). Those predicate felonies include mail fraud, bank fraud, and conspiracy to commit the same. *See id.* § 1028A(c)(5).

Because Young-Bey argues that he is entitled to acquittal on the conspiracy, mail fraud, and bank fraud counts, he concludes the identity-theft counts, "all of which relied on the predicate felony charges, must similarly fail." Rule 29 Supp. at 3. But as the Court has explained, the jury's

22

guilty verdicts on the predicate counts were well-supported.  And Young-Bey offers no other basis for disturbing the jury's guilty verdicts on Counts Nine through Thirteen.

*    *    *

Viewing the evidence in the light most favorable to the Government, and for all the reasons stated, the Court will **DENY** Young-Bey's Motion for Acquittal.

**IV. MOTION FOR NEW TRIAL**

The Court now turns to Young-Bey's Motion for New Trial.  Young-Bey asserts four arguments in support of his motion.  None entitle him to a new trial.  The Court takes them in turn.

### A.  Dismissal of Juror Number Four

Young-Bey first argues that the Court should order a new trial because the Court excused and replaced a juror who experienced a medical emergency early in the jury's deliberations. Because Young-Bey has not shown that the Court abused its discretion by excusing this juror or that the Court's decision to do so prejudiced him, the Court shall not order a new trial on this basis.

The Court may excuse a juror who is "unable to perform" his duties and replace him with an alternate.  Fed. R. Crim. P. 24(c)(1).  Whether to excuse a juror is a matter for the discretion of the trial court; "nothing in the rule or case law" requires the Court to "temper [its] discretion by performing any particular test to determine whether a juror is competent."  *United States v. Simpson*, 992 F.2d 1224, 1228 (D.C. Cir. 1993).  Although courts ordinarily prefer not to dismiss jurors after deliberations have begun, in this Circuit, "a district court may dismiss a deliberating juror," so long as the reasons for doing so are "'independent' of the juror's possible views of the evidence."  *United States v. Armstead*, 116 F.4th 519, 524 (D.C. Cir. 2024) (quoting *United States v. McGill*, 815 F.3d 846, 868 (D.C. Cir. 2016)).

In their post-verdict briefing, the parties accurately summarize the events that led the Court to dismiss one juror, Juror Number Four. In summary, after the jury had deliberated for about four-and-a-half hours, the Court received a note from the foreperson indicating that Juror Number Four was experiencing "medical issues," including "moments of hyperventilating," "profusely sweating," and memory problems rendering him "unable to remember a lot of our discussion." *See* Jury Notes, ECF No. 196 at 1. The note also indicated that Juror Number Four was "waiting to hear from his doctor." *Id.*

In response to the note from the foreperson, the Court called the parties to the courtroom for a sealed discussion on the record. The Court then summoned Juror Number Four and questioned him in the parties' presence. In response to questions from the Court, Juror Number Four stated that he was feeling somewhat better and thought he could continue to deliberate. But he also told the Court that his medical condition "varies," that there are times when his condition "flares up," and that there are "a lot" of different things that can trigger his symptoms.

After the Court finished questioning Juror Number Four, it directed that he be taken to a separate room to wait while the Court conferred with the parties. During the conference that followed, Young-Bey's counsel proposed that the Court allow Juror Number Four to continue to deliberate with the rest of the jury. Meanwhile, counsel for Young-Bey's co-defendant, Jones, asked that the Court excuse Juror Number Four and replace him with an alternate.

Soon afterward, the Courtroom Deputy informed the Court and the parties that she had brought Juror Number Four a bottle of water, which he had struggled to handle and ended up spilling "all over himself." The Courtroom Deputy then told the Court and the parties, "I think the nurse should come up." The Court agreed and asked that a nurse come to examine the juror. Young-Bey's counsel then argued that Juror Number Four should not be excused "unless and until

he says he can't perform his service." The Government disagreed and joined in Jones's request that Juror Number Four be excused because of his medical condition. The Court acknowledged the parties' positions and took a recess.

During the recess, the Court spoke briefly with Juror Number Four, in the presence of the Courtroom Deputy but outside the presence of the parties. When the Court spoke with the juror, he had unbuttoned his business shirt, exposing an undershirt, and he was repeatedly running his hands through his hair. A nurse then came and examined the juror in private. After this examination, the nurse advised the Court that Juror Number Four "should not" and "cannot" continue to participate in deliberations.

The Court then reconvened the parties and reported what had happened during the recess. The Court informed the parties of its impression that, in the interest of Juror Number Four's own health, he should be excused from further service and replaced with an alternate. The Court then asked the parties to state their positions. Defendant Young-Bey's counsel replied, "We understand, Your Honor, and have no further argument."

On this record, Young-Bey has not shown that the Court abused its discretion by excusing Juror Number Four. *See Simpson*, 992 F.2d at 1228. The Court concluded during trial and reiterates again today that Juror Number Four's serious medical condition was "just cause" for excusing him from continued service. *See United States v. Patterson*, 26 F.3d 1127, 1129 (D.C. Cir. 1994) (acknowledging that "a serious medical problem precluding further participation in the trial" may constitute just cause for excusing a juror during deliberations). This conclusion is based on the Court's own contemporaneous observations of Juror Number Four, the observations of the Court's Courtroom Deputy that he was unable to handle a water bottle, the symptoms described in the note the Court received from the jury, the recommendation of the nurse who examined Juror

25

Number Four that he "should not" and "cannot" continue to serve, and the juror's statements on the record that his condition "varies" and "flares up" in response to "a lot" of different triggers. The Court "balanced the nature of" Juror Number Four's medical condition "against the possible prejudice from the use of an alternate" and concluded that excusing him and recalling an alternate juror was the best course of action. *Simpson*, 992 F.2d at 1228. The Court did not abuse its discretion in evaluating that balance, and it therefore declines to order a new trial based on its decision to excuse Juror Number Four.

Finally, in his motion for a new trial, Young-Bey briefly suggests that it was improper for the Court to speak with Juror Number Four outside the presence of the parties and their counsel. Rule 33 Mot. at 6. The Court does not gainsay that any *ex parte* communication with a member of a deliberating jury is "perilous." *United States v. Harris*, 491 F.3d 440, 451 n.3 (D.C. Cir. 2007). Here, the Court took the unusual step of conferring with a juror outside the presence of the parties only because of the exigency of an apparent medical crisis. Under the circumstances, Young-Bey has not shown that he was prejudiced by the Court's brief *ex parte* conversation with Juror Number Four, in the presence of the Courtroom Deputy and a nurse, about the juror's health. The Court therefore shall not grant a new trial based on this brief conversation.

## B. Cross-Examination of Special Agent Douglas

Next, Young-Bey argues the Court erred by refusing to allow his counsel to cross-examine FBI Special Agent Durrell Douglas about statements his co-defendant Jones had made during an interview with the FBI. *See* Rule 33 Mot. at 7–13. Young-Bey argues that the Court misapplied the Federal Rules of Evidence when it precluded this line of questioning about his co-defendant's out-of-court statements. *Id.* at 9–10. And he further contends that the Court's ruling deprived him of his right to a fair trial under *Napue v. Illinois*, 360 U.S. 264 (1959). Rule 33 Mot. at 7; Rule 33

Supp. at 1–4.  Young-Bey is mistaken on both counts.

On direct, Douglas testified as to the investigative steps the FBI took in developing the case against Young-Bey and Jones.  On cross-examination, Young-Bey's counsel sought to develop the theory that the FBI had ignored evidence that Young-Bey was an unwitting participant in the schemes and that JLo was the true culprit.  The following exchange ensued:

> Q:    You also learned during your investigation that Mr. Young-Bey had a business associated named Joseph Lowery who went by JLo.  Is that correct?
>
> A:    During the course of my investigation?
>
> Q:    During the course of this case.
>
> A:    This case?
>
> Q:    I don't mean in trial today.  Before trial.
>
> A:    I don't recall seeing any information or documentation that shows that he was an associate of Mr. Young-Bey.
>
> Q:    Would it refresh your recollection to see a 302 where you noted that you had heard that somebody named JLo was an associate of Mr. Young-Bey's?

Trial Tr. Vol. VII at 155:21–156:10.  The term "302" refers to FBI Form 302, a form in which FBI agents memorialize the contents of their interviews.  In this instance, the relevant 302 documented Jones's proffer to the FBI.  The 302 recorded Jones's statements that (1) she met a man who introduced himself as JLo at her mortgage lender's office sometime in 2019 and (2) that she later encountered JLo again in the company of Young-Bey.

When Young-Bey's counsel showed the 302 to the Government, the Government objected, and the Court held a bench conference.

***Rules of Evidence.***  During the bench conference, the Government argued that Young-Bey's line of questioning was an effort to elicit hearsay statements made by Jones.  Trial Tr. Vol. VII at 156:23–157:4.  Young-Bey's counsel responded that he "wasn't going to mention Martina

Jones whatsoever" and would only inquire about whether the Douglas took any steps to investigate JLo "or if he focused his entire investigative attention instead" on Young-Bey. *Id.* at 157:5–13.

The Court noted, and Young-Bey does not dispute, that Jones's statement in the 302 itself was "definitely hearsay." Trial Tr. Vol. VII at 157:22. But recognizing that Young-Bey sought to refresh Douglas's recollection and ask him about why he did not investigate JLo (rather than introduce the 302 itself), the Court focused its attention on the prejudice that would result from such questioning. *See id.* at 157:25–160:21.

Because Jones's statements were hearsay, Douglas would have been constrained in answering questions related to his 302. *Id.* at 159:7–19. He could not, for example, have responded to the question by saying, "Now that my recollection has been refreshed, Jones once told me about a man named JLo, but she didn't say he was Young-Bey's business associate."

And more problems would have obtained on redirect. The Government did not investigate Jones's statements about JLo because she made them during a self-serving proffer in which she had minimized her conduct and misrepresented other facts. *See* Gov't's Opp'n at 27 n.5. In short, the Government "didn't believe her." Trial Tr. Vol. VII at 157:17–19. But the Court could not have allowed the Government to elicit this explanation on redirect. An FBI agent testifying that he thought Jones was a liar whose version of events could not be trusted would have been massively prejudicial to her. *Id.* at 160:15–19 (noting that such an explanation "is a problem in terms of their raising and frankly hurting Ms. Jones in the whole thing by indicating they don't think she's believable"). Federal Rule of Evidence 403 would have barred such testimony. (Even without the Court's intervention, the Government could not have drawn it out under the terms of its proffer agreement with Jones. *See* Gov't's Opp'n at 28.) For these reasons, as the Court explained at the time, allowing Young-Bey to probe Douglas's response (or lack thereof) to Jones's

out-of-court statements about JLo would have meant that Young-Bey "g[o]t to ask [his] question" while the Government "[would]n't get to respond." *Id.* at 159:4–6. Accordingly, the Court concluded that Young-Bey's questions would have unfairly prejudiced the Government.

The Court further concluded that Young-Bey's intended line of questioning was "not that probative." Trial Tr. Vol. VII at 160:12. As the Court observed, Jones's mention of JLo was only relevant to the extent it demonstrated the FBI failed to pursue other viable leads in its investigation of the mortgage frauds. *See id.* at 158:13–19. But even if Douglas could have explained what Jones told him out of court, his explanation would not have been particularly probative. Jones did not proffer that JLo had anything to do with the mortgage fraud scheme or her dealings with Young-Bey. At most, and if credited, her statement showed that she met a man named JLo with some connection to the real-estate business and that she later saw him with Young-Bey on one occasion. These statements did not tend to show that JLo was a viable suspect whom the FBI failed to investigate.

Rule 403 provides that trial courts "may exclude relevant evidence if its probative value is substantially outweighed by a danger . . . of unfair prejudice." And this Court has "considerable discretion to place reasonable limits on a criminal defendant's presentation of evidence and cross-examination of government witnesses." *United States v. Lathern*, 488 F.3d 1043, (D.C. Cir. 2007) (Kavanaugh, J.) (quoting *United States v. Whitmore*, 359 F.3d 609, 616 (D.C. Cir. 2004)). Exercising this discretion, the Court concluded that Young-Bey's intended line of questioning presented a danger of significant prejudice, either to his co-defendant or to the Government, and that the probative value of such questioning was low. For that reason, Young-Bey's question was properly stricken under Rule 403.

Even assuming the Court's ruling was error, that error was harmless. Young-Bey asked

Douglas about the extent of his investigation into other figures related to the case. *See, e.g.*, Trial Tr. Vol. VII at 161:5–171:23. And Young-Bey had ample opportunity to develop his theory that JLo masterminded the fraud schemes, seizing those opportunities throughout the trial. Faced with overwhelming documentary evidence and witness testimony demonstrating that Young-Bey, in fact, perpetrated the frauds, the jury rejected Young-Bey's more far-fetched explanation. And the Court cannot conclude that Young-Bey's inability to press Douglas on Jones's 302 "had a substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States*, 328 U.S. 750, 776 (1946).

Because Young-Bey has not convinced the Court that "a serious miscarriage of justice may have occurred" when he was prevented from questioning Douglas about Jones's statement, he is not entitled to a new trial on this basis. *Wheeler*, 753 F.3d at 208.

***Purported* Napue *Violation.*** Under *Napue* and its progeny, the prosecution's introduction of false testimony "deprives a defendant of a fair trial as required by the Fifth and Sixth Amendments. *United States v. Ausby*, 916 F.3d 1089, 1092 (D.C. Cir. 2019). The Government commits a *Napue* violation when it "introduces false or misleading testimony or allows it go uncorrected, even though the government knew or should have known that the testimony was false." *United States v. Straker*, 800 F.3d 570, 602 (D.C. Cir. 2015) (per curiam). But even then, "the grant of a new trial is not automatic. *Vega*, 826 F.3d at 529. Instead, the defendant must show that the testimony in question was material, meaning it "could have altered the outcome of the case." *Id.* at 531.

Young-Bey's argument fails at the first hurdle: Douglas's testimony was neither false nor misleading, and as a result, the Government had not obligation to correct it. Young-Bey's counsel asked Douglas whether he had "learned during his investigation that Mr. Young-Bey had a

business associate named Joseph Lowery who went by JLo." Trial Tr. Vol. VII at 155:21–23.
Douglas answered "no" and further clarified that he did not "recall seeing any information or
documentation that shows that [JLo] was an associate of Mr. Young-Bey." *Id.* at 156:3–7.

Douglas's answers were true. He had not learned that Young-Bey had a business associate
named Joseph Lowery. To the Court's knowledge, nothing in the FBI's investigation or the
evidence presented at trial indicated that JLo and Young-Bey were business associates. If such
evidence did exist, Young-Bey would no doubt have brought it to the jury's attention.

Young-Bey offers a strained argument that the 302 documenting Jones's proffer
contradicted Douglas's testimony and showed that the Government knew or should have known
Douglas's statements were a lie. The 302 stated that Young-Bey once "accompanied J.Lo" outside
a mortgage office. Reply at 17. And, Young-Bey notes, a dictionary defines "accompany" to
mean "to go with as an associate or companion." *Id.* (quoting *Accompany*, Merriam-Webster
Online Dictionary, https://www.merriam-webster.com/dictionary/accompany). So, Young-Bey
concludes, Douglas had in fact heard that Young-Bey and JLo were associates. *Id.* & n.17.

But in law as in life, words derive meaning from their context. *See* Antonin Scalia & Bryan
Garner, *Reading Law* 56 (2012). Young-Bey's counsel asked Douglas whether he learned that JLo
was a "business associate" of Young-Bey. Trial Tr. Vol. VII at 155:22. In this context, the fact
that Douglas once heard that JLo accompanied Young-Bey, or "went with him as an associate,"
did not mean he had heard the two were *business* associates. As the Court, Douglas, the
Government, and surely the jury understood, the question was whether JLo and Young-Bey were
partners or collaborators who worked together in the real-estate industry. They were not. Jones's

statements did not suggest otherwise.  And a dictionary definition stripped of all relevant context does nothing to establish the import of Douglas's answer to the listener in the moment.[4]

Because, understood in context, Douglas's answer was neither false nor misleading, the Government had no obligation to correct it.  As a result, there was no *Napue* violation.  And Young-Bey is not entitled to a new trial on this basis.

### C.  Cross-Examination Regarding Riyad Jelani

Young-Bey next argues that the Court committed reversible error by limiting lines of cross-examination that may have helped lay foundation for a defense theory.  Rule 33 Mot. at 13–15.  Specifically, he argues that the Court improperly prevented him from eliciting testimony about Riyad Jelani, whose parents Rashid and Ann Jelani owned the 12th Street property around the time of the events at issue in this case.  *Id.* at 14.  According to Young-Bey, some people told investigators that they believed Jelani or his parents may have sold the 12th Street property in a "side deal."  *Id.*  Young-Bey argues that it was error to limit his inquiries into Jelani and his role in a "side deal" sale of the property because doing so denied him "a full opportunity to lay a foundation upon which to seek the introduction of evidence vital to his defense."  *Id.* at 15.

Not so.  The Court limited cross-examination about Jelani and the suspected "side deal" because Young-Bey's intended lines of questions would have invited improper speculation about matters outside the witnesses' personal knowledge.  *See* Trial Tr. Vol. V at 48:21–54:19; Trial Tr. Vol. VI at 66:21–68:23; Trial Tr. Vol. VII at 48:25–49:2, 49:14–20, 209:16–213:5; *see also* Trial Tr. Vol. VIII at 7:23–11:17 (orally denying motion for reconsideration).

The Federal Rules of Evidence disallow witnesses from engaging in this kind of speculation.  *See* Fed. R. Evid. 602.  In federal court, "[a] witness [other than an expert witness]

---

[4] Consider, for example, 45 CFR § 16.103, which provides a nearly 500-word definition of the term "Business associate" that surely was not satisfied here.

may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." *Id.* The purpose of this rule is "to assure reliability" of testimony that is presented to the jury. *United States v. Lemire*, 720 F.2d 1327, 1347 (D.C. Cir. 1983). A district court has a duty to enforce this rule, and "the district court does not abuse its discretion in cutting off examination of a witness where the question would call for a speculative answer." *United States v. Stewart*, 104 F.3d 1377, 1384 (D.C. Cir. 1997).

The only bases in the record for the lines of questioning at issue here are reports from the FBI's investigation into the alleged transactions. These reports recount speculation by witnesses Jason Balin and John Settles that Jelani or another member of his family may have played a role in transferring the 12th Street property as part of a "side deal" with Young-Bey. *See* Trial Tr. Vol. V at 49:5–8, 49:18–21, 51:9–24; Trial Tr. Vol. VI at 64:25–65:5, 65:20–66:6. Neither these reports nor any other evidence in the record indicates any basis in personal knowledge for the witnesses' speculation: One report stated that "based on Balin's past experience, Balin *assumed* that Young-Bey had a side deal with Jelani to fix and flip the property," Trial Tr. Vol. V at 51:14–16 (emphasis added), while another stated that Settles "*believed* that Mr. Young-Bey had a . . . business relationship" with Jelani, Trial Tr. Vol. VI at 5:20–66:6 (emphasis added). The Court inquired whether either Balin or Settles had any basis in personal knowledge for forming these assumptions or beliefs, and Young-Bey's counsel offered none. *See* Trial Tr. Vol. V at 49:22–24, 51:25–52:2; Trial Tr. Vol. VI at 65:12–16. The Court therefore concluded that the proposed inquiries called for improper speculation. *See* Trial Tr. Vol. V at 54:5–11; Trial Tr. Vol. VI at 67:17–68:8. The Court also noted that the proposed lines of questioning risked confusing the issues before the jury. Trial Tr. Vol. V at 53:2–8; *see* Fed. R. Evid. 403.

Later, the Court denied Young-Bey's request to re-call witness Jason Balin to testify about the suspected "side deal" and a suspected fire insurance claim, for a similar reason: Young-Bey did not proffer a sufficient basis for concluding that Balin had personal knowledge of the relevant events. *See* Trial Tr. Vol. VII at 209:16–213:5; *see also* Trial Tr. Vol. VIII at 7:23–11:17 (orally denying motion for reconsideration). As the Court explained on the record, Balin "was called as a fact witness and not an expert witness," meaning that it would be improper for him to testify in the form of an opinion based on matters outside his personal knowledge. *See* Trial Tr. Vol. VIII at 11:3–12. Because nothing in the record supported the conclusion that Balin had personal knowledge about any suspected fire insurance claim, the Court did not permit him to testify about that subject. *See id.*

Young-Bey suggests that the Court's limitations on his questions regarding Jelani and the suspected "side deal" violated his right to present a defense, but the record does not support that argument. Rule 33 Mot. at 14–15; Def.'s Reply at 28–29. The right to present a defense is violated when a court precludes "all inquiry by the defense on a particular aspect of the case." *See Stewart*, 104 F.3d at 1384. But here, the Court left open multiple potential lines of inquiry into Jelani's role and the suspected side deal. The Court expressly advised counsel that Young-Bey was free to put on evidence of "contacts," "discussions," or anything else that may have formed a basis for Balin, Settles, or others to have personal knowledge about whether Jelani or a member of his family had made a "side deal" regarding the house. *See* Trial Tr. Vol. VI at 68:3–5, 68:19–21. The Court also advised counsel that Young-Bey was free to "re-call [Balin] if [Young-Bey could] . . . produce some evidence" supporting the theory that Jelani may have participated in a "side deal" regarding the 12th Street property. Trial Tr. Vol. V at 53:4–12. On this record, Young-Bey has not shown

that the Court violated his right to present a defense by improperly foreclosing "all inquiry" into a relevant topic. *See Stewart*, 104 F.3d at 1384.

In sum, the Court concludes that the limitation on Young-Bey's examination of witnesses concerning Jelani and the suspected "side deal" regarding the 12th Street property was not an abuse of discretion and is not grounds for ordering a new trial.

### D. Rule 404(b) Evidence

Finally, Young-Bey argues the Court erred by admitting the stipulated fact that he was convicted of bank fraud in 1995. Rule 33 Mot. at 15–18. Specifically, he argues that admitting the stipulated fact of the conviction was an abuse of discretion because the fact of the conviction alone, without supporting detail about the nature of the crime he committed, was substantially more prejudicial than probative. *See* Rule 33 Mot. at 15–18; Def.'s Reply at 29–31. Because Young-Bey has not shown that the Court abused its discretion by admitting this stipulation with an appropriate limiting instruction, the Court shall not order a new trial based on this argument.

The stipulation that the Court read to the jury was as follows: "[I]n 1995, Defendant Young-Bey was convicted of bank fraud in the United States District Court for the Eastern District of Virginia." Feb. 2 Tr., ECF No. 216, at 29:8–10. Immediately after reading this stipulation to the jury, the Court gave the following limiting instruction, which is based on the D.C. Criminal Jury Instruction 2.321:

> So you've just heard this stipulation that Defendant Young-Bey was convicted of bank fraud in 1995. It's up to you to decide whether to accept that evidence. If you find that Defendant Young-Bey was convicted of bank fraud, you may use this evidence only for the limited purpose of deciding whether the Government has proved beyond a reasonable doubt that in this case Defendant Young-Bey had the requisite intent and that he acted knowingly and on purpose, not by mistake or accident. You may not use this evidence for any other purpose.
>
> Defendant Young-Bey is only on trial for the crimes charged. Defendant Young-Bey is not charged in this case with any offense relating to this prior bank fraud

conviction. And you may not use this evidence to conclude that he has a bad character or that Defendant Young-Bey has a criminal personality.

The law does not allow you to convict Defendant Young-Bey simply because you believe he may have done bad things not specifically charged as crimes in this case.

Trial Tr. Vol. VIII, ECF No. 216 at 29:14–30:7. The Court repeated this instruction in its closing instructions to the jury before they began deliberating. Trial Tr. Vol. X, ECF No. 223 at 38:3–19.

Young-Bey argues that the Court erred by admitting this stipulation because it had previously ruled that the 1995 bank-fraud conviction was inadmissible. Rule 33 Mot. at 15 (citing Mem. Op. & Order, ECF No. 122, at 9). But as the Government correctly notes, Young-Bey misconstrues the Court's prior ruling. *See* Gov't's Opp'n at 36.

Before trial, the Court concluded that Young-Bey's 1995 conviction was not admissible as *impeachment* evidence under Federal Rule of Evidence 609. Mem. Op. & Order, ECF No. 122, at 8–9. That rule allows the admission of evidence of some convictions as impeachment evidence against a defendant who chooses to take the stand in his own defense. *See* Fed. R. Evid. 609. But it places limits on admissibility, especially for older convictions: If "more than 10 years have passed" since the defendant was convicted or released from confinement, whichever is later, a conviction is admissible as impeachment evidence "only if . . . its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." *Id.* (b)(1). If less than 10 years have passed, the evidence must be admitted against a defendant who takes the stand "if the probative value of the evidence outweighs its prejudicial effect to that defendant." *Id.* (a)(1)(B). In this case, the Court concluded before trial that Young-Bey's 1995 conviction did not satisfy either standard if offered for the purpose of impeaching Young-Bey's credibility as a witness. Mem. Op. & Order, ECF No. 122, at 9.

Contrary to Young-Bey's argument, the Court admitted the stipulation that he now challenges for a different purpose, under a different Rule of Evidence, and in a different context than the Court was evaluating in the pretrial ruling that he cites. Rather than admitting the stipulation as impeachment evidence, as the Court declined to do before trial, the Court concluded based on the parties' arguments during trial that Young-Bey's prior conviction was admissible under Federal Rule of Evidence 404(b) to show "intent . . . , knowledge, . . . absence of mistake, or lack of accident." *See* Mem. Op & Order, ECF No. 185, at 3–9. The probative value of this evidence became apparent only after opening arguments at trial, when Young-Bey began to mount a defense that he was an unwitting participant in a scheme led by JLo, with no knowledge of the fraudulent character of the alleged transactions. *See id.* at 6; Trial Tr. Vol. III, ECF No. 211 at 64:4–12, 66:19–71:9.

As the Court explained in a Memorandum Opinion and Order issued during trial, Young-Bey's prior conviction for a similar crime had significant probative value as non-propensity evidence to rebut his defense of unwitting participation in bank fraud. *See* Mem. Op. & Order, ECF No. 185, at 4–9. In short, the fact of Young-Bey's prior conviction, even without any of the supporting details, was relevant to show that he had "knowledge" of fraudulent schemes against banks, and that evidence served the non-propensity purpose of rebutting his trial argument that he was an unsuspecting participant in someone else's scheme. *See id.*

The Court took account of the fact that the 1995 conviction was "stale," but it nonetheless concluded that the conviction was probative evidence in light of all the circumstances. *Id.* at 5–6. The Court then weighed the conviction's probative value against the risk of unfair prejudice to Young-Bey, taking into account the risk that the jury would interpret the prior conviction as propensity evidence or draw any other improper inference. *Id.* at 5–9. After evaluating that risk,

weighing it against the conviction's probative value, and considering relevant precedent from this Circuit and beyond, the Court admitted the conviction with an appropriate limiting instruction. *Id.* at 9. For all the reasons stated in the Court's prior Memorandum Opinion and Order, ECF No. 185 at 3–9, which the Court hereby incorporates and makes part of this Opinion, the Court's decision to admit this evidence with a limiting instruction was consistent with precedent and not an abuse of discretion. *See United States v. McCarson*, 527 F.3d 170, 174 (D.C. Cir. 2008).

\*    \*    \*

In sum, Young-Bey is not entitled to a new trial because has not shown any error that was "substantial" and "not harmless" that "'affected [his] substantial rights.'" *See United States v. Safavian*, 644 F. Supp. 2d 1, 8 (D.D.C. 2009) (PLF), *aff'd*, 649 F.3d 688 (D.C. Cir. 2011). Nor has he shown that this case is one of "those limited circumstances" in which a new trial is warranted because "'a serious miscarriage of justice may have occurred.'" *Wheeler*, 753 F.3d at 208 (quoting *United States v. Rogers*, 918 F.2d 207, 213 (D.C.Cir.1990)). The Court shall therefore **DENY** his [228] Motion for a New Trial.

## V. CONCLUSION

Accordingly, the Court shall **DENY** Young-Bey's [228] Motion for a New Trial and [229] Motion for Judgement of Acquittal. An appropriate Order accompanies this Memorandum Opinion.

**DATED:** February 28, 2025.



COLLEEN KOLLAR-KOTELLY
United States District Judge