IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JEFFREY M. YOUNG-BEY,<br><br>Defendant. | Case No. 21-CR-661 (CKK) |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

Over the course of seven short months—November 2019 through April 2020—Defendant Jeffrey Young-Bey stole title to two townhomes in Washington D.C. worth well over half a million dollars each. On the basis of lies, forged documents, and a fake notary stamp he purchased for thirty-five dollars at an engraving store in Rockville, Young-Bey systematically and methodically defrauded and wreaked havoc in the lives and business operations of the following: (1) Roosevelt Twiggs and Prell Allison Davis, the rightful owners of 164 Bryant Street NW (the "Bryant Street Property"); (2) Ann and Rashid Jelani, the owners of 7712 12th Street NW (the "12th Street Property"); (3) the D.C. Recorder of Deeds Office (the "Deeds Office"); (4) Jason Balin, the owner of Hard Money Bankers ("Hard Money"); (5) David Edlavitch, the owner of Brennan Title Company; (6) John Settles and Dennis Argerson, small business owners and long-time real estate investors; (7) Richard Levine, the owner of RBL Ventures; (8) three title companies, including Stewart Title, Fidelity National Title, and Marvel Title; (9) Patricia Davis, a certified notary; and (10) Scott Regnier, the owner of R.S. Rubber Stamp. As a result of his campaign of fraud, Young-Bey convinced Hard Money to loan almost $600,000 from the equity in two houses that he did not own, money he used to purchase two BMWs. And when his fraud came to light and he was brought

1

to trial, he blamed a drug-addicted young man with mental health issues and a phantom criminal mastermind he called "J-Lo."

This Court should put a stop to Young-Bey's repeated fraud and abuse of the system. The U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines") appropriately recognize that Young-Bey's crimes were extremely serious and his criminal history long and disturbing. According to the Presentence Investigation Report ("PSR"), the defendant's Guidelines offense level for his counts of conviction is a level 31. PSR ¶ 53. The PSR also assessed the defendant three criminal history points which places him in a criminal history category II. PSR ¶ 74. His applicable guidelines sentencing range is therefore 121-151, followed by a mandatory 24-month sentence for counts nine through thirteen. The factors set forth in 18 U.S.C. § 3553(a)—specifically, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offense and promote respect for the law, and the need for both specific and general deterrence—demand a significant custodial sentence. In light of the harm caused by the defendant and to send a clear message to other would-be fraudsters, the government respectfully submits that a sentence of 143 months[1] in custody for counts one through five to be run concurrently, followed by a 24-month consecutive sentence for counts nine through thirteen to be run concurrently to one another, appropriately balances the § 3553(a) factors. The Court should also impose three years of supervised release and order Young-Bey to pay restitution in the amount of $678,400. Such a sentence is sufficient but not greater than necessary to achieve the goals of sentencing.

**FACTUAL BACKGROUND**

Because the Court is well-familiar with the facts and history of this case, *see* ECF No. 241,

---

[1] The government calculates 143 months to be the top-quarter of the advisory sentencing guidelines range.

Memorandum Opinion Denying Post-Trial Motions ("Post-Trial Opinion"), this memorandum does not set out the evidence adduced at trial in great detail. As the Court explained in its thorough Post-Trial Opinion:

> At trial, the Government proved that Young-Bey orchestrated a scheme to steal the title to two properties in Washington, D.C. and convince a bank to loan money against those properties. The first property, 164 Bryant Street NW (the "Bryant Street property"), had been owned by Roosevelt Twiggs for fifty years. But Young-Bey created a fake deed purporting to transfer the Bryant Street property to an entity owned and controlled by Jones. He then bought a notary stamp, forged the relevant signatures and seals, and brought the fraudulent deed to the D.C. Recorder of Deeds (the "Recorder"). In doing so, he tricked the Recorder into memorializing Jones's ownership of the Bryant Street property and caused the Recorder to mail the deed to Jones.
>
> Then, using the fraudulent deed, Young-Bey and Jones worked together to strike a deal with Hard Money Bankers ("Hard Money"), a real-estate financier. Young-Bey and Jones lied to Hard Money, telling them that Jones had inherited the Bryant Street property and that Jones was renting it to a non-existent tenant. With the fake deed and a fake lease in hand, Young-Bey and Jones convinced Hard Money to lend Jones $350,000 against the Bryant Street Property. When Jones received the money, she wired half of it to Young-Bey at his direction. And Young-Bey used these proceeds to buy a BMW with a cashier's check.
>
> Later, Young-Bey repeated the scheme on his own. This time, he prepared a deed purporting to transfer title to 7712 12th Street NW (the "12th Street property") from Ann and Rashid Jelani to a company he controlled. He then took the deed to the Recorder with the Jelanis' forged signatures and the same fake notary stamp he had used before. Once again, Young-Bey tricked the Recorder into memorializing his ownership of the 12th Street property and caused the Recorder to mail the deed to an address he provided for his company. Then, Young-Bey exploited the recorded deed to secure a $225,604 wire transfer and used the proceeds to purchase yet another BMW with a cashier's check.
>
> To explain away the copious documentary evidence showing his participation in this scheme, Young-Bey argued to the jury that he was a scapegoat. In Young-Bey's telling, Joseph Lowery—"JLo"—had masterminded the frauds, taken advantage of him, and pretended to be him by repeatedly using his email address, cell phone, and credit card. Young-Bey further contended that, to the extent he participated in the frauds (rather than being impersonated by JLo), he did so without knowledge of the scheme and in good-faith reliance on others' representations.

*See* Post-Trial Opinion at 2-3.

The jury clearly rejected Young-Bey's far-fetched story and convicted him of 12 of 13 counts: one count of conspiracy to commit mail and bank fraud (Count One); two counts each of mail fraud and bank fraud (Counts Two to Five); two counts of expenditure money laundering (Count Seven and Eight); and five counts of aggravated identity theft (Counts Nine to Thirteen). *See* Verdict, ECF No. 206.

## ARGUMENT

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Although the Guidelines are advisory, they are nevertheless "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id*. at 49. Accordingly, they are the "starting point and the initial benchmark" for sentencing. *Id*.

After calculating the applicable Guidelines range, the Court must then consider the applicable factors set forth in 18 U.S.C. § 3553(a). The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the Guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a)(1)-(7).

A.  **Sentencing Guidelines Calculations**

The PSR calculates the total offense level as follows:

| | |
|---|---:|
| Base Offense Level, U.S.S.G. § 2B1.1(a)(1) | 7 |
| Specific Offense Characteristics, § 2B1.1(b) | |
|     Loss more than $1.5 million, § 2B1.1(b)(1)(I) | +16 |
|     Substantial Financial Hardship, U.S.S.G. § 2B1.1(b)(2)(A)(iii) | +2 |
|     Sophisticated Means, § 2B1.1(b)(10)(C) | +2 |
| Victim Related Adjustment | |
|     Vulnerable Victim, § 3A1.1(b)(1) | +2 |
| Role in the Offense | |
|     <u>Organizer, leader, manager, supervisor, § 3B1.1(c)</u> | <u>+2</u> |
| **Total Offense Level** | **31** |

The government agrees that the PSR accurately calculates the total offense level. With a Criminal History Category II, Young-Bey's recommended Guidelines range is calculated to be 121 months to 151 months. PSR ¶ 168. The government understands that the defendant objects to most, if not all, of the Guidelines adjustments. The government addresses the applicability of each below.

    i.  **Calculation of Loss**

In the context of financial crimes covered by U.S.S.G § 2B1.1, the relevant "harm" contemplated by Section 1B1.3(a)(3) is "loss." Because courts must consider both actual harm and intended harm under Section 1B1.3(a)(3), for purposes of calculating "loss" under Section 2B1.1, courts must consider both "actual loss" and "intended loss." And Section 2B1.1(b)(1) instructs Courts to apply the greatest of actual or intended loss. *United States v. Horn*, 129 F.4th

5

1275, 1300 (11th Cir. 2025)

"The cumulative loss produced by a common scheme or course of conduct should be used in determining the offense level, regardless of the number of counts of conviction." U.S.S.G. §2B1.1 n.20; *see also* U.S.S.G. §1B1.3 (loss is calculated based on all relevant conduct, including charged and uncharged conduct). "Because of the difficulties often associated with attempting to calculate loss in a fraud case, the district court 'need only make a reasonable estimate' of the loss using a preponderance of the evidence standard." *United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013); *see also United States v. Bras*, 483 F.3d 103, 112 (D.C. Cir. 2007) ("loss need not be determined with precision" and may be a "reasonable estimate . . . given the available information."); U.S.S.G. §2B1.1 n.3(C). The fair market value of the property unlawfully taken is a reasonable basis to calculate loss. U.S.S.G. §2B1.1 n.3(B)(i).

The PSR reasonably and appropriately determined the value of both the 164 Bryant Street Property and the 12th Street Property. With respect to the 164 Bryant Street Property, the PSR took an average of the estimated value between two public source databases, Redfin and Zillow. *See* PSR ¶ 43. As a result of those estimated values, the PSR concluded that the value of the 164 Bryant Street Property was $739,085. With respect to the 12th Street Property, the PSR compared the price the Jelanis sold the home for and the price the home ultimately sold after it had been renovated. The PSR concluded that the value of the 12th Street Property was $1.1 million. Accordingly, the loss arrived at in the PSR was $1,839,085. Defendant did not attempt to take portions of these real properties, he fraudulently took title to the entire property and the intended loss is therefore the $1,839,085 figure calculated by the PSR. Even assuming, however, that those estimates are not valid ways of estimating loss, the evidence adduced at trial based on the tax assessments listed on FP-7s placed the value of the 164 Bryant Street Property at $659,000 and

the 12th Street Property at $639,230. 1.26.24 Tr. at 154, 162. Using those estimates, the loss total would be $1,298,230.

### ii. Substantial Hardship

The PSR includes a 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(iii), which applies when an offense results in the "substantial financial hardship to one or more victims." *See* PSR ¶ 44. In determining whether this adjustment applies, the Guidelines instruct the Court to consider, "among other factors, whether the offense resulted in the victim – . . . (iii) suffering substantial loss of a retirement, education, or other savings or investment fund." *See* U.S.S.G. § 2B1.1, Application Note 4 (F). In determining whether the substantial hardship enhancement applies, the Court should "focus on the victim['s] individual circumstances," "plac[ing] greater emphasis on the extent of harm to that particular victim suffer[s]." *United States v. Iwuanyanwu*, 69 F.4th 17, 25 (1st Cir. 2023) (citing *United States v. George*, 949 F.3d 1181, 1185 (9th Cir. 2020) (rejecting defendant's argument that stealing from victims already financially ruined is no reason to reduce the weight of this theft's substantial financial hardship on those victims). "[W]hether a loss has resulted in a substantial hardship (or substantial loss to a savings account as in this case) will, in most cases, be gauged relative to each victim." *See United States v. Minhas*, 850 F.3d 873, 877-78 (7th Cir. 2017).

As explained in the PSR, Roosevelt Twiggs, an 81-year old chemist who retired from civil service with the U.S. Bureau of Engraving, has still been unable to transfer the deed to the 164 Bryant Street Property back into his name, resulting in Mr. Twiggs being unable to evict the current tenant. *See* PSR ¶ 44; *see also* Ex. A. As a result, Mr. Twiggs has lost $2,000 per month for the past five years and has been forced to pay property taxes and upkeep on the 164 Bryant Street Property out of his personal savings, which have now been depleted. *Id*. Mr. Twiggs has also been

7

forced to take out a home-equity loan to cover these costs, a loan he never would have incurred but for Young-Bey's fraud. Mr. Twiggs and his wife struggle to buy groceries at this point. There is no serious debate whether Young-Bey's fraud caused Mr. Twiggs to suffer serious financial hardship. *See generally United States v. Iwauanyanwu*, *supra*., 69 F.4th at 24 (finding that $6,000 taken from a disabled and unemployed victim of a romance scam met the criteria for substantial hardship when that amount constituted approximately 6 months of the victim's income from government benefits); *United States v. Aderinoye*, 33 F.4th 751, 757 (5th Cir. 2022) (finding that even a temporary loss can cause substantial hardship, particularly for a small business).

### iii. Sophisticated Means

The Guidelines provide for a two-level enhancement if the offense conduct involved "sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C). The commentary to the Guidelines explains that "'sophisticated means' means especially complex or especially intricate offense conduct." *Id*. § 2B1.1 cmt. n.9 (emphasis omitted). "Conducting an offense in multiple jurisdictions 'ordinarily indicates sophisticated means.' So too does the use of 'fictitious entities, corporate shells, or offshore financial accounts' to conceal the fruits of an unlawful scheme." *United States v. Milligan*, 77 F.4th 1008, 1013 (D.C. Cir. 2023) (citing *United States v. McCants*, 554 F.3d 155, 163 (D.C. Cir. 2009) (internal citations omitted). The examples listed in the commentary are "simply illustrative, not exclusive," and the enhancement can apply to "conduct less sophisticated than the list articulated in the application note." *Id*. (citing *United States v. Jennings*, 711 F.3d 1144, 1147 (9th Cir. 2013) (collecting cases).

The PSR correctly applied the sophisticated means enhancement. *See* PSR ¶ 45. Here, Young-Bey used a sham corporate entity, First Democracy Mortgage Investors Group ("First

8

Democracy"), to conduct the fraud. Young-Bey obtained a lease from a "we-work" type company, Regus, to give First Democracy a veneer of legitimacy. 2.1.24 Tr. at 14. Young-Bey also directed his accomplice, Martina Jones, to re-instate her own LLC, Upper Beauty Level Salon, to steal title to the 164 Bryant Street Property.

Similarly, Young-Bey fabricated fake deeds and rental lease agreements, forged signatures on the agreements, pulled lease and deed templates from the internet, both of which were necessary to conceal the fraud. He purchased a fake notary stamp and forged the name of the notary, Patricia Davis, on both deeds. Young-Bey also used specialized knowledge of real-estate financing and the databases maintained by the Deeds Office to identify the previous owners of the 164 Bryant Street Property and the 12th Street Property. He opened a checking account with Bank of America in the name of his sham entity and drafted checks to the D.C. Government to cover the real estate transfer taxes. After using the checks to push through this fraudulent transfer, he exploited a delay in the DC government check processing and immediately placed a stop-payment order on the checks, so that he never had to pay the money. All of these actions were designed to cover his tracks.

He then researched lenders, provided con-stories to title companies, and cycled through companies until he found a set of lenders and titles companies that would offer him a deal—of course, these companies lacked the knowledge that the entire transaction was built on lies. He then created fake construction plans to submit to Hard Money Bankers when taking out a construction loan on the 12th Street Property. It all worked as planned. Young-Bey's scheme was sophisticated enough to fool Hard Money Bankers, the settlement companies, and the downstream buyers of the 12th Street Property. Because Young-Bey's conduct lies "in the same zone of sophistication" as the conduct at issue in *Milligan*, the sophisticated means enhancement applies. *Milligan*, 77 F4th at 1014.

### iv. Vulnerable Victim

The vulnerable victim enhancement applies if "the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S. Sentencing Guidelines Manual § 3A1.1. The commentary to the enhancement explains that a vulnerable victim is someone "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *Id.* cmt. n. 2. *United States v. Fareri*, 712 F.3d 593, 595 (D.C. Cir. 2013).

It is telling that the Defendant did not target newly built properties throughout Washington, D.C. He targeted a property owned by an 81-year-old man and the family trust of a deceased prior part owner. Circumstantially, it is clear that the Defendant purposefully targeted a vulnerable victim because he did not think they would notice the error as fast as the owner of a newly built property, a younger victim, or a homeowner living in the residence.

### v. Organizer, Leader, Manager, or Supervisor

Under U.S.S.G. § 3B1.1(c), an "organizer, leader, manager, or supervisor in any criminal activity" receives a two-level enhancement based on the aggravating role played by the defendant. In order for the enhancement to apply, the defendant must have organized, led, managed, or supervised at least one other participant. U.S.S.G. § 3B1.1, comment (n.2); *see also United States v. Smith*, 374 F.3d 1240, 1250 (D.C. Cir. 2004) ("All persons receiving an enhancement [under Section 3B1.1] must exercise some control over others.") (cleaned up). When determining whether to apply the enhancement, the Court should consider several factors, including the exercise of decision making authority by the defendant, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of

10

the illegal activity, and the degree of control and authority exercised over others. U.S.S.G. § 3B1.1, comment (n.4).

The evidence at trial made clear that Young-Bey was running the show and providing direction to his accomplice, Martina Jones. Jason Balin, owner of Hard Money Bankers, explained that Young-Bey was his primary point of contact for the 164 Bryant Street Property loan. *See* 1.29.24 Tr. at 262-270. Balin communicated with Young-Bey repeatedly during the loan application process, including by providing instructions regarding loan documents. Id. In each instance, Young-Bey told Balin that he would ensure that Jones took all of the necessary steps to ensure the loan was funded. *Id*. Likewise, Young-Bey told the settlement processor for the 164 Bryant Street Property transaction that he the "middleman" with the transaction because Jones was "not very savvy with real estate matters." *Id*. at 100-01.

Multiple emails shown at trial also demonstrated that Young-Bey was shepherding Jones through the loan application process. When Balin asked for Articles of Organization for Upper Level, Young-Bey emailed Jones and asked if she had gotten the articles. *See* GX 931. Young-Bey obtained a fake lease for a non-existent tenant, which he forwarded to Jones for her signature. *See* GX 976, 977. Jones then forwarded a signed copy of the fraudulent lease to Balin. And when Jones had been wired the funds from the title company, Young-Bey could not have been clearer with his directions to Jones about what to do with the funds:

```
From:       Jeffrey Young-Bey <fdminvestors@gmail.com>
Sent:       Wednesday, January 1, 2020 3:34 PM
To:         martina jones
Subject:    Wiring Instructions

First Democracy Mortgage Investors
Acct. Number:
446024335661
Wire Routing Number:
#026009593.
```

```
From:       Jeffrey Young-Bey <fdminvestors@gmail.com>
Sent:       Wednesday, January 1, 2020 3:36 PM
To:         martina jones
Subject:    Wiring instructions, part 2

$161,612.47 is the amount to be sent. This is half of what you received.
```

*See* GX 900, 901. Following Young-Bey's management of the scheme, Jones wired Young-Bey his half of the proceeds of the fraud. The evidence and testimony clearly demonstrated that Young-Bey was calling the shots, organizing the scheme from start to finish, and ensuring the scheme got over the finish line. Accordingly, the PSR correctly applied the § 3B1.1(c) enhancement.

    **B.**    **3553(a) Factors**

Young-Bey's crime was brazen, sophisticated, and intentional. He preyed on vulnerable victims not because he was destitute or desperate. Instead, he stole the most valuable asset owned by Roosevelt Twiggs and the Jelanis so he could buy himself fancy cars. And when it came time to own his conduct, Young-Bey tried to cast himself as the victim. To this day, he refuses to acknowledge the harm he has caused. His pattern of lies and repeated abuse of the system warrants a lengthy period of incarceration.

    **1. The Nature and Circumstances of the Offense**

12

Roosevelt Twiggs continues to pay the price of Young-Bey's crimes. Twiggs has been unable to obtain clear title to the 164 Bryant Street property. As a result, he is unable to generate steady rental income from the property. And yet, Twiggs continues to pay taxes on the property, cover the utility bills, and incur necessary costs to maintain the property. Mr. Twiggs has depleted his personal savings, taken out home equity loans, and struggles to buy groceries. The defendant's response? Twigg's losses "cannot reasonably be tied to any offense conduct" and are expenses "any homeowner would reasonably have to pay by virtue of owning and maintaining their house." ECF No. 247 at 8. But that's exactly the point: because of Young-Bey's fraud, Mr. Twiggs does not own his own home. Young-Bey continues to spin narratives that are untethered to reality and reflect a shocking lack of remorse. For Mr. Twiggs, Young-Bey's offense has had profound consequences.

But the ramifications of Young-Bey's scheme are not limited to Mr. Twiggs. His fraud affected not only the rightful owners of the two properties he targeted, but also multiple parties who were caught up in the fraud, including the settlement companies, the lenders, the title companies, and the downstream purchaser of the 12th Street Property, who have also sustained losses as a result of litigation to sort out the title and rightful ownership of the home. Young-Bey's fraud resulted in hundreds of thousands of dollars in actual loss, money that will likely never be fully repaid.

Finally, the means used to orchestrate the fraud demonstrate Young-Bey's utter disdain for systems that are meant to prevent fraud like this from occurring. The Deeds Office requires real estate documents to be notarized to ensure the integrity of transactions. Not only did Young-Bey forge the deeds, he purchased a knock-off notary stamp that he used to trick the Deeds Office. In doing so, he stole and used the identity of an actual D.C. notary. He also lied to Hard Money

Bankers with a fake lease he downloaded from rocketlawyer.com. And because his scheme worked so well with the 164 Bryant Street Property, he did it again. Put simply, Young-Bey repeatedly lied, created fraudulent documents, manipulated multiple real estate professionals, and abused the system so that he could pocket more than half a million dollars. His deliberate scheme demands a significant period of incarceration.

### 2. The Need for Deterrence and to Promote Respect for the Law

A Guidelines sentence would also promote respect for law and deter other would-be fraudsters, particularly when this type of fraud scheme is not uncommon in the District. A significant period of incarceration would send a clear message to individuals in the real-estate field that the legal system will hold criminals who target unsuspecting homeowners. The amount of federal resources necessary to detect and prove this type of offense means that the number of such prosecutions is limited, and thus a sentence that carries a strong general deterrent effect is important.

### 3. The History and Circumstances of Defendant

Young-Bey's criminal history spans 19 pages in the PSR. He began his criminal career at the age of 21, with a 1978 conviction for receiving stolen property. PSR ¶ 55. Two years later he was convicted of uttering without sufficient funds, also known as passing bad checks. PSR ¶ 56. In 1981, he was again convicted for passing bad checks. PSR ¶ 60. Again in 1981, he was convicted for passing bad checks. PSR ¶ 61. In 1984 he was convicted for 1st degree theft. PSR ¶ 62. Again in 1984, he was convicted for passing bad checks. PSR ¶ 63. In 1986 he was convicted for Bank Fraud. PSR ¶ 65. In 1988, he was convicted of the sale or receipt of a stolen vehicle. PSR ¶ 67. In 1993, he was again convicted of forgery relating to passing bad checks. PSR ¶ 69. He was once again convicted of Bank Fraud in 1995. PSR ¶ 70. Attempted rape and false imprisonment in 1997

were the first violent offense for Young-Bey and they resulted in the most significant sentence, 25 years imprisonment. PSR ¶ 71. That brings us to present date, while Young-Bey was in arrears on restitution on his 1995 Bank Fraud conviction and under supervision in his attempted rape conviction, he orchestrated this entire scheme. Young-Bey's criminal history is appalling.

The fact that Young-Bey targeted distressed or abandoned properties and his complete lack of remorse says much about Young-Bey's character and the dim prospect that he will reform his ways. Nor is Young-Bey mentally or emotionally incapable of avoiding crime. To the contrary, he used his intelligence and knowledge of the real estate business to exploit it. Simply put, he is a career criminal and fraudster and has never once reformed, after myriad and continuous convictions dating back nearly 50 years.

### C. Restitution is Mandatory

Under the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, the Court is required to order restitution to the victims. If an offense involves a "scheme, conspiracy, or pattern of criminal activity," as in this case, the MRVA permits broad restitution. 18 U.S.C. § 3663A(a)(2). The government requests that at the time of the sentencing hearing, the Court order restitution in the amounts set forth in the below table[2]:

| Victim | Amount of Loss |
|---|---|
| Roosevelt Twiggs | $144,000 |
| Stewart Title Company | $379,500 |
| Fidelity National Title Company | $135,000 |
| Richard Levine | $19,990 |

---

[2] The amounts reflected in this table are set forth in Exhibit A to this Memorandum. The government continues to receive documentation of losses from victims of Young-Bey's fraud and reserves the right to submit a supplemental statement of loss as new information is received.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Court should sentence defendant to a term of 143 months in custody for counts one through five to be run concurrently, followed by a 24-month consecutive sentence for counts nine through thirteen to be run concurrently to one another, followed by three years of supervised release and to order defendant to pay restitution to the victims (in amounts to be determined and allocated at the sentencing hearing), but at least $678,400. This within Guidelines' sentence is appropriate given the § 3553(a) factors here and represents a sentence that is sufficient but not greater than necessary to achieve the purposes of sentencing.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:    /s/*Christopher R. Howland*
Christopher R. Howland
Kevin Rosenberg
Assistant United States Attorneys
D.C. Bar No. 1016866 (Howland)
601 D Street, N.W.,
Washington, D.C. 20530
202-252-7106 (Howland)
Christopher.Howland@usdoj.gov